

U.S. Department
of Transportation
**Federal Aviation
Administration**

Office of the Chief Counsel

800 Independence Ave., S.W.
Washington, D.C. 20591


Glenn P. Wicks, Esq.
Roncevert D. Almond, Esq.
The Wicks Group PLLC
1215 17th Street, N.W.
Sumner Square, Fourth Floor
Washington, D.C. 20036

AUG 2 2 2008


RE:  Opinion on the Runway Safety Area Project at Tweed-New Haven Airport

Dear Messrs. Wicks and Almond:

This is in response to your request for an opinion on the power of non-proprietors to regulate airport development within the existing boundaries of an airport. In the context of the Town of East Haven's use of its zoning powers to prevent Tweed-New Haven Airport (Airport) from enlarging its runway safety areas[1] (RSAs) at each end of its air carrier runway, you ask specifically whether "a non-proprietor municipality's improper attempts to regulate the construction of an aviation safety project being carried out by the [Airport] Authority, an airport sponsor, entirely within the boundaries of the Airport and under the authority, approval, and supervision of the federal and state governments," would be federally preempted.

Based upon the information in your letter and articulated below, our conclusion is that the Town of East Haven is federally preempted from using its police powers to prevent the Airport from attempting to comply with current FAA RSA standards, as recently mandated by Congress, through enlarging its sub-standard RSAs at either end of Runway 2/20 to meet those standards.

I.  Background:

The Tweed-New Haven Regional Airport Authority is the sponsor of the Tweed-New Haven Regional Airport (Airport). Opened in 1931, the Airport is a primary, commercial service, public-use airport, and a recipient of Airport Improvement Program (AIP) funds from the Federal Aviation Administration (FAA). The Airport, which has scheduled air carrier service, is included in the FAA's National Plan of Integrated Airport Systems (NPIAS) and

---

[1] A "runway safety area" is an unobstructed area along the sides and at the end of a runway, the dimensions of which are determined by the type of aircraft that use the airport. RSAs consist generally of a grass surface or other prepared surface to safely accommodate an aircraft that makes an excursion from the runway. At Tweed-New Haven, the enlarged RSAs will provide a level area free of obstructions for aircraft to roll to a safe stop without substantial damage to the aircraft or injury to passengers. Standard size RSAs will also provide a clear, level area to accommodate emergency, rescue, and/or firefighting vehicles and associated activities.

has an operating certificate as required by 49 U.S.C. 44706, "Airport operating certificates," and its implementing regulations, 14 C.F.R. Part 139.

The Airport is located in both East Haven and the City of New Haven. The municipal boundary runs approximately down the center of Runway 2/20, with East Haven to the east and New Haven to the west. This arrangement has led to numerous disputes and judicial challenges concerning the Airport and its operations. Since 1967, the Town of East Haven has filed a series of lawsuits opposing the expansion of the Airport.[2]

In 1967 and 1969, New Haven and the FAA entered into agreements that committed the United States to fund an extension of the Airport's principal runway from 4,771 to 5,660 feet to facilitate the use of jet aircraft. Although all of the extended runway was physically in New Haven, the city purchased some 73 acres in East Haven for use as a runway protection zone.[3] In 1970, the Connecticut Supreme Court held that the acquisition of property violated state law because East Haven did not have a chance to approve or disapprove the sale. The court ordered New Haven to cease operating the Airport's principal runway at the expanded length, thus prohibiting overflying the area of East Haven which it held had been illegally acquired. The City of New Haven continued to operate the extended runway until the state court issued a contempt order. New Haven then closed the runway. The United States then sued for a preliminary injunction to restrain enforcement of the state court order so that the runway could become operational again.

In United States v. City of New Haven, 447 F.2d 972 (2d Cir. 1971), the court affirmed the district court's granting of the government's motion for preliminary injunction. The United States had argued that the runway protection zones "embrace navigable air space which are within the sole jurisdiction of the federal government," (447 F.2d at 973) and that the United States had asserted that it "possesses and exercises complete and exclusive national sovereignty in the airspace of the United States." Id. The government also took the position that the navigable airspace included "airspace needed to insure safety in the takeoff and landing of aircraft," and that state legislation "purporting to deny access to navigable air space would constitute a forbidden exertion of the power which the federal government has asserted." Id.

---

[2] E.g., Town of East Haven v. Eastern Airlines, Inc., 470 F.2d 148 (2d Cir. 1972), cert. denied 411 U.S. 965 (1973); Town of East Haven v. City of New Haven, 271 A.2d 110 (Conn. 1970); U.S. v. City of New Haven, 447 F.2d 972 (2d Cir 1971); U.S. v. City of New Haven, 496 F.2d 452 (2d Cir 1974); Town of East Haven v. City of New Haven, 337 A.2d 668 (1975); City of New Haven v. Town of East Haven, 402 A.2d 345 (1977); Leach v. City of New Haven (Civil No. N 85-71) (1988); Melillo v. City of New Haven, 732 A.2d 133 (1999); City of New Haven v. Town of East Haven, 2000 WL 33124032 (Conn. Sup. Ct. 2000); City of New Haven v. Town of East Haven, 822 A.2d 376, 389 (2001); City of New Haven v. Town of East Haven, 818 A.2d 741 (2003).

[3] The court used the term "clear zones" but that term has since been superseded by "runway protection zones" (RPZ). FAA Advisory Circular 150/5300-13, "Airport Design," Change 13, para. 212, p. 13. A "runway protection zone" is "an area off the runway end to enhance the protection of people and property on the ground. Id. at 3. RSAs are smaller than RPZs and generally fit the larger RPZ. As noted, the purpose of RPZs, which are trapezoidal in shape, is to protect people and property on the ground. RSAs primarily enhance the safety of the pilot and passengers.

Three years later, in United States v. City of New Haven, 496 F.2d 452 (2d Cir. 1974), the United States sought to make permanent the preliminary injunction granted before. The court affirmed the district court's granting of the permanent injunction. The Second Circuit stated that "it is quite evident ... that the airspace above the East Haven land acquired by New Haven is within the meaning of 'clear zone' [i.e., runway protection zone].... The clear zones, as part of the navigable airspace, are subject to federal regulation, and the orders of the Connecticut courts infringed upon the federal power." 496 F.2d at 454.

> Thus, the order of the New Haven Superior Court was directed to and conflicted squarely with the regulation of navigable airspace which Congress has reserved for exclusive federal control. To the extent that it prevents aircraft from using navigable airspace it is unenforceable under the supremacy clause and may properly be enjoined by a federal court, despite the broad sweep of the anti-injunction statute.... Id.

Tweed-New Haven currently has sub-standard RSAs at either end of Runway 2/20, its principal, air carrier runway.[4] The Airport has been able to operate with RSAs that do not meet the requirements of the FAA because of a grandfather clause in the regulations (see below). As will be explained, that grandfather clause is now disfavored by Congress.

RSAs enhance the safety of air travelers by providing a buffer zone at runway ends in the event of emergencies. Specifically, they provide an area for aircraft which undershoot, overrun, or veer off the runway, and they provide direct access for firefighting and rescue equipment and personnel during such incidents. The FAA defines an RSA as a "defined surface surrounding the runway prepared or suitable for reducing the risk of damage to airplanes in the event of an undershoot, overshoot, or excursion from the runway ... The RSA is intended to enhance the margin of safety for landing or departing aircraft." FAA Advisory Circular 150/5300.13, "Airport Design," pp. 3, 22. RSAs must be capable of "supporting airplanes without causing structural damage to the airplanes or injury to their occupants." Id. at 139.

Title 49 of the United States Code, section 44706, requires airports that serve air carriers operating aircraft designed for at least 31 passenger seats, such as Tweed-New Haven, to have an "airport operating certificate." 49 U.S.C. 44706(a). The statute required the FAA to draft implementing regulations establishing "terms" for airport operating certificates "necessary to ensure safety in air transportation." 49 U.S.C. 44706(b).

Section 44706's implementing regulations, 14 C.F.R. Part 139, require in turn that each certified airport, "in a manner authorized by the Administrator[5] ... to provide and

---

[4] The Runway 2 end does not have a standard RSA because of the close proximity of a brook and degraded wetlands. The Runway 20 end does not have a standard RSA because of the close proximity of Dodge Avenue and the brook.

[5] Under FAA Order 5200.8, "Runway Safety Area Program," the FAA's objective is that all certificated airports shall conform to the standards in AC 150/5300-13, "Airport Design," "to the extent practicable." FAA Order 5200.9 (March 15, 2004) offers guidance for the practicability determination by comparing various RSA improvement alternatives with improvements that use Engineered Material Arresting Systems (EMAS), and

maintain, for each runway and taxiway that is available for air carrier use, a safety area" of certain dimensions (14 C.F.R. 139.309(a), (a)(1), and (a)(2)):

- At least those dimensions that "[e]xisted on December 31, 1987, if the runway or taxiway had a safety area on December 31, 1987, and if no reconstruction or significant expansion of the runway or taxiway was begun on or after January 1, 1988;" or

- At least those dimensions that "[a]re authorized by the Administrator at the time the construction, reconstruction, or expansion began if construction, reconstruction, or significant expansion of the runway or taxiway began on or after January 1, 1988."

Each certificated airport must maintain its RSAs as follows:

> (1) Each safety area must be cleared and graded and have no potentially hazardous ruts, humps, depressions, or other surface variations.
> (2) Each safety area must be drained by grading or storm sewers to prevent water accumulation.
> (3) Each safety area must be capable under dry conditions of supporting snow removal and aircraft rescue and firefighting equipment and of supporting the occasional passage of aircraft without causing major damage to the aircraft.
> (4) No objects may be located in any safety area, except for objects that need to be located in a safety area because of their function. These objects must be constructed, to the extent practical, on frangibly mounted structures of the lowest practical height, with the frangible point no higher than 3 inches above grade.

> 14 C.F.R. 139.309(b)(1)(2)(3)(4).

Finally, 14 C.F.R. 139.309(c) states that FAA advisory circulars "contain methods and procedures for the configuration and maintenance" of RSAs acceptable to the Administrator.

The Part 139 RSA requirements are in turn implemented by FAA Advisory Circular (AC) 150/5300-13, "Airport Design" (Sept. 29, 1989 and incorporated changes 1-13). Grant-funded airports such as Tweed-New Haven are required to comply with the AC.

The "Airport Design" AC sets forth the various RSA design standards, including RSA dimensions. As noted, the required size RSAs for Tweed-New Haven's Runway 2/20, to the extent practicable, are 500 feet wide by 1,000 feet long. Table 3-3, AC 150/5300-13 CHG 12 (Jan. 3, 2008). RSAs "shall be cleared and graded and have no potentially hazardous ruts, humps, depressions, or other surface variations," and be "capable ... of supporting snow removal equipment, aircraft rescue and firefighting equipment," and be "free of objects." Id., CHG 7, p. 21.

---

determining the maximum financially feasible cost for RSA improvements, whether they involve EMAS or not.

Under paragraph 305(c) of the AC, "Sub-standard RSAs," RSA standards "cannot be modified or waived like other airport design standards ... A continuous evaluation of all practicable alternatives for improving each sub-standard RSA is required until it meets all standards for grade, compaction, and object frangibility." Id. "Today, modification to standards no longer apply to runway safety areas." Id. at 139.

As noted, FAA safety standards require RSAs of 1,000 feet in length for each end of Runway 2/20 based on the type of aircraft that currently use and are reasonably forecast to use Tweed-New Haven. At the present time, there is only 200 feet of RSA length available at both ends of Runway 2/20.

Over the years, Congress has indicated its concern about sub-standard RSAs. In 1993, a House Report demonstrates Congress' apprehension

> about the problem of inadequate safety areas beyond the ends of runways at certificated airports. This deficiency has resulted in airline accidents which could have been prevented. The standards for safety areas were changed in 1987, and some areas that did not meet the new standards were "grandfathered," [such as Tweed-New Haven] meaning they continued to be certificated even though they failed to meet the new standards. In order to help remedy this problem and bring these airports up to current standards, the FAA should, within six months of enactment, complete a study and a cataloging of runways used by air carriers at certificated airports to determine which runway safety areas do not meet current FAA standards. Within six months of enactment, the FAA should also determine the costs and feasibility of bringing these runway safety areas up to standards.

> H. Rep. No. 103-240, Sept. 14, 1993, 103d Cong., 1st Sess. 1994 U.S.C.C.A.N. 1676, 1993 WL 356742.

In FY 2000, the FAA started an ambitious program to accelerate RSA improvements for commercial service runways that do not meet standards. The FAA developed a long term completion plan that will ensure that all practicable improvements are completed by 2015.

In 2005, Congress amended 49 U.S.C. 44706 to require all certificated airports, such as Tweed-New Haven, to come into compliance with FAA RSA standards. Congress mandated "[t]hat not later than December 31, 2015, the owner or operator of an airport certificated under 49 U.S.C. 44706 shall improve the airport's runway safety areas to comply with the Federal Aviation Administration design standards required by 14 CFR part 139...." Congress also required the FAA to report annually to the Congress "on the agency's progress toward improving the runway safety areas at 49 U.S.C. 44706 airports." Pub. L. No. 109-115, div. A, title I, 119 Stat. 2401 (Nov. 30, 2005); see also 49 U.S.C. 44706, note. A June 14, 2008 Senate Report again noted Congress' concern about RSAs that do not conform to FAA standards:

> [f]unding for grants-in-aid to airports pays for capital improvements at the Nation's airports, including those investments that emphasize capacity development, safety

improvements, and security needs. Other priority areas for funding under this program include improvements to runway safety areas that do not conform to FAA standards....

S. Rep. No. 110-418 (June 14, 2008), 110th Cong., 2d Sess., 2008 WL 2736832.

When the FAA's RSA improvement initiative began in FY 2000, there were a total of 453 RSAs requiring improvement. Since then, significant progress has been made and 63 percent of the RSA improvements have been completed. By the end of 2010, 88 percent of RSA improvements will be completed, leaving only 54 to meet the 2015 goal. Testimony of Hang Krakowski, Chief Operating Officer, Air Traffic Organization, FAA, before the House Subcommittee on Aviation on Improving Runway Safety (Feb. 13, 2008).

According to your letter, the Airport adopted a master plan in 1983, which was substantially updated between 2000 and 2002. Phase One involved preparation of an environmental impact statement (EIS) concerning RSA and taxiway improvements. Phase Two involves the actual construction and funding of the RSA project[6], and is broken out into two stages. Stage One involves the Runway 2 (south) end, where inland and tidal wetlands mitigation will occur and the construction of a standard RSA measuring 500 feet wide by 1,000 feet long. Stage Two involves the Runway 20 (north) end, where a brook will be channeled, a municipal road (Dodge Avenue) will be moved 500 feet to the north, and a modified standard RSA, measuring 500 feet wide by 1,000 feet long (950 feet in the northeast corner) will be constructed. You state that all of the construction work related to Stage One of the RSA Project, other than tide gate modifications required for tidal wetland mitigation, will take place within the existing boundaries of the Airport.

The enlargement of the sub-standard RSAs to meet FAA requirements is being funded under the Airport and Airway Improvement Act (AAIA), 49 U.S.C. 47101, et seq. The FAA issued a grant for Stage One in the amount of $10,050,000.00. Funds for Stage Two in the amount of $10,762,968.00 have been requested by the Authority from the FAA for Fiscal Year 2008. The FAA has committed to pay 95% of the total project cost. The FAA has provided substantial discretionary funding for both Stages based on its determination that the project is a necessary element of the airport layout plan.

In the early 1990s, the FAA began an EIS process during which the environmental impacts of the RSA projects were identified and assessed. The EIS process, and specifically the identification of alternatives to the proposed activities, involved significant municipal and public participation. Municipal officials and members of the public were given the opportunity to raise potential alternatives, express comments and participate in FAA's alternatives assessment process. The extensive FAA analysis was then submitted to the United States Army Corps of Engineers ("Corps of Engineers"), the United States Environmental Protection Agency ("EPA"), the Federal Emergency Management Agency ("FEMA"), the Connecticut Office of Policy and Management ("COPM"), the Connecticut Department of Transportation ("CTDOT"), and the Connecticut Department of Environmental Protection ("DEP"). The FAA's Record of Decision ("ROD") for the RSA

---

[6] In this letter, "project" refers to the RSA projects at either end of Runway 2/20, unless stated otherwise.

project was signed in 2002.  Subsequently, after applications based on detailed final design drawings and numerous public hearings, the project was approved by the above federal and state agencies.

As the Airport began undertaking Stage One of the project pursuant to the state and federal approvals, East Haven's town engineer instructed the Airport's construction contractor not to locate its trailer on the East Haven side of the Airport property.  On February 5, 2008, East Haven's Inland Wetland and Watercourse Commission issued a "Notice: Stop Work Cease and Desist Order," asserting regulatory power over the project, and prohibiting any "filling, construction and/or use" and "the placement of material, removal of material, alteration of wetlands and watercourses and the removal of vegetation...."

Again, according to your letter, on or about February 13, 2008, the Airport and East Haven agreed to a 60-day moratorium on the project to provide time for the parties to seek a political resolution. During that moratorium, the Airport, with the active cooperation of New Haven, attempted to craft a settlement under which East Haven would be compensated for any harms East Haven may perceive flowing from the project. The discussions did not bear fruit.  On February 27, 2008, the Airport advised the East Haven Wetland & Watercourse Commission that East Haven lacked jurisdiction to regulate the project, and asked that East Haven withdraw its Cease & Desist Order.  East Haven refused to do so. The voluntary moratorium on commencement of the project expired on April 21, 2008.

On April 21, 2008, the Tweed-New Haven Airport Authority filed a Complaint, Motion for Preliminary Injunction, and Motion for Ex Parte Temporary Restraining Order in United States District Court, District of Connecticut, to prevent East Haven from blocking the RSA project.  Trial begins on August 25, 2008.

## II.  Preemption Principles

Under the Supremacy Clause of the United States Constitution, art. VI, cl. 2, state and local laws that "interfere with, or are contrary to," federal law are invalid and preempted. Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211 (1824). The existence of preemption is a matter of congressional intent.  Gade v. National Solid Wastes Management Ass'n, 112 S.Ct. 2374, 2381-82 (1992).  It may be either explicit in a statute's language, or implicit in the legislation's structure and purpose. Id. at 2383; Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977).  There are two types of implied preemption -- "field preemption" and "conflict preemption."

Under field preemption, the federal scheme of regulation is "so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). On the other hand, if Congress has not completely displaced state regulation of a particular area, conflict preemption may exist either where "compliance with both federal and state regulations is a physical impossibility," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress." Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  The Supreme

Court has noted, however, that these categories are not rigid and may overlap in many cases. Gade, 112 S.Ct. at 2386, n. 2. The Court has also stressed the importance in any preemption inquiry of determining "whether state regulation is consistent with the structure and purpose of the [federal] statute as a whole," not merely an isolated sentence or provision. Id. at 2383; see also id. at 2383-84. Further, while the purpose of a state law is a factor for consideration, the effects of that law on the overall federal regulatory scheme must be assessed as well. Id. at 2387-88. Notwithstanding the importance to a state of its own law, it must yield to federal law when there is a conflict. Smallwood v. Office of Thrift Supervision, 925 F.2d 894, 897 (6th Cir. 1991) (and cases cited). Finally, federal regulations, as well as federal statutes, may preempt state law. Moreover, local ordinances are examined in the same way as state statutes for purposes of a preemption analysis. Hillsborough County v. Automated Medical Lab, Inc., 471 U.S. 707, 713 (1985).

### III.  The Federal Government's Comprehensive Role in Airspace Regulation, Public Airport Development and Design, and Noise

#### A.  The Federal Aviation Act of 1958 (49 U.S.C. 40101, et seq.)

The Federal Aviation Act of 1958 (FAA Act), as amended and recodified, 49 U.S.C. 40101, et seq., was enacted to create a "uniform and exclusive system of federal regulation" in the field of air safety. Air Transport Association of America, Inc. v. Cuomo, 520 F.3d 218, 224-225 (2d Cir. 2008), citing City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 639 (1973). The FAA Act "was passed by Congress for the purpose of centralizing in a single authority-indeed, in one administrator-the power to frame rules for the safe and efficient use of the nation's airspace." ATA v. Cuomo, 520 F.3d at 224 (internal citations omitted). Congress and the FAA have used this authority to enact rules addressing virtually all areas of air safety. These regulations range from a general standard of care for aircraft operating requirements to the details of the contents of mandatory onboard first-aid kits. Id.

Several provisions of the FAA Act explicitly preempt state law.[7] As noted above, 49 U.S.C. 44706 requires airports that serve air carriers operating aircraft designed for at least 31 passenger seats, such as Tweed-New Haven, to have an "airport operating certificate." 49 U.S.C. 44706(a). This section's implementing regulations, 14 C.F.R. Part 139, require each certificated airport, "in a manner authorized by the Administrator,... to provide and maintain, for each runway and taxiway that is available for air carrier use, a safety area" of certain dimensions. The regulation points to FAA advisory circulars that "contain methods and procedures for the configuration and maintenance" of RSAs acceptable to the Administrator. 14 C.F.R. 139.309(4)(c).

In 2005, Congress amended 49 U.S.C. 44706 to require all certificated airports to come into compliance with FAA RSA standards. Congress mandated "[t]hat not later than December 31, 2015, the owner or operator of an airport certificated under 49 U.S.C. 44706

---

[7] For example, state laws relating to "a price, route, or service of an air carrier" are explicitly preempted. 49 U.S.C. 41713(b) (1). This, however, does not limit a state or political subdivision that owns or operates a commercial airport (such as New Haven) "from carrying out its proprietary powers and rights." 49 U.S.C. 41713(b) (3).

shall improve the airport's runway safety areas to comply with the Federal Aviation Administration design standards required by 14 CFR part 139...." Congress also required the FAA to report annually to the Congress "on the agency's progress toward improving the runway safety areas at 49 U.S.C. 44706 airports." Pub. L. No. 109-115, div. A, title I, 119 Stat. 2401 (Nov. 30, 2005); see also 49 U.S.C. 44706, note.

Another example of express preemption includes the regulation of the airspace: "The United States Government has exclusive sovereignty of airspace of the United States." 49 U.S.C. 40103(a) (1). Congress has declared that, in exercising that sovereignty, safety must be "the highest priority in air commerce." 49 U.S.C. 40101(a)(1).[8]

Complementing both that safety policy and the express preemption of airspace regulation are numerous other provisions that concern, directly or indirectly, runway safety and configurations. For example, the FAA Act directs the FAA to "assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace," and to prescribe regulations for "protecting individuals and property on the ground" and "preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects." 49 U.S.C. 40103 (b)(1), (2)(B), (D) (emphasis added). In City of Burbank, the Supreme Court cited the prior version of those sections of the FAA Act, along with the provision explicitly recognizing United States sovereignty over the nation's airspace, and noted the direct relationship between airspace management and airport congestion. See 411 U.S. at 626-627. It repeated the Court's observation many years earlier: "[t]he moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls.'" Id. at 634 (quoting Northwest Airlines v. Minnesota, 322 U.S. 292, 303 (1944)). Referring to FAA regulations on "takeoff and landing procedures and runway preferences," the Supreme Court thus concluded that the

> Aviation Act requires a delicate balance between safety and efficiency * * * and the protection of persons on the ground. * * * The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled. * * * [F]ractionalized control of the timing of takeoffs and landings would severely limit the flexibility of FAA in controlling air traffic flow.

Id. at 638-39 (emphasis added).

Other provisions of the FAA Act also demonstrate the necessary and unavoidable relationship between the control of airspace and runway placement, improvement, and use.

---

[8] Courts have had little difficulty in finding federal preemption of local regulation of activities directly implicating the airspace. See, e.g., National Helicopter Corp. of America v. City of New York, 137 F.3d 81, 92 (2d Cir. 1998) ("the law controlling flight paths through navigable airspace is completely preempted ....[t]he proprietor exception, allowing reasonable regulations to fix noise levels at and around an airport at an acceptable amount, gives no authority to local officials to assign or restrict routes."); Blue Sky Entertainment, Inc. v. Town of Gardiner, 711 F. Supp. 678, 690-95 (N.D.N.Y. 1989) (FAA Act and FAA regulations preempt town ordinances that regulate parachute-jumping); Command Helicopters, Inc. v. City of Chicago, 91 F. Supp. 1148, 1150-51 (N.D. Ill. 1988) (FAA Act and federal regulations preempt city ordinance restricting helicopter load-lifting operations).

For instance, the FAA Act requires the FAA to "make long range plans and policy for * * * the orderly development and location of air navigation facilities, that will best meet the needs of, and serve the interests of, civil aeronautics and the national defense." 49 U.S.C. 44501(a) (emphasis added). An "air navigation facility" includes a "landing area," which, in turn, includes "an airport." 49 U.S.C. 40102 (a)(4)(A), (28). In United States v. City of Berkeley, 735 F. Supp. 937, 940 (E.D. Mo. 1990), the court recognized that "the establishment and improvement of air navigation facilities for the safety of the public" was an important Congressional objective. It thus held that a city building code was preempted by the FAA Act and could not impede construction of an airport radar facility located on land within the city. Id. To ensure "conformity with [the FAA's] plans and policies for, and allocation of, airspace * * * under section 40103(b) (1)," the FAA Act further requires airports, whether federally funded or not, to give the FAA prior notice of the substantial alteration of any runway. 49 U.S.C. 44502(c) (1), (2). The FAA is also authorized to inspect air navigation facilities (which, as noted above, include landing areas) and to prescribe minimum safety standards for operating an airport. 49 U.S.C. 44701(b) (2), 44708. Moreover, it issues operating certificates to airports, which "shall contain terms necessary to ensure safety in air transportation," such as friction treatment for runways. 49 U.S.C. 44706(b); see 14 C.F.R. Part 139.

Runway development and placement, which necessarily includes RSAs to the extent practicable, has a direct effect on flight operations and substantially affects the use of airspace. As both the Act itself and the self-evident realities of air traffic control demonstrate, the FAA's regulation of airspace throughout the nation is necessarily and inextricably linked to the placement and use of airport runways and taxiways at the nation's commercial service airports. For example, safety considerations require that runway location and orientation take account of local topography, wind velocity and direction, airspace availability, and obstructions to air navigation. Runways that are designed and located -- or shut down in order to satisfy local zoning ordinances can result in inefficiencies, congestion, and delays, both in the air and on the ground, that reverberate throughout the nation's integrated air transportation system. Worse yet, they could create safety concerns. On the other hand, runway improvements that focus on and fulfill the FAA's nationwide air traffic control needs can produce efficiencies and safety benefits that enhance air commerce throughout the United States. In similar circumstances,[9] the Ninth Circuit in Burbank-Glendale-Pasadena,[10] 979 F.2d 1339 (9th Cir. 1992), relied largely on the FAA Act and the Supreme Court's reasoning in city of Burbank in holding that

> [t]he proper placement of taxiways and runways is critical to the safety of takeoffs and landings and essential to the efficient management of the surrounding airspace. The [non-proprietor city's] regulation of runways and taxiways is thus a direct

---

[9] The Burbank Airport, which is located within the city of Los Angeles, sought to cure certain safety deficiencies in takeoff and landing procedures by extending its runways and taxiways on a parcel of land it already owned. Los Angeles enacted an ordinance that required the airport to obtain its prior approval before undertaking the runway reconstruction project.

[10] But see Burbank-Glendale-Pasadena Airport Authority v. City of Burbank, 136 F.3d 1360 (9th Cir. 1998), cert. denied, 525 U.S. 873 (1998) (based upon Ninth Circuit precedent, because the Authority was a political subdivision, it lacked standing under federal law to challenge the constitutionality of a state statute).

interference with the movements and operations of aircraft, and is therefore preempted by federal law.

979 F.2d at 1341.

The court added: "Stated simply, a nonproprietor municipality may not exercise its police power to prohibit, delay, or otherwise condition the construction of runways and taxiways at a non-city-owned airport." Id.

Although the Ninth Circuit's discussion of the FAA Act is limited, as discussed above, the FAA Act's grant of regulatory authority to the federal government to control the airspace necessarily encompasses the placement, size, and configuration of runways, including RSAs.

    B.  The Airport and Airway Improvement Act of 1982 (AAIA),

        49 U.S.C. 47101, et seq.

In addition to the FAA Act, the AAIA prescribes a dominant role for the FAA in airport development. See 49 U.S.C. 47101-47153. "Airport development" encompasses "constructing, repairing, or improving a public-use airport." 49 U.S.C. 47102(3) (A). The AAIA is not merely a funding statute; indeed, the financing provisions are separate from the significant program responsibilities the statute imposes on, and the national interest considerations entrusted to the FAA. See 49 U.S.C. 48101-48110. Rather, the AAIA gives the federal government substantial oversight responsibilities in all aspects of airport planning and development, even where federal funding is not provided.

The "highest aviation priority" among the AAIA's enumerated policies is "the safe operation of the airport and airway, system." 49 U.S.C. 47101(a)(1). Another policy is that "airport construction and improvement projects" to increase facility capacity should "be undertaken to the maximum feasible extent so that safety and efficiency increase and delays decrease." 49 U.S.C. 47101(a)(7). Congress has also directed the AAIA to "be carried out consistently with a comprehensive airspace system plan, giving highest priority to commercial service airports, to maximize the use of safety facilities," including numerous runway enhancements. 49 U.S.C. 47101(f). Perhaps most significant, under the AAIA, the Secretary of Transportation ("the Secretary") must develop and maintain a "'national plan of integrated airport systems'" (the NPIAS or National Plan), which "shall include the kind and estimated cost of eligible airport development the Secretary * * * considers necessary to provide a safe, efficient, and integrated system of public-use airports adequate to anticipate and meet the needs of civil aeronautics," the national defense, and the Postal Service. 49 U.S.C. 47103(a). Tweed-New Haven Airport is among the public airports included in the NPIAS/National Plan.

The FAA conducts a detailed review of all such airport improvement plans and prepares the appropriate environmental analysis pursuant to the National Environmental Policy Act NEPA), 42 U.S.C. 4321, et seq. A grant for a development project will be approved only if the airport sponsor complies with certain environmental and other requirements. See

49 U.S.C. 47106 (a)(b)(c). For instance, the airport sponsor must show that it has or will acquire good title to land used for runways, and that "the interests of the community in or near which the project may be located have been given fair consideration." 49 U.S.C. 47106(b) (1), (2). See, e.g., Communities. Inc. v, Busey, 956 F.2d 619 (6th Cir.) (discussing extensive FAA review process and upholding FAA approval of plan to improve and expand Louisville airport), cert. denied, 113 S.Ct. 408 (1992); see also City of Grapevine v. Department of Transp., 17 F.3d 1502 (D.C. Cir.), cert. denied, 115 S.Ct. 635 (1994).[11]

Various other provisions of the AAIA reflect a similar sensitivity to a wide range of state and local concerns. See, e.g., 49 U.S.C. 47101(a) (5) (federal policy encourages development of various modes of transportation in way that will serve state and local communities efficiently and effectively); 47101(g) (in carrying out policy of section 47101(a) (5), Secretary shall cooperate with state and local officials in developing airport plans based on overall transportation needs); 47106(a) (1) (airport project must be consistent with plans of state-authorized agencies for development of area surrounding airport); 47106(c) (1) (A)(i) (airport sponsor must provide public hearing to consider economic, social, and environmental effects of airport location and its consistency with planning objectives carried out by community); 47107(a) (10) (appropriate action, including zoning laws, must be taken to restrict use of land near airport to uses compatible with normal airport operations).

A strong inference may be drawn from the AAIA that Congress intended the extensive FAA review process to be the forum in which state and local communities are to express their views on airport development projects. See, e.g., 49 U.S.C. 47106(C) (1) (A) (ii) (if community where airport is located does not have voting representation on airport management board, airport sponsor must notify communities of their "right to petition the Secretary about a proposed project").

If a grant under the AAIA is approved, the airport sponsor must provide numerous "assurances" to the FAA concerning, inter alia, the operation of the facility and acquisition of land.[12] 49 U.S.C. 47107(a) - (e). Among the ongoing obligations that attach to each and every federal grant is that the airport will maintain a current airport layout plan and will not make any alteration of the airport without the FAA's prior approval. 49 U.S.C. 47107(a) (16). Thus, even in the unlikely event that an airport could and would forgo federal funding for a runway improvement project, it must nonetheless submit its development plan to the FAA for prior approval in order to fulfill a condition of a prior federal grant. This serves to protect the investment that the federal government (and the taxpayers) has already made in a particular airport. As a result, an airport that has been receiving federal airport grants cannot simply avoid any potential conflict between federal law and local, non-proprietor zoning regulations simply by foregoing federal funding.

---

[11] A party dissatisfied with the FAA's decision to approve or deny such a proposal may seek judicial review in the court of appeals. 49 U.S.C. 46110, 47106(d) (3).

[12] Under its sponsor assurances, Tweed-New Haven is required to comply with AC 150/5300-13, "Airport Design."

Notwithstanding the FAA's extensive role in public airport development, the AAIA does not direct the federal government to decide where to build airports, or whether and where an existing airport should acquire additional property onto which it can expand.[13] The design of the federal statutory scheme is to place the primary responsibility for such decisions on the airport proprietors, while giving the protection of federal law to developments that the proprietors might propose; see Griggs v. Allegheny County, 369 U.S. 84, 89 (1962); Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 197 (D.C. Cir.), cert. denied, 502 U.S. 994 (1991); Suburban O'Hare Commission v. Dole, 787 F.2d 186, 196 (7th Cir.), cert. denied, 479 U.S. 847 (1986). See also 49 U.S.C. 47102(2) (A) (land must be an "airport," as defined by the AAIA, for federal statute to apply). As a result, the expansion of an airport within its existing boundaries is a matter within the FAA's jurisdiction and interest,[14] whereas the initial siting of an airport and the subsequent expansion of an airport beyond its existing boundaries are subject to the traditional power of state and local authorities to control land use. See, e.g., Dallas/Fort Worth Int'l Airport Bd. v. City of Irving, 854 S.W.2d 161, 168 (Tex. Ct. App.) ("[n]o one disputes that federal laws preempt local-regulation within the boundaries of an airport"), vacated as moot, 868 S.W.2d 750 (Tex. 1993); cf. City of Burbank, 411 U.S. at 653 (Rehnquist, J., dissenting) ("[a] local governing body could * * * use its traditional police power to prevent the establishment of a new airport or the expansion of an existing one within its territorial jurisdiction by declining to grant the necessary zoning"). As stated above, the AAIA contemplates that airport development will take place only after a local sponsor submits an application to the FAA for a new or expanded facility. See 49 U.S.C. 47106(b).

In City of Cleveland v. City of Brook Park, 893 F. Supp. 742 (N.D. Ohio 1995), the court addressed non-proprietor ordinances designed to impede airport development. To meet projected traffic increases and to continue operating safely, Cleveland Hopkins International Airport proposed construction of a new runway, much of which would be located on land within neighboring Brook Park. Soon thereafter, Brook Park enacted ordinances that required Cleveland to obtain a conditional use permit for any new runway construction within Brook Park. Cleveland challenged the ordinances seeking a declaratory judgment that the ordinances violated the Supremacy Clause, arguing that the FAA Act and the AAIA preempted Brook Park's land use and zoning laws. The court held that there was no conflict preemption, no field preemption, and that compliance with the ordinances would not frustrate any federal purpose. The City of Cleveland appealed to the Sixth Circuit Court of Appeals.

The United States disagreed with the court's holding and filed an amicus curiae brief, a reply brief, and a supplemental brief in the Sixth Circuit Court of Appeals to seek to overturn the district court's decision. The United States argued that contrary to the district court's belief, the Federal Government has a comprehensive role in both airspace regulation and public airport development, and that the court erred in its analysis of federal noise

---

[13] See, e.g., Hoagland v. Town of Clear Lake, 415 F.3d 693 (7th Cir. 2005), and Gustafson v. City of Lake Angelus, 76 F.3d 778 (6th Cir. 1996).

[14] See, e.g., Dallas/Fort Worth Int'l Airport Bd. v. City of Irving, 854 S.W.2d 161, 168 (Tex. Ct. App.) ("[n]o one disputes that federal laws preempt local-regulation within the boundaries of an airport"), vacated as moot, 868 S.W.2d 750 (Tex. 1993).

control law and Brook Park's noise ordinance. However, the case was settled and no appeals court decision was issued.

## IV. Preemption Analysis

According to the FAA's EIS, Tweed-New Haven Airport has "[i]nsufficient runway safety areas on its principal, air carrier Runway 2/20, which do not meet current FAA safety standards." The RSA project seeks to improve the Airport's safety margin by expanding the size of the Airport's RSAs consistent with 49 U.S.C. 44706, 14 C.F.R. Part 139, and FAA AC 150/5300-13 requirements. Based on the Airport's runway design criteria, which are based on the Aircraft Approach Category C, the FAA standard RSA is 500 feet wide and 1,000 feet long beyond each runway threshold. Neither of the runway ends has the required RSA. At the present time, there is only 200 feet of RSA length available at both ends of Runway 2/20 instead of 1,000 feet.

As described above, in 1983, the Airport Authority adopted a master plan for the Airport, which was revised in 2000-2002. Phase One involved the preparation of an EIS for the RSA project, and Phase Two is the RSA project. Through the extensive EIS process and Neighborhood Liaison Committee, the public was given numerous opportunities to comment on the RSA project. After the Airport obtained all necessary federal and state approvals for the RSA project to go ahead, East Haven issued a cease and desist order asserting regulatory authority over the project. You note in your letter that for the past 40 years, East Haven has attempted to contain, and limit the growth of, the Airport.

As noted above, 49 U.S.C. 44706 requires airports that serve air carriers operating aircraft designed for at least 31 passenger seats, such as Tweed-New Haven, to have an "airport operating certificate." 49 U.S.C. 44706(a). This section's implementing regulations, 14 C.F.R. Part 139, require each certified airport, "in a manner authorized by the Administrator,... to provide and maintain, for each runway and taxiway that is available for air carrier use, a safety area" of certain dimensions. 14 C.F.R. 139.309(a), (a)(1), and (a)(2). Under Part 139, the Airport's sub-standard RSAs are currently grandfathered since "no reconstruction or significant expansion of the runway or taxiway was begun on or after January 1, 1988." 14 C.F.R. 139.309(a)(1). However, Congress amended 49 U.S.C. 44706 in 2005 to require that not later than December 31, 2015, certificated airports such as Tweed-New Haven "shall improve the airport's runway safety areas to comply with the Federal Aviation Administration design standards required by 14 CFR part 139...." Pub. L. No. 109-115, 119 Stat. 2401 (Nov. 30, 2005). As early as 1993, Congress had expressed its concern about "inadequate safety areas beyond the ends of runways at certificated airports," and how grandfathered airports such as Tweed-New Haven could be "continued to be certificated even though they failed to meet the new [RSA] standards." H. Rep. No. 103-240, Sept. 14, 1993, 103d Cong., 1st Sess. 1994 U.S.C.C.A.N. 1676, 1993 WL 356742. In response to concerns from Congress, the FAA began an ambitious program in FY 2000 to accelerate RSA improvements for commercial service runways that do not meet standards. The FAA developed a long term completion plan that will ensure that all practicable improvements are completed by 2015.

East Haven's enforcement of its zoning regulations to prevent the Airport from expanding its sub-standard size RSAs to comply with current FAA standards within the existing boundaries of the Airport conflicts squarely with the above Federal law. East Haven's enforcement of its police powers to regulate construction of the RSAs "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress." Hines v. Davidowitz, 312 U.S. 52, 67 (1941). The Town's conduct has the effect of overriding Congress' will and the FAA's safety decisions. As a non-proprietor, East Haven has no role in regulating airport or aircraft safety, and is federally preempted from doing so.

Through its police powers, East Haven is unlawfully preventing the Airport from increasing the margin of safety at the Airport within the existing Airport boundaries.[15] East Haven's actions are preventing Tweed-New Haven from enhancing the safety of air travelers by providing a standard size RSA for aircraft which undershoot, overrun, or veer off the runway. According to the EIS, the sub-standard RSAs at Tweed-New Haven Airport increase emergency response times. "By providing properly designed runway safety areas for Runways 2 and 20, rescue/firefighting personnel would be able to access more efficiently the areas south of Runway 2 and north of Runway 20. Response times would be reduced considerably, thus ensuring that rescue, medical, and firefighting aid could be provided as quickly as possible." Runway Safety Area & Taxiway Improvements Final Environmental Impact Statement, May 2000, p. 1-7.

East Haven's enforcement of its local regulations to prevent the Airport from expanding its RSAs to standard size within the existing boundaries of the Airport is also preempted under FAA's exclusive control of aircraft safety and the navigable airspace. 49 U.S.C. 40103.

The intent to centralize air safety authority and the comprehensiveness of these regulations pursuant to that authority have led numerous other courts to conclude that Congress intended to occupy the entire field and thereby preempt state regulation of air safety. Air Transport Ass'n of America, Inc. v. Cuomo, 520 F.3d 218, 225 (2d Cir. 2008). See Montalvo v. Spirit Airlines, 508 F.3d 464, 468 (9th Cir.2007) ("[T]he FAA preempts the entire field of aviation safety through implied field preemption. The FAA and regulations promulgated pursuant to it establish complete and thorough safety standards for air travel, which are not subject to supplementation by ... state laws."); Greene v. B.F. Goodrich Avionics Sys., Inc., 409 F.3d 784, 795 (6th Cir.2005), cert. denied, 547 U.S. 1003 (2006); Abdullah v. American Airlines, Inc., 181 F.3d 363, 367-68 (3d Cir. 1999); French v. Pan Am Express, Inc., 869 F.2d 1, 5 (1st Cir. 1989); Curtin v. Port Auth. of N.Y. & N.J., 183 F.Supp.2d 664, 671 (S.D.N.Y.2002).

East Haven's enforcement of its local regulations in this instance has the effect of overriding safety and airspace efficiency decisions which are the sole province of the FAA. The town's enforcement of its zoning and other regulatory powers is impliedly preempted by the FAA

---

[15] In a July 11, 2007 letter to the East Haven Planning & Zoning Commission, the Mayor of East Haven states that RSA project is a "pre-cursor to the actual expansion of the runway in the near future." However, according to the FAA's EIS, the RSA project "address[es] safety margins at the Tweed-New Haven Airport and do not affect the underlying demand for air traffic through Tweed or the ability of the airport to accommodate larger aircraft...." FAA EIS, p. 1-11 (emphasis original).

Act, in which Congress states that safety must be "the highest priority in air commerce." 49 U.S.C. 40101(a)(1). Congress has directed the FAA to "assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace," and to prescribe regulations for "protecting individuals and property on the ground" and "preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects." 49 U.S.C. 40103 (b)(1), (2)(B), (D) emphasis added). Under 49 U.S.C. 44701(b)(2), the FAA may prescribe "minimum safety standards" for "operating an airport serving any passenger operation of air carrier aircraft designed for at least 31 passenger seats" (emphasis added). Moreover, under 49 U.S.C. 44706, the FAA issues "airport operating certificates" that "contain terms necessary to ensure safety in air transportation."

In United States v. City of Berkeley, 735 F. Supp. 937 (E.D. Mo. 1990), the court granted the United States permanent injunctive relief to enjoin the city of Berkeley from interfering with the construction of an airport surveillance radar facility at Lambert St. Louis International Airport on land owned by the city of St. Louis but located within the confines of the city of Berkeley. The radar was part of the National Airspace System Plan designed to enhance air safety for the travelling public, by improving the ability of air traffic controllers to detect aircraft, in particular small planes, at a greater distance. There was overwhelming evidence that the ASR-9 radar would greatly improve air traffic safety in the crowded skies over Lambert/St. Louis International Airport.

During this period the FAA sought but was denied a special use permit for the radar project. The FAA conducted two environmental assessments of the project. Each of these assessments resulted in the issuance of a Finding of No Significant Impact (FONSI). As a result of these assessments, the FAA concluded that the radar project would have a minimal to non-existent economic impact on Berkeley. The FAA then entered into a contract for the construction of the radar facility. After the contractor began work on the project, Berkeley posted a stop work order at the radar site prohibiting further work until Berkeley issued a special use permit. The FAA then sought to enjoin Berkeley from interfering with the radar project.

Despite the fact that the FAA Act provision at issue here (49 U.S.C. App. § 1348(b), now 49 U.S.C. 44502), did not contain an express statement of preemption, the Court concluded that the FAA regulations governing the construction of the facility preempt Berkeley's building code.

The court noted the federal regulation of airspace management, air navigation facilities and air safety is pervasive, and cited City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624 (1973). The court recognized that "the establishment and improvement of air navigation facilities for the safety of the public" was an important Congressional objective, and noted that the FAA has broad authority to "acquire, establish and improve air-navigation facilities wherever necessary." It stated, "[t]aken alone, the comprehensive federal regulation of air navigation facilities and air safety would permit the Court to conclude that local regulation of the construction of air navigation facilities is preempted." 735 F. Supp. at 940.

The court also found that Berkeley's attempt to regulate the construction of the facility also stood as an obstacle to the accomplishment of the statutory objective: the establishment and improvement of air navigation facilities for the safety of the public. "Where local control over federal activity obstructs the achievement of a congressional objective, local regulation is preempted." Id.

Concerning Berkeley's refusal to issue the federal government a special use permit, the court noted that "Congressional objectives such as enhanced air safety may not be 'thwarted by local fiat.'" As a result, Berkeley was not permitted to halt construction of the radar facility by demanding compliance with its building code.[16]

Under the AAIA, as noted, Congress has given the FAA a dominant role in airport development and substantial oversight responsibilities in all aspects of airport planning and development. The "highest priority" among the AAIA's policies is "the safe operation of the airport and airway system." 49 U.S.C. 47101(a)(1). The expansion of an airport within its existing boundaries is a matter within the FAA's jurisdiction and interest. There is an unavoidable and necessary relationship between the federal government's control of air traffic nationwide and the placement, improvement, and use of runways at commercial service airports throughout the nation.

In Burbank-Glendale Pasadena Airport Authority v. City of Los Angeles, 979 F.2d 1339 (9th Cir. 1992), the Ninth Circuit Court of Appeals reviewed the constitutionality of an ordinance that required prior submission and approval of plans for development of a 54-acre parcel of land. The land, which was used solely for aircraft landings and takeoffs at Burbank Airport, was slated for construction of a taxiway project that was expected to produce significant safety improvements and noise benefits. The ordinance was enacted by the City of Los Angeles just before construction of a taxiway project was to begin, and applied exclusively to the parcel of land owned by the airport but located in the jurisdiction of the City of Los Angeles.

The court found that the City was prohibited from conditioning airport development on prior City approval. It stated that proper placement of taxiways and runways is critical to the safety of takeoffs and landings and essential to the efficient management of the navigable airspace. The Court stated that Federal aviation safety interests preempted control of airport ground facilities. The Court held that nonproprietor jurisdictions may not abuse their land use powers by delaying a safety project and withholding a building permit until the FAA and the airport proprietor agree to aircraft noise control terms.

In the federal statutory and regulatory scheme, airport proprietors are responsible for maximizing compatible land use around airports and that contemplates that surrounding non-proprietor jurisdictions will use their zoning powers to mitigate the effects of aircraft

---

[16] In the context of Tweed-New Haven, an "air navigation facility" includes a "landing area," which, in turn, includes "an airport." 49 U.S.C. 40102 (a)(4), (A)(28).

noise.  Non-proprietors are not permitted to use their zoning powers as a means of frustrating airport development.  They may not use these powers to override FAA standards that define RSAs, thereby prohibiting the designation and use of the parcel for that purpose.

Non-proprietor jurisdictions, like East Haven, have no role in determining the legal requirements for runway expansion and development within the boundaries of the existing airport. Federal aviation law preempts local ordinances designed to control and impede air navigation facilities, airport safety projects, or development projects on airport property at commercial service airports as a means of controlling aircraft noise, and to otherwise control flight operations and impede safe and efficient airspace management.

East Haven's exercise of its police powers to regulate construction of the RSAs at the Airport are preempted under federal law.

I hope this letter is helpful to you.  If you have any questions, please do not hesitate to contact me at 202-267-3199, or Jonathan Cross, Acting Branch Manager, Airports Law Branch, at 202-267-7173.

Sincerely,

Daphne A. Fuller
Assistant Chief Counsel
Airports and Environmental
  Law Division