# EXHIBIT A



Not Reported in A.2d
Not Reported in A.2d, 2001 WL 76989 (Conn.Super.)

Page 1

▶Harper v. King
Conn.Super.,2001.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.
Wendell C. HARP,
v.
Gary E. KING, et al.
**No. CV960392107S.**

Jan. 10, 2001.

MEMORANDUM OF DECISION RE: DEFENDANT GARY E. KING AND LAWRENCE D. PILCHIER'S MOTION FOR SUMMARY JUDGMENT (# 214) DEFENDANT VINCENT J. FLYNN'S MOTION FOR SUMMARY JUDGMENT (# 213) DEFENDANT REGINA RENTZ'S MOTION FOR SUMMARY JUDGMENT (# 228.20)

DEVLIN.

I. *INTRODUCTION*

**\*1** The plaintiff, Wendell C. Harp ("Harp") has brought this lawsuit against four employees of the Connecticut Housing Finance Authority ("CHFA"). The four defendants are Gary B. King ("King"), Vincent J. Flynn ("Flynn"), Lawrence C. Pilcher ("Pilcher") and Regina Rentz ("Rentz"). The four defendants have been sued in their individual capacities. Harp's Fourth Revised Complaint, dated December 29, 1997, is in six counts. The First Count alleges defamation asserting that the defendants agreed among themselves and took joint action to publish defamatory material that caused Harp to suffer damages. The Second Count alleges that conduct of the defendants caused Harp to be placed in a false light in public and deprived him of his right to privacy. The Third Count alleges that the defendants tortiously interfered with Harp's business expectations. The Fourth Count alleges intentional infliction of emotional distress. The Fifth Count alleges racial discrimination in credit practices in violation of General Statutes § 46a-66. The Sixth Count alleges racial discrimination in the provision of services by a state agency in violation of General Statutes § 46a-71.

All defendants have moved for summary judgment on the first, second, third and fourth counts of the Fourth Revised Complaint.[FN1] For the reasons set forth below, the motions are granted.

FN1. The fifth and sixth counts are not involved in the present motions.

A. *FOURTH REVISED COMPLAINT*

The allegations in the Fourth Revised Complaint may be summarized as follows:

Harp is an African American real estate developer who owns and/or manages properties in New Haven that are financed through CHFA. In July 1996, Pilcher and Flynn prepared a memorandum for King in which they outlined and memorialized the defendants' agreement to subject Harp to discrimination, humiliation, loss of property, loss of income and infliction of extreme emotional distress by engaging in wrongful and malicious actions. These actions consisted of (1) causing litigation to be instituted against Harp, regardless of merit, at the earliest opportunity; (2) to institute or transfer any litigation to Hartford because Harp and/or his attorney were well-regarded in the New Haven area; (3) depriving Harp of his CHFA contracts and ownership of his real estate by claiming a "technical default" of mortgage provisions and (4) by launching a public relations campaign to discredit Harp. The "apparent motivation" of the scheme was to discriminate against Harp because of his race.

As part of the defendants' joint action, they spoke with Paul Bass, a newspaper writer, and caused him to submit to CHFA a detailed request for documents. Thereafter, King and Rentz furnished false and malicious allegations to Paul Bass that Harp had engaged in "misuse of money" to the detriment of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-00597-JCH   Document 100-2   Filed 09/05/08   Page 3 of 9

Not Reported in A.2d                                                                                                                      Page 2
Not Reported in A.2d, 2001 WL 76989 (Conn.Super.)

public and the poor and that CHFA planned to declare him in default of the $10 million it lent him. On September 12, 1996, Paul Bass published these allegations in *The New Haven Advocate.*

As a further part of their joint action, the defendants subjected Harp to unfair and discriminatory audits that have been more frequent and broader in scope than those conducted on properties of Caucasian developers.

**\*2** Harp asserts that the defendants, by their conduct, which was outside the scope of their employment with CHFA, committed the torts set forth in the first four counts of the complaint and thereby caused Harp to sustain damages.

B. *PRIOR RULINGS*

As noted above, all defendants have moved for summary judgment as to the First, Second, Third and Fourth Counts, claiming that, on the present record, there is no genuine issue of material fact and they are entitled to judgment as a matter of law. During the pendency of these motions, and prior thereto, four legal rulings have been issued that affect the summary judgment claims.

On February 11, 1999, the court (Moran, J.) denied Harp's motion to compel disclosure of the Flynn/Pilcher memoranda ruling that the disclosure of the material was "a classic case of accidental, unintentional and inadvertent disclosure."See Order at docket entry # 201. Thereafter, on February 16, 2000, this court ruled that the so-called "litigation strategies memorandum" that is referenced in the complaint and was the subject of Judge Moran's ruling, was protected by the attorney-client privilege. This court then issued a protective order barring deposition questions to Flynn relating to legal advice Flynn provided to CHFA concerning Harp or his firm, Renaissance Management Company. See *Memorandum of Decision Re: Defendant Vincent J. Flynn's Motion for Protective Order (# 216).* The import of these two decisions is that the legal strategies memorandum as well as legal communications between CHFA and its lawyers regarding Harp, are covered by the attorney-client privilege and are therefore not admissible evidence.

In addition to the rulings about the attorney-client privilege, the application of the journalist's privilege not to reveal the identity of a confidential source was also litigated in this case. On March 15, 2000, the court (Levin, J.) ruled that Paul Bass of *The New Haven Advocate* did not have to reveal the source of his knowledge that a meeting had taken place at CHFA regarding Harp, because the confidential source of this information was covered by the journalist's privilege. See *Memorandum of Decision* at docket entry # 228.

Finally, on February 25, 2000, this court ordered that five paragraphs of Harp's December 22, 1999 affidavit in opposition to summary judgment be stricken. This ruling was pursuant to Practice Book § 17-46 that requires affidavits to be based on personal knowledge and admissible evidence. See *Memorandum of Decision Re: Motion to Strike Affidavit (# 221).* On September 18, 2000, Harp filed a revised affidavit dated September 15, 2000. Following the filing of this revised affidavit, each of the defendants have again moved to strike it for failure to comply with Practice Book § 17-46. Rather than revisit Harp's affidavit through the motions to strike, the court intends to address the summary judgment motion on its merits and disregard those portions of the counter affidavits of Harp and Milton Jackson that do not comply with the § 17-46.

II. *STANDARD: SUMMARY JUDGMENT*

**\*3** Pursuant to the Practice Book, summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Practice Book § 17-49.

Summary judgment is appropriate only if a fair and reasonable person could conclude only one way. *Miller v. United Technologies Corp.,* 233 Conn. 732, 751, 660 A.2d 810 (1995). A summary disposition should be on evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict for the moving party. *Id.*

In determining whether there exists a genuine issue of material fact, the trial court must view the evidence in the light most favorable to the nonmoving party. *Hertz Corp. v. Federal Ins. Co.,* 245 Conn. 374, 381, 713 A.2d 820 (1998)."A

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-00597-JCH   Document 100-2   Filed 09/05/08   Page 4 of 9

Not Reported in A.2d                                                                                                          Page 3
Not Reported in A.2d, 2001 WL 76989 (Conn.Super.)

genuine issue has been variously described as a triable, substantial or real issue ... and had been defined as one which can be maintained by substantial evidence." *United Oil Co. v. Urban Development Commission,* 158 Conn. 364, 378, 260 A.2d 596 (1969).

A material fact has been defined adequately and simply as a fact which will make a difference in the result of the case. *United Oil v. Urban Development Commission, supra,* 158 Conn. 379.

The movant has the burden of demonstrating the absence of any genuine issue of material fact. *Hertz v. Federal Ins. Co., supra,* 245 Conn. 381. The party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. *Id.*

"Although the party seeking summary judgment has the burden of showing the nonexistence of material fact ... a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. It is not enough however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertion of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court." *Maffucci v. Royal Park Ltd. Partnership,* 243 Conn. 552, 554-55, 707 A.2d 15 (1998). Only evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment. *Home Ins. Co. v. Aetna Life & Casualty Co.,* 235 Conn. 185, 202-03, 663 A.2d 1001 (1995). Inadmissible evidence is to be disregarded. *2830 Whitney Avenue v. Heritage Canal Development,* 33 Conn.App. 563, 568-69, 636 A.2d 1377 (1994).

### III. DISCUSSION

The defendants' arguments in support of their motions for summary judgment are two-pronged. The first prong is that Harp's claim of joint action among them is legally precluded by the application of the intracorporate conspiracy doctrine. The second prong is that Harp has failed to support his allegations of tort with any admissible evidence. The court finds that both of these arguments have merit and that each of them independently and alternatively support entry of summary judgment in favor of the defendants.

### A. *INTRACORPORATE CONSPIRACY DOCTRINE*

**\*4** The intracorporate conspiracy doctrine emanates from the common sense proposition that one cannot conspire with himself. *Lieberman v. Gant,* 474 F.Supp. 848, 875 (D.Conn.1979). This doctrine holds that,

there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors officers and employees, each acting within the scope of this employment.

*Herrmann v. Moore,* 476 F.2d 453, 459 (2d Cir.1978).

The intracorporate conspiracy doctrine had been recognized in Connecticut.See *Day v. General Electric Credit Corporation,* 15 Conn.App. 677, 684, 546 A.2d 315 (1988) ("Employees of a corporation acting in the scope of their employment cannot conspire with one another or with the corporation that employs them; each acts for the corporation and the corporation cannot conspire with itself.")

The defendants claim that since they were all employees and/or officers of CHFA during the times alleged by Harp, and that the wrongful acts allegedly committed by them were done in connection with that employment, the intracorporate conspiracy doctrine precludes the civil conspiracy asserted in the Fourth Revised Complaint. Stated another way, the defendants argue that, under the circumstances of this case, their acts were essentially the acts of CHFA and therefore as a matter of law cannot support conspiratorial liability.

In response, Harp makes two claims. First, that he has not alleged a conspiracy but has only claimed that the defendants bear joint liability for the torts committed. Second, that the acts of the defendants were outside of the scope of their employment at CHFA.

Although the Fourth Revised Complaint does not contain the word "conspiracy," it is clear that Harp is pursuing a theory of liability based on the defendants'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-00597-JCH   Document 100-2   Filed 09/05/08   Page 5 of 9

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 2001 WL 76989 (Conn.Super.)

agreement and joint action. Indeed, the phrase "joint action" appears repeatedly in the complaint. According to the Restatement (Second) Torts, one is liable for harm to a third person from the tortious conduct of another if he "does a tortious act in concert with the other or pursuant to a common design with him."Restatement (Second) Torts § 876. This concept of vicarious liability for tortious acts done pursuant to a common design is central to Harp's causes of action against the four defendants. Comment b to § 876 notes that, "[i]t is in connection with these common designs or plans that the word 'conspiracy' is often used."The court therefore finds that notwithstanding the absence of word "conspiracy," Harp's Fourth Revised Complaint does, in effect, allege a civil conspiracy among the four defendants.

A related question concerns the application of the intracorporate conspiracy doctrine to CHFA which is not, strictly speaking, a corporation but rather a public instrumentality of the State of Connecticut. General Statutes § 8-244. The Authority, however, acts through a board of directors and has separate legal existence such that the doctrine should apply. The application of the intracorporate conspiracy doctrine has not been limited to private corporations. See *Lieberman v. Gant, supra* 474 F.Sup. 852 (University of Connecticut); *Cole v. University of Hartford,* 391 F.Supp. 888, 890 (D.Conn.1975) (private university); *Doe v. Bd. of Educ. of Hononegah School Dist. 207,* 883 F.Supp. 1366, 1381 (N.D.Ill.1993) (local school district). The same principals of agency that enable a corporation to act through, and therefore be liable for, the acts of its directors and employees applies equally to CHFA. The court therefore finds that the intracorporate conspiracy doctrine is appropriately applied to the actions of CHFA performed through its directors and employees.

**\*5** Harp's second objection to the application of the doctrine to this case is that he has affirmatively alleged that the defendants' actions were outside the scope of their employment at CHFA. Harp, however, has not offered any admissible evidence to support that assertion. To the contrary, Harp's affidavit along with the other evidence in the record establishes that the actions of the defendants were done in the course of their official duties. The alleged wrongful agreement among the defendants to declare Harp's CHFA loans in default, to institute CHFA litigation against him, deprive him of his CHFA contracts, institute CHFA audits against him unfairly, or to disclose CHFA documents about him to the press, derived solely from the defendants' positions within CHFA. But for their official positions, none of the defendants had any ability to injure Harp in the ways alleged. In this regard, the test is not the wrongful nature of the conspirators' actions, but whether the wrongful conduct was performed within the scope of the conspirators' official duties. *Doe v. Bd. of Educ. of Hononegah School Dist. 207, supra,* 1381.

In the present case, Harp's central claim is that the defendants set about to deprive him of his CHFA financing with the resulting potential loss of income and property to him. The allegedly wrongful conduct was performed, and could only be performed, because of the defendants' official status as CHFA employees. On the present record, the court finds that the intracorporate conspiracy doctrine does not permit CHFA to conspire with itself, and the defendants are entitled to summary judgment.

B. *INDIVIDUAL COUNTS*

*FIRST COUNT: DEFAMATION*

The first count alleges defamation based on the assertion that the defendants agreed among themselves and then took joint action to publish defamatory material about Harp. This count rests on two factual assertions: (1) that the defendants devised a plan to deprive Harp of his property and (2) that pursuant to that plan the defendants caused Paul Bass to submit a request for documents contained in CHFA's files and thereafter furnished Paul Bass with "false and malicious allegations" that Bass published in a *New Haven Advocate* article. Harp has not supported these allegations by admissible evidence.

At the outset, it should be noted that each of the defendants has submitted an affidavit pertaining to Harp's allegations. Among other things, their affidavits attest to the following:

**\*6** 1. Lawrence Pilcher, an Assistant Counsel at CHFA, denied drafting any memorandum or participating in any agreement, scheme or joint action to subject Harp to discrimination, emotional distress, humiliation, loss of income or loss of property.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-00597-JCH   Document 100-2   Filed 09/05/08   Page 6 of 9

Not Reported in A.2d                                                                                           Page 5
Not Reported in A.2d, 2001 WL 76989 (Conn.Super.)

Pilcher denies that there was any agreement to deprive Harp of his profession or property or to discriminate against him. Pilcher further attests that he did not cause, encourage or suggest that Paul Bass submit a Freedom of Information request to CHFA to obtain information about Harp.

2. Vincent Flynn, as Assistant Counsel at CHFA and pursuant to direction from CHFA's General Counsel, William A. Dickerson, prepared a privileged "litigation strategy memorandum" that discussed the rights, obligations and options of CHFA with respect to written agreements between CHFA and Harp's business entities. Flynn's conclusions and recommendations were based on the best interests of his client, CHFA, and not motivated by any malice or intent to injure Harp or to discriminate against him. Flynn never met or spoke with Paul Bass. His only communication with Paul Bass was to write a cover letter for documents provided to him in response to a Freedom of Information request Bass had filed with CHFA. Flynn denied any agreement or joint action between him and anyone else to deprive Harp of his profession or property, or to discriminate against him.

3. Gary King, President/Executive Director of CHFA, denied receiving or reviewing any memoranda written by Lawrence Pilcher and/or Vincent Flynn that in any way discussed a plan to subject Harp to discrimination, emotional distress, humiliation, loss of income or loss of property. King did not encourage or suggest to Paul Bass that he submit a Freedom of Information request to CHFA for information about Harp. King did not speak to Bass about Harp or his properties and did not provide him with any false or malicious information about Harp. King denied any agreement, scheme or joint action with anyone to deprive Harp of his profession or property, or to discriminate against him.

4. Regina Rentz, Internal Auditor for CHFA, denied being part of any agreement and joint action to deprive Harp of his property and profession or to discriminate against him. Rentz never met, spoke with or corresponded with Paul Bass. She took no action to encourage Bass to file an FOI request and did not participate in the preparation of the response to Paul Bass's FOI request.

In addition, the defendants have submitted the affidavit of Paul Bass wherein he states that the idea to seek information about Harp from CHFA was his idea and "not the CHFA's idea and that "[t]he CHFA did not 'cause' or encourage me to make a Freedom of Information request about Wendall Harp ..." Bass further stated that he had been writing about the "controversies surrounding Mr. Harp's activities in New Haven for seven years, long before CHFA even figured into the article."

In the face of these categorical denials, Harp has submitted his revised affidavit dated September 15, 2000. With respect to the claimed agreement the defendants to deprive him of his profession and property, the affidavit states: [FN2]

> FN2. As discussed above, earlier court decisions have ruled that the so called "litigation strategies memo" that is the centerpiece of Harp's complaint and featured prominently in his original affidavit, was protected by the attorney-client privilege.

*7 Paragraph 10: "This Rockwell Report was among the documents given to Paul Bass by defendant Flynn subsequent to Flynn's June 1996 memos directing that a plan of discreditation be undertaken against me."

Paragraph 15: "Acting in concert with a written and orchestrated plan to remove me from management of my properties, defendant King acquiesced in, participated in, or directed CHFA staff and consultants to accomplish the stated objective of removing me from management of my properties. I know this because of defendant King's continuous refusal to approve my management contact renewal."

As to the assertion that the defendants "caused" Paul Bass to make a Freedom of Information request; the revised affidavit states:

Paragraph 22: "During the months of July and August, defendant Flynn communicated with Mr. Paul Bass of the New Haven Advocate weekly newspaper and gave Mr. Bass a number of documents relating to my properties and the dispute I was having with CHFA."

Paragraph 23: "As of this date, all the defendants have refused to disclose the specific CHFA file

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-00597-JCH   Document 100-2   Filed 09/05/08   Page 7 of 9

Not Reported in A.2d                                                                                                    Page 6
Not Reported in A.2d, 2001 WL 76989 (Conn.Super.)

documents that they gave to Attorney Flynn for his review and subsequent distribution to Mr. Bass ... However, the selected documents, information and materials provided by defendant Flynn to Mr. Bass were reviewed and approved by defendant King ... At the time said documents and information were provided to Mr. Bass, defendants Flynn and King knew or should have known that said information was false and intentionally misleading in its characterization of me and my property management/ownership interests."

Harp's conclusory assertion about an agreement or plan among the defendants to discredit and harm him is insufficient to raise a genuine issue of material fact on that issue. See *Gupta v. New Britain Hospital,* 239 Conn. 574, 583, 687 A.2d 111 (1996) (a party's conclusory statements in the affidavit and elsewhere may not constitute evidence sufficient to establish the existence of disputed material facts). Harp's claim that he inferred the existence of such an agreement from King's refusal to approve his management and contract renewal is not logical or reasonable. Moreover, there is no evidentiary support in the affidavit that the defendants "caused" Paul Bass to make an FOI request to CHFA. At most, the affidavit makes the conclusory assertions that King and Flynn knew, or should have known, that the unidentified information provided to Bass pursuant to the FOI request was "false and intentionally misleading." Finally, there has been no admissible evidence presented to support Harp's claim that the unknown documents turned over to Bass were defamatory.

In sum, the allegation in the first count that the defendants entered into an agreement to deprive Harp of his property and then acted on that agreement by essentially planting a defamatory news story in the *New Haven Advocate,* is not supported by Harp's affidavit. Moreover, these claims are completely and unequivocally denied by all four defendants and Mr. Bass himself.

The defendants are entitled to summary judgment on the first count.

*SECOND COUNT: FALSE LIGHT INVASION OF PRIVACY*

**\*8** The gist of the allegations in the second count is that the September 12, 1996 *New Haven Advocate* article caused Harp to be placed in a false light in public. To establish this tort, as pled, Harp must prove that the defendants agreed to give publicity to facts concerning his private life. 3 Restatement (Second) Torts § 652A. In addition to the lack of admissible evidence to support the requisite agreement, there is no evidence to establish that the defendants were responsible for the publicity of Bass's article in the *New Haven Advocate.*Bass, through his affidavit and deposition testimony, has stated that it was his idea, prompted by a confidential source, to seek information from CHFA. Other than responding to that request, there is no evidence that any of the defendants had any involvement whatsoever in the Bass article.[FN3]

> FN3. As discussed above, Harp's efforts to compel Bass to disclose his confidential source were denied by Judge Levin based on the application of the journalist's privilege.

The defendants are entitled to summary judgment on the second count.

*THIRD COUNT: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTATIONS*

The gravamen of the third count is that the defendants, by their agreement, interfered with Harp's reasonable expectation to continue to do business with state and federal agencies involved in providing affordable housing. The tortious conduct alleged were the defendants' actions to (1) cause CHFA to purport to terminate Renaissance Management Company contracts to manage certain properties as well as (2) devising the idea of a "technical default" leading to foreclosure of Harp's CHFA mortgages.[FN4]This count cannot be sustained for three reasons.

> FN4. The record reflects that the contracts in question have *not* been terminated nor has any foreclosure action been commenced by CHFA.

First, as discussed above, there is no admissible evidence of an agreement among the defendants to deprive Harp of his property either through a "technical default" or otherwise. Second, as employees and agents of CHFA, the defendants cannot be held liable for causing CHFA to breach its

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-00597-JCH   Document 100-2   Filed 09/05/08   Page 8 of 9

Not Reported in A.2d                                                                                                   Page 7
Not Reported in A.2d, 2001 WL 76989 (Conn.Super.)

own contract. See *Murray v. Bridgeport Hospital,* 40 Conn.Supp. 56, 61, 480 A.2d 610 (1989) (An agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract.) Third, a claim for tortious interference must be supported by evidence that the defendants' conduct was tortious. This requires proof that the defendants' actions were motivated by some improper motive or improper means. *Blake v. Levy,* 191 Conn. 257, 262, 464 A.2d 52 (1983). In the present case, the defendants have denied any improper motive to discriminate against Harp or deprive him of his property. Although Harp has alleged racial discrimination in his complaint, he has not supported that allegation with any admissible evidence. In his brief opposing summary judgment, Harp states:

Plaintiff *submits* that Caucasian developers were not treated in the same manner by the CHFA. Plaintiff's *allegation* that his race fueled the disparate treatment and that CHFA actively interfered with his relationship with HUD create genuine issues of material fact in dispute as to plaintiff's tortious interference claim.

**\*9** *Plaintiff's Memorandum of Law in Opposition to Defendant Flynn's Motion For Summary Judgment,* p. 88 (emphasis added). Harp has not adequately supported this "allegation" with admissible evidence. The notion of "technical default" grows out of Harp's claims regarding the so called legal strategies memorandum that has been ruled inadmissible. The allegations of disparate treatment are too conclusory to raise a genuine factual issue.

In sum, since (1) the contracts in question were not terminated, (2) there is no admissible evidence that the defendants conspired to terminate them or to otherwise deprive Harp of his property, (3) as CHFA agents the defendants cannot be held liable for causing CHFA to breach its own contract, and (4) there is insufficient admissible evidence that the defendants acted tortiously, summary judgment should enter.

The defendants are entitled to summary judgment on the third count.

### FOURTH COUNT: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To make out a case for intentional infliction of emotional distress, a plaintiff must prove: 1) that the defendant intended to inflict emotional distress, or knew or should have known emotional distress was a likely result of his conduct; 2) that the conduct was extreme and outrageous; 3) that the defendants' conduct caused the plaintiff's distress and 4) that the emotional distress sustained was severe. *DeLaurentis v. New Haven,* 220 Conn. 225, 267, 597 A.2d 807 (1991).

For conduct to be considered extreme and outrageous, it must "exceed all bounds usually tolerated by a decent society."*Hustler Magazine v. Falwell,* 485 U.S. 46, 53, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The requirements of this tort are rigorous and difficult to satisfy. Prosser and Keaton, *The Law of Torts,* 5th Ed. § 12, p. 56. Whether the defendants' conduct and the plaintiff's resulting distress are sufficient to satisfy the elements of the tort is a question, in the first instance, for the court. *Mellaly v. Eastman Kodak Co.,* 42 Conn.Supp. 17, 18, 597 A.2d 846 (1991).

Harp has not offered admissible evidence of any conspiratorial agreement among the defendants nor that they caused him to be publically defamed. When these unsupported claims are removed, the conduct complained of consists of audits, financial scrutiny, and CHFA decisions that Harp asserts were inaccurate and unfair. This is not sufficiently extreme or outrageous to support a cause of action for intentional infliction of emotional distress, particularly in the business context of this case.[FN5]

> FN5. The cases cited by Harp describe far more extreme factual situations, see e.g., *Berry v. Loiseau,* 223 Conn. 786, 793, 614 A.2d 414 (repeated physical abuse in the workplace); *Whelan v. Whelan,* 41 Conn.Supp. 519, 520, 3 Conn.L.Rptr. 135 (husband's false statement to his wife that he had AIDS). In addition, the one case cited by Harp involving an arguably similar situation, failure to restructure a loan, was a decision on a motion to strike where the court observed that the conduct "does not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-00597-JCH   Document 100-2   Filed 09/05/08   Page 9 of 9

Not Reported in A.2d                                                                                                                   Page 8
Not Reported in A.2d, 2001 WL 76989 (Conn.Super.)

seem particularly atrocious, outrageous or extreme." *Connecticut National Bank v. Montanari,* 9 CSCR 196 (1994) [11 Conn.L.Rptr. 10].

The defendants are entitled to summary judgment on the fourth count

*CONCLUSION*

**\*10** For the reasons set forth above the defendants' motions for summary judgment as to the First, Second, Third and Fourth counts of the Fourth Revised Complaint are granted.

So Ordered at New Haven, Connecticut this, 10th day of January 2001.

Conn.Super.,2001.
Harper v. King
Not Reported in A.2d, 2001 WL 76989 (Conn.Super.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.