**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

_____

:

TWEED-NEW HAVEN AIRPORT
AUTHORITY

                    Plaintiff,

        VS.

TOWN OF EAST HAVEN,
CONNECTICUT; TOWN OF EAST
HAVEN, CONNECTICUT INLAND
WETLAND AND WATERCOURSE
COMMISSION; and, TOWN OF EAST
HAVEN, CONNECTICUT PLANNING
AND ZONING COMMISSION; and
TOWN OF EAST HAVEN,
CONNECTICUT FLOOD AND
EROSION CONTROL BOARD

                    Defendants.

_____

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 3:08-cv-00597 (JCH)

SEPTEMBER 5, 2008

Corrected for non-substantive
technical errors
September 10, 2008

**PLAINTIFF'S CORRECTED POST TRIAL BRIEF**

**I.      EAST HAVEN'S REGULATORY ACTIONS ARE FEDERALLY PREEMPTED**

        Congress has enacted a comprehensive and pervasive scheme of federal regulation and

oversight of the nation's air transportation system, including public airport development.  The

existence of federal preemption is a matter of Congressional intent. See Gade v. National Solid

Wastes Management Ass'n, 505 U.S. 88, 94-95, 112 S. Ct. 2374, 2381-82 (1992).  Preemption may

be explicit in a statute's language, or implicit in the legislation's structure and purpose.  Id., at 98; Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977).  Express preemption arises when "a federal statute expressly directs that state law be ousted." Air Transport Ass'n of America, Inc. v. Cuomo, 520 F.3d 218, 220 (2dCir. 2008)(citing, Assn'n of Int'l Auto. Mfrs. v. Abrams, 84 F.3d 602, 607 (2d. Cir. 1996)).  Implied preemption arises when, "in the absence of explicit statutory language…Congress intended the Federal Government to occupy [a field] exclusively," or when a state law "actually conflicts with federal law." Air Transport v. Cuomo, at 220 (citing, English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990)).  Due to the pervasive and comprehensive scheme of federal aviation regulation, East Haven's attempt to control and restrain construction of the Runway Safety Area Project ("Project") runs afoul of both express and implied federal preemption.  See American Airlines, Inc. v. Town of Hempstead,  272 F.Supp. 226, 232 (E.D.N.Y. 1966) aff'd, 398 F.2d 369 (2d Cir. 1968), cert. denied, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969) ("It would be difficult to visualize a more comprehensive scheme of combined regulation, subsidization and operational participation than that which the Congress has provided in the field of aviation.").

   A. **EXPRESS FEDERAL PREEMPTION**

   East Haven's enforcement of its local regulations to stop, change, interfere with, and/or delay, construction of the Project is expressly preempted by federal law.

   This action is brought under the Supremacy Clause, Art. VI, Cl. 2, of the United States Constitution.  Complaint at ¶ 2.   Under Art. VI, Cl. 2, the laws of the United States are supreme, and

preempt any local regulation or actions that "interfere with, or are contrary to" any federal law or field which is under the exclusive jurisdiction of the United States.  See Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211 (1824).  The evidence adduced at trial clearly establishes that East Haven is using the enforcement of its local regulations to stop, change, interfere with, and/or delay, construction of the Project in violation of the laws of the United States.

## 1.  EAST HAVEN'S ENFORCEMENT OF ANY LOCAL REGULATION AFFECTING ROUTES OR SERVICES OF AN AIR CARRIER IS EXPRESSLY PREEMPTED

The Airline Deregulation Act of 1978 (the "ADA") Pub. L. No. 95-504, 92 Stat. 1705. (codified, as amended, in scattered sections of 49 U.S.C.) expressly preempts any action by East Haven that even indirectly affects prices, routes or services of air carriers which are subject to federal regulation. The ADA provides in part:

> (b) Preemption-(1) Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713 (2005).  The Supreme Court has long found that Congress intended the term "relating to" in the ADA to have a "broad scope" and an "expansive sweep." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 112 S.Ct. 2031 (1992), citing, Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739, 105 S.Ct. 2380, 2388-2389, 85 L.Ed.2d 728 (1985); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47, 107 S.Ct. 1549, 1552-1553, 95 L.Ed.2d 39 (1987).  The ADA's

"relating to" language is "broadly worded," "deliberately expansive," and "conspicuous for its breadth." Id. citing, Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990); Pilot Life, supra, 481 U.S., at 46, 107 S.Ct., at 1552; FMC Corp. v. Holliday, 498 U.S. 52, 58, 111 S.Ct., at 407.

The Supreme Court and the Second Circuit have interpreted the term "relating to" in the ADA as preempting enforcement of local regulations even if the effect on rates, routes and services "is only indirect." Rowe v. New Hampshire Motor Transport Ass'n, 128 S.Ct. 989, 995, __ US __ (2008)[1] citing, Morales v. Trans World Airl., Inc., 504 U.S. 374, 378, 112 S.Ct. 2031 (1992); Air Transport Ass'n of America, Inc. v. Cuomo, 520 F.3d 218, 222 (2d. Cir. 2008) ("such preemption may occur even if a state law's effect on rates, routes or services 'is only indirect'"). Local regulatory enforcement actions that affect the routes and service of commercial aircraft are preempted even if "not specifically designed to affect" the federally preempted field. Morales v. Trans World Airl., Inc., 504 U.S. 374, 386, 112 S.Ct. 2031, 2038 (1992). Enforcement actions which affect any one (a price, route or service) also unavoidably affect the other two.

The evidence adduced at trial establishes that East Haven's regulatory enforcement actions have, and are specifically designed to have, a direct and significant effect on the routes and services of air carriers operating pursuant to federal law at the Airport.

---

[1] In Rowe v. New Hampshire Motor Transport Ass'n, 128 S.Ct. 989, 995, __ US __ (2008), the Court interpreted the Federal Aviation Administration Authorization Act of 1994, which contains the same  language (i.e., "no State ... shall enact or enforce any law ... relating to rates, routes, or services of any air carrier") as is found in the ADA, and specifically stated that because Congress used the same language in both statutes, both would be interpreted the same. Id. at 994.

The Airport is federally regulated pursuant to 14 CFR § 139.  See Stipulation of Uncontroverted Facts, Section XV(a) of the Joint Trial Memorandum filed on August 12, 2008, Court document 68 ("Stipulated Facts") P.16, ¶ 12; and Testimony of John Silva, Exhibit 10, P. 38, L. 22 through P. 39, L. 6.  The Airport is among the public-use airports included in the National Plan of Integrated Airport Systems.  See Stipulated Facts P.15, ¶ 9; National Plan of Integrated Airport Systems 2007-2011, Appendix A, Exhibit 2.   The Airport currently services an air carrier that provides commercial federally regulated air transportation.  See Stipulated Facts P. 15, ¶ 5; FAA Record of Decision, Exhibit 29, Section II, ¶ 2 ("US Airways, a commercial airline, maintains a regular flight schedule at the Airport flying to and from Philadelphia, Pennsylvania."); May 5, 2008 hearing transcript, Billowitz testimony, Exhibit 63 at P. 54, L. 12-16.

The Airport is classified by the FAA as a primary, commercial service airport in that it provides regularly scheduled commercial passenger air service.  See Stipulated Facts P.16, ¶ 12 with citations.  The Airport is also the base for four aircraft dependent on the Airport maintaining the existing runway length.  See Transcript of Hearing on May 5, 2008, Exhibit 63, P. 54; FAA Record of Decision, Exhibit 29, Section II.  Given this classification as a primary, commercial service airport, the Airport is currently required to, and does, hold an operating certificate under FAA Regulation Part 139 (14 CFR § 139), which currently requires the Airport to have Runway Safety Areas ("RSAs") on its main runway acceptable to the FAA.  See 14 CFR 139.309, Exhibit 52 at P. 3, Section 139.7 and P.10, Section 139.309; Department of Transportation Federal Aviation

Administration Order 5200.8, Exhibit 53 at P.1, Section 5; FAA Record of Decision, Exhibit 29 at P. 3; Testimony of John Silva, Exhibit 10, P. 32, L. 18 – P. 33, L. 8. Because it maintains scheduled commercial air service, the Airport is required to have RSA's in order to maintain its Part 139 Certificate.  See Stipulated Facts P.16, ¶ 12; 14 CFR § 139, Exhibit 52 at P. 10.

The Project is being funded by the United States through the FAA under the federal Airport and Airway Improvement Act ("AAIA").  See Stipulated Facts P.21, ¶ 31; 2008 FAA Airport Capital Improvement Plan, Exhibit 20;  FAA Grant Agreement; DUNS:87-902-6748, Exhibit 21; 2008 FAA Airport Capital Improvement Plan, Exhibit 20, Application for Federal Assistance, Section 10.  As part of the AAIA grant program, the Authority[2] made assurances to the United States that the Authority would build the Project in accordance with the mandates of the FAA.  See FAA Grant Agreement; DUNS:87-902-6748, Exhibit 21, P. 2, ¶ 4 (The Authority "shall carry out and complete the Project without undue delays and in accordance with the terms hereof, and such regulations and procedures as the secretary shall prescribe . . . .").   Failure to maintain compliance with Part 139 obligations puts the Airport in violation of assurances, for which the FAA can suspend grant funding. See Arapahoe County Public Airport Authority v. F.A.A.,  242 F.3d 1213, 1222 (10th Cir, 2001) (upholding FAA's suspension of discretionary funding to airport that violated its grant assurances by not allowing regularly scheduled commercial air service); FAA Record of Decision, Exhibit 29, P.7

---

[2] The Authority is the lessee and operator of the airport and property located at 155 Burr Street in New Haven, Connecticut ("Airport").  See Lease and Operating Agreement, Exhibit 1, P. 6, ¶ 1 and 3. The Airport property is owned by the City of New Haven and leased to the Authority pursuant to the terms of a Lease and Operating Agreement, dated July 1, 1998.  See Lease and Operating Agreement, Exhibit 1, P. 6, ¶ 1

("FAA will withhold Airport Improvement Program funding if the airport does not comply with the [wetland] mitigation commitments" specified in the approved Project documents.) (emphasis added). Without FAA-approved RSAs at the Airport, the FAA can withdraw the Airport's Operating Certificate.  See Testimony of John Silva, Exhibit 10, P. 75, L. 9 – 19.  Federal law will not permit the Airport to maintain commercial air service without a Part 139 Certificate.  See May 5, 2008 hearing transcript, Billowitz testimony, Exhibit 63 at P. 53, L. 10 – P. 54, L. 11.  Stated simply, unless the Authority is able to build the RSAs at the Airport, the Airport will have to cease all commercial air transportation service.  See May 5, 2008 hearing transcript, Billowitz testimony, Exhibit 63 at P. 69, L. 6-11.

The FAA has determined that installation of RSAs within the current boundaries of the Airport is practicable.  See Stipulated Facts P. 17, ¶ 16; FAA Runway Safety Area Determination, Exhibit 55; and Transcript of Hearing on May 5, 2008, Exhibit 63, P. 17, l. 13 – P.18, l. 6.  Federal RSA standards cannot be modified or waived like other design standards, and are solely related to aviation safety.  See Stipulated Facts – P.17, ¶ 17; FAA Airport Design Advisory Circular 150/5300-13, Exhibit 14, P. 21, ¶ C; see also Transcript of Hearing on May 5, 2008, Exhibit 63, P. 15, L. 5-10.  Currently, the Airport does not have standard Runway Safety Areas at either end of its main runway, Runway 2/20, and therefore, does not comply with the FAA's Part 139 standards.  See Stipulated Facts P.17, ¶ 18.  In order to fulfill its mandates under federal law, the Airport must have RSAs 500' wide and 1000' long on each runway that services commercial aircraft.  See Testimony of John

Silva, Exhibit 10, P. 37, L. 16-18; FAA Runway Safety Area Determination, Exhibit 55.   The Project is designed to build appropriately-sized RSAs at the ends of each runway that services commercial aircraft.  <u>See</u> Stipulated Facts P.19, ¶ 24 and P.19-20, ¶ 26.  The United States and the State of Connecticut have approved the Project as designed.  <u>See</u> Stipulated Facts P.25, ¶ 48 with citations.

The enforcement of East Haven's local regulations to stop, change, interfere with, and/or delay, construction of the Project has a direct and significant effect on the type of aircraft (i.e., service) that air-carriers are able to use at the Airport, and therefore, the destinations (i.e., routes) those carriers can service.  <u>See</u> FAA Airport Design – Advisory Circular, AC: 150/5300-13; Date: 9/29/89, Exhibit 14 at P. 5 and 251-74 (establishing the mandatory runway and RSA design criteria required for each type of commercial aircraft).

The enforcement of East Haven's local regulations to stop, change, interfere with, and/or delay, construction of the Project thus has a direct and significant effect on the routes and service of a carrier providing air transportation at the federally regulated Airport.  <u>See</u> May 5, 2008 hearing transcript, Billowitz testimony, Exhibit 63 at P. 48, L. 8-14 and P. 69, L. 6-11; Exhibit 65, P. 9 Robinson Aviation Web Site – List of corporate aircraft using the Airport; <u>see</u> <u>also</u>, <u>Burbank-Glendale-Pasadena Airport Authority v. City of Los Angeles</u>,  979 F.2d 1338, 1341 (9th Cir.1992) ("The regulation of runways and taxiways is  . . . a direct interference with the movements and operations of aircraft, and is therefore preempted by federal law.").

One such regulatory action was that East Haven refused to permit the relocation of Dodge Avenue and Morris Creek/Tuttle Brook at the north end.  <u>See</u> Stipulated Facts P.28, ¶ 61; Actions of East Haven Town Council, Exhibit 44.  East Haven's refusal to permit the relocation of Dodge Avenue and Morris Creek/Tuttle Brook at the north end has the effect of stopping, changing, interfering with, and/or delaying, construction of the Project, because it is impossible to build the Project as approved by the FAA without the relocation of Dodge Avenue and Morris Creek/Tuttle Brook.  <u>See</u> Plan of RSA and Taxiway Improvements Program, Exhibit 5, P. 3; Exhibit 12; Exhibit 19, and Downar Testimony, Trial Transcript P. 20, L. 19 through P. 21, L. 5.

East Haven also issued a Cease & Desist Order, asserting regulatory power over the Project, and ordering all work on the East Haven part of the Project to stop immediately.  <u>See</u> Stipulated Facts P.29, ¶ 64; and Cease and Desist Order, Exhibit 45.  East Haven's issuance of a Cease & Desist Order on work at the south end has the effect of stopping, changing, interfering with, and/or delaying, construction of the Project because it is a physical impossibility to construct the Runway Safety Area without the relocation of Morris Creek and the required environmental remediation as approved by the United States and the State of Connecticut.  <u>See</u> Exhibit 4; Exhibit 5, P. 1; Exhibit 13; Exhibit 99; Downar Testimony, Trial Transcript P. 12, L. 21 through P. 13, L. 1; and Zawoy Testimony, Trial Transcript P. 147, L. 23 through P. 148, L. 3.

East Haven's enforcement of its local regulations, and its other actions which have the effect of stopping, changing, interfering with, and/or delaying, construction of the Project, is enforcement of

"a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation [pursuant to federal law]." 49 U.S.C. § 41713(b)(1).  As such, East Haven's enforcement of its local regulations, and its other regulatory actions which have, or which will have, the effect of stopping, changing, interfering with, and/or delaying, construction of the Project are expressly preempted by the Airline Deregulation Act of 1978, 49 U.S.C. § 41713 (2005).

Although local regulatory actions that affect the routes and service of commercial aircraft are preempted <u>even if</u>  "not specifically designed to affect" the federally preempted field (<u>Morales v. Trans World Airlines, Inc.</u>,  504 U.S. 374, 386, 112 S.Ct. 2031, 2038 (1992)), the uncontested evidence adduced at trial establishes that East Haven's regulatory enforcement actions were "specifically designed to affect" the federally preempted field.  <u>Id.</u>  Specifically, East Haven's regulatory enforcement efforts to stop, change, interfere with, and/or delay, construction of the Project, were "specifically designed to affect" the length of runways upon which commercial aircraft travel (e.g., routes) and the schedule of flights (e.g., service) of a carrier providing federally regulated commercial air transportation.  <u>See</u> Capone-Almon Testimony, Trial Transcript P. 98, L. 16 through P. 99, L. 10.  East Haven's power to "enforce a law, regulation, or other provision having the force and effect of law" (49 U.S.C. § 41713(b)(1)) which affects the length of runways or the schedule of flights at the Airport is expressly preempted by federal law because such enforcement actions significantly affect routes and services of federally regulated carriers.

> The proper placement of taxiways and runways is critical to the safety of takeoffs and landings and essential to the efficient management of the surrounding airspace. The regulation of runways and taxiways is thus a direct interference with the movements and operations of aircraft, and is therefore preempted by federal law.

Burbank-Glendale-Pasadena Airport Authority v. City of Los Angeles,  979 F.2d 1338, 1341 (9th Cir.

1992); U.S. v. City of New Haven,  447 F.2d 972, 974 (2d Cir. 1971) ("[C]losing a part of the runway

and thus halting jet service constitutes an irreparable public injury and interference with the

commercial use of navigable air space.").  East Haven's regulatory enforcement efforts to stop,

change, interfere with, and/or delay, construction of the Project, were also "specifically designed to

affect" the frequency of flights (e.g., service) at the Airport, the flight paths (e.g., routes) of those

flights in proximity to houses in East Haven, as well as aviation safety, and aircraft noise.  See

DeSorbo Testimony, Trial Transcript P. 62, L. 1-16.  Each of these considerations is expressly within

the field of federally preempted aviation regulations.

> Federal authority to control the navigable airspace necessarily encompasses the placement, size, and configuration of runways. Likewise, the Airport and Airway Improvement Act of 1982 prescribes a dominant role for the FAA in airport development, which encompasses constructing, repairing, or improving public use airports, and imposes significant program responsibilities on the FAA. Non-proprietor jurisdictions have no role in determining the legal requirements for runway expansion and development within the boundaries of the existing airport. Federal aviation law preempts local ordinances designed to control and impede air navigation facilities, airport safety projects, or development projects on airport property at major airports as a means of controlling aircraft noise, and to otherwise control flight operations and impede safe and efficient airspace management.

65 FR 43802, 43815 (emphasis added).[3]  Any further efforts by East Haven to affect the length of runways, the schedule of flights, the frequency of flights, the path of flights in proximity to houses in East Haven, aviation safety, and/or aircraft noise, are expressly preempted by the Airline Deregulation Act of 1978, 49 U.S.C. § 41713, and should be enjoined, because such efforts are designed to affect a route and service of federally regulated air carriers.

### 2.   EAST HAVEN'S REGULATION OF AIR NAVIGATION FACILITIES IS EXPRESSLY PREEMPTED

As set forth in the Aviation Act of 1958 (as amended and recodified, 49 U.S.C. 40101, et seq.), the United States has "complete and exclusive national sovereignty in the airspace of the United States."  Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 626 (1973) (citation omitted); U.S. v. City of New Haven, 447 F.2d 972, 973 (2d Cir. 1971) (citation omitted).  Congress vested in the FAA the exclusive power to "assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace."  49 U.S.C 40103(b)(1).  As part of this mandate, Congress expressly empowered the FAA to prescribe regulations for "protecting individuals and property on the ground" and "preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects."  49 U.S.C 40103(b)(2)(B), and (D)(emphasis added).  "[RSAs are a] vital component of airport safety.  They

---

[3] East Haven cannot justify its usurpation of power under the guise of regulating public heath and safety because there is no exception to the federal preemption for health and safety regulations.  Air Transport v. Cuomo, 520 F.3d at 224 ("Rowe accordingly forecloses New York's argument and the district court's conclusion that classifying the PBR as a health and safety regulation or a matter of basic human necessities somehow shields it from the preemptive force of § 41713(b)(1).") citing, Rowe v. New Hampshire Motor Transport Ass'n, 128 S.Ct. 989, __ US __ (2008).

enhance the safety of air travelers by providing an area for aircraft which undershoot, overrun, or veer off the runway, and they provide direct access for firefighting and rescue equipment and personnel during such incidents."  May 2000 Final Environmental Impact Statement/Environmental Impact Evaluation – Runway Safety Area & Taxiway Improvements – Tweed-New Haven Airport, Exhibit 58, P. 1-8; Stipulated Facts P.16, ¶ 13; Testimony of John Silva, Exhibit 10, P. 39, L. 9 through P. 44, L. 2; Testimony of Richard Lamport, Exhibit 15, P. 83, L. 9 through P. 87, L.15.

The United States, through the FAA, has exclusive jurisdiction to acquire, establish, improve, operate, and maintain "air navigation facilities."  49 U.S.C.A. § 44502(a)(1)(A).  The term "'air navigation facility' means a facility used, available for use, or designed for use, in aid of air navigation, including: (A) a landing area; . . . (D) another structure or mechanism for guiding or controlling flight in the air or the landing and takeoff of aircraft."  49 U.S.C.A. § 40102(4) (emphasis added).   The term "landing area" in turn, includes "an airport."  49 U.S.C.A. § 40102(28).  Under these definitions, both a runway and an RSA are clearly "air navigation facilities" over which the federal government has express and exclusive regulatory control.  It is also clear that, by these sweeping aviation regulations, Congress intended to reserve all regulatory authority over the establishment, improvement and maintenance of air navigation facilities, including RSAs, to the FAA.  Any attempt by East Haven to enforce its local land use regulations to stop, change, interfere with, and/or delay the "establishment, improvement and maintenance" of the RSAs is violative of the

federal government's superior powers under the Supremacy Clause, and should be permanently enjoined.

### B.  IMPLIED FEDERAL PREEMPTION

Implied preemption arises when, "in the absence of explicit statutory language…Congress intended the Federal Government to occupy [a field] exclusively," or when a state law "actually conflicts with federal law." Air Transport v. Cuomo, 520 F.3d at 220 (citing, English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990)).

### 1.  THE UNITED STATES OCCUPIES THE ENTIRE FIELD OF AVIATION SAFETY

#### a)  The FAA Possesses Exclusive Jurisdiction to Regulate Aviation Safety

In 1958, Congress enacted the Aviation Act to create a "uniform and exclusive system of federal regulation" in the field of air safety.  Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 626 (U.S. 1973); see also, 49 U.S.C. § 40103(a)(1).   The Aviation Act "was passed by Congress for the purposes of centralizing in a single authority – indeed, one administrator – the power to frame rules for the safe and efficient use of the nation's airspace."  Air Transport.v. Cuomo, 520 F.3d at 224.

The FAA has occupied the entire field of airport safety regulation, leaving no room for East Haven to assert its police powers over construction of the Project.  See Montalvo v. Spirit Airlines, 508 F.3d 464, 468 (9th Cir.2007) ("the FAA preempts the entire field of aviation safety from state

and territorial regulation . . . .").  The federal government's preemption of state and local regulations

extends, not only in the air, but also on the ground.

> [The FAA] requires that exclusive control of airspace management be concentrated at the
> national level. . . Congress and the Federal Aviation Administration have used this
> authority to enact rules addressing virtually all areas of air safety. . . . This power extends
> to grounded planes and airport runways.

Air Transport v. Cuomo,  520 F.3d at 225 (emphasis added); Burbank v. Lockheed Air Terminal,

Inc., 411 U.S. 624, 626 (1973) ("The moment a ship taxis onto a runway it is caught up in an

elaborate and detailed system of controls.") quoting, Northwest Airlines. v. Minnesota, 322 U.S. 292,

303 (1944).

As the Authority's Project involves RSAs within the Airport's existing boundaries, there is

simply no room for East Haven to regulate the Project.  The FAA completely occupies the field of

regulations relating to airport and runway safety.

### b)  The FAA has Exclusive Jurisdiction over Aviation Safety Projects

The Airport and Airway Improvement Act ("AAIA") prescribes a dominant role for the FAA

in "Airport Development."  See 49 U.S.C 47101-47153.  "Airport Development" encompasses

"constructing, repairing, or improving a public-use airport."  49 U.S.C 47102(3)(A).  The AAIA is far

more than an airport construction funding authorization statute.  It specifically requires the FAA to

develop and maintain a "national plan of integrated airport systems" which "shall include the kind

and estimated cost of eligible airport development the Secretary . . . considers necessary to provide a

safe, efficient, and integrated system of public-use airports . . . . 49 U.S.C. 47103(a) (emphasis added).  The Airport is among the public-use airports included in the National Plan of Integrated Airport Systems.  See National Plan of Integrated Airport Systems 2007-2011, Appendix A, Exhibit 2; Stipulated Facts P.15, ¶ 9.  The FAA is also mandated by Congress to review and approve any proposals for airport improvement projects, like the Project, whether or not federal funds are requested for the project.  49 U.S.C. 44502(c)(1)(2).[4]  After receiving input and approval from United States Army Corps of Engineers ("Corps of Engineers"), the United States Environmental Protection Agency ("EPA"), the Federal Emergency Management Agency ("FEMA"), the Connecticut Office of Policy and Management ("COPM"), the Connecticut Department of Transportation ("CTDOT"), and the Connecticut Department of Environmental Protection ("DEP"), the FAA approved the Project as proposed by the Authority. See Stipulated Facts P.25, ¶ 48; Corps of Engineers Permit, Exhibit 34; Federal Register USEPA Notice, Exhibit 35; FEMA Conditional Letter Of Map Revision approval for New Haven, Exhibit 36; FEMA Conditional Letter Of Map Revision approval for East Haven, Exhibit 37; Letter of Support from Commissioner of CTDOT, Exhibit 38;  COPM Memorandum, Exhibit 39; DEP Permit No.200003049-KZ, Exhibit 40 at P. 1; DEP Permit Nos. IW-2000-116, DIV-200003052 & WQC-200003051, Exhibit 41 at P. 1; and DEP Approval of NPDES Application No.

---

[4]  49 U.S.C. 44502(c)(1)(2) provides that "To ensure conformity, an airport or landing area not involving the expenditure of Government money may be established or constructed, or a runway may be altered substantially, only if the Administrator of the Federal Aviation Administration is given reasonable prior notice so that the Administrator may provide advice on the effects of the establishment, construction, or alteration on the use of airspace by aircraft".

200600317, Exhibit 42; see also August 8, 2008 Ruling Re: Defendant's Motion to Dismiss, Court

Document 65, P. 3.

Neither the ADA, the Aviation Act, nor the AAIA suggest that the FAA's regulatory authority

was meant to be shared in any way with local "non-proprietor" municipalities (i.e., municipalities

which do not themselves operate an airport located within their borders).  East Haven is a non-

proprietor jurisdiction in that it does not own or operate any part of the Airport. See Stipulated Facts

– P.14, ¶ 4.  "Non-proprietor jurisdictions [like East Haven] have no role in determining the legal

requirements for runway expansion and development within the boundaries of the existing airport."

65 FR 43802, 43815.  In fact, the Second Circuit Court of Appeals has recently reiterated that: "The

FAA preempts the entire field of aviation safety through implied field preemption. The FAA and

regulations promulgated pursuant to it establish complete and thorough safety standards for air travel,

which are not subject to supplementation by. . . state laws."  Air Transport v. Cuomo,  520 F.3d at

225.

The Project contemplates building RSAs within the existing boundaries of the Airport

property.  Downar Testimony, Trial Transcript P. 22, L. 17-20 and P. 30, L. 13-17.  East Haven has

no power to regulate any aspect of construction of an aviation safety project being carried out within

the boundaries of the existing airport. See Burbank v. Los Angeles,  979 F.2d at 1341 (9th Cir. 1992).

("Stated simply, a non-proprietor municipality may not exercise its police power to prohibit, delay, or

otherwise condition the construction of runways and taxiways at a non-city-owned airport.").  East

Haven's land use regulations and East Haven's exercise of power to enforce those regulations, are therefore preempted by federal law.

> The problem with this Ordinance is that it conditions the construction and reconstruction of taxiways and runways on the prior approval of the City. This the City may not do. The proper placement of taxiways and runways is critical to the safety of takeoffs and landings and essential to the efficient management of the surrounding airspace. The regulation of runways and taxiways is thus a direct interference with the movements and operations of aircraft, and is therefore preempted by federal law.

Burbank v. Los Angeles,  979 F.2d at 1341 (9th Cir. 1992); Dallas/Fort Worth Int'l Airport Bd. v. City of Irving, 854 S.W.2d 161, 168 (Tex. App.-Dallas 1993) ("[n]o one disputes that federal laws preempt local regulation within the boundaries of an airport"), *vacated as moot*, 868 S.W.2d 750 (Tex. 1993).  Any attempt by East Haven to use its regulatory powers to stop, change, interfere with, and/or delay construction of the RSAs invades the United States' exclusive regulatory power over the field of aviation safety, and should be enjoined.

### c)   Congress Has Mandated Construction of the RSAs

By the Department of Transportation Appropriations Act, 2006,[5] Congress decreed that the RSAs at all airports operating under 14 CFR 139, including the Airport, must comply with the RSA standards promulgated by the FAA.

---

[5] P.L. 109-115 (2005 HR 3058). Official title as introduced: Making appropriations for the Departments of Transportation, Treasury, and Housing and Urban Development, the Judiciary, District of Columbia, and independent agencies for the fiscal year ending September 30, 2006, and for other purposes.

> That not later than December 31, 2015, the owner or operator of an airport certificated under 49 U.S.C. 44706 shall improve the airport's runway safety areas to comply with the Federal Aviation Administration design standards required by 14 CFR part 139

Pub.L. 109-115, Div. A, Title I, Nov. 30, 2005, 119 Stat. 2401 (the "2006 Act").   The Airport is a

"primary, commercial service airport," regulated under 14 CFR Part 139.  Stipulated Facts P.16, ¶ 12.

The requirements promulgated under 14 CFR Part 139 establish the required physical characteristics

RSAs must have, and establish that it is the FAA Administrator – and not the Town of East Haven –

that has the power to authorize airports to construct, reconstruct, expand, and configure RSAs.

> (a) In a manner authorized by the Administrator, each certificate holder must provide and maintain, for each runway and taxiway that is available for air carrier use, a safety area of at least the dimensions that--
>
>> (1) Existed on December 31, 1987, if the runway or taxiway had a safety area on December 31, 1987, and if no reconstruction or significant expansion of the runway or taxiway was begun on or after January 1, 1988; or
>>
>> (2) Are authorized by the Administrator at the time the construction, reconstruction, or expansion began if construction, reconstruction, or significant expansion of the runway or taxiway began on or after January 1, 1988.
>
> (b) Each certificate holder must maintain its safety areas as follows:
>
>> (1) Each safety area must be cleared and graded and have no potentially hazardous ruts, humps, depressions, or other surface variations.
>>
>> (2) Each safety area must be drained by grading or storm sewers to prevent water accumulation.
>>
>> (3) Each safety area must be capable under dry conditions of supporting snow removal and aircraft rescue and firefighting equipment and of supporting the occasional passage of aircraft without causing major damage to the aircraft.

(4) No objects may be located in any safety area, except for objects that need to be located in a safety area because of their function. These objects must be constructed, to the extent practical, on frangibly mounted structures of the lowest practical height, with the frangible point no higher than 3 inches above grade.

(c) FAA Advisory Circulars contain methods and procedures for the configuration and maintenance of safety areas acceptable to the Administrator.[6]

14 CFR 139.309, Exhibit 52 at P. 10.

In the 2006 Act, Congress also set the deadline of December 31, 2015 for the Airport to complete construction of the RSAs which comply with the FAA standards.  However, the FAA has mandated that the RSAs at the Airport be completed by 2014.  Stipulated Facts P.25, ¶ 51.  If the RSAs are not operational by that time the FAA will likely require that the Airport shorten the effective length of its runways to take areas equivalent of the required RSA dimensions from the existing pavement. See May 5, 2008 hearing transcript, Billowitz testimony, Exhibit 63 at P. 48, L. 22 through P. 49, L. 10; Stipulated Facts P.20, ¶ 28.  Allowing a local municipality to effect such a result by regulating in the preempted field of aviation safety would be antithetical to Congress's intent of enforcing a consistent and pervasive scheme of aviation safety regulations through "a single authority – indeed, one administrator . . . ." Air Transport v. Cuomo,  520 F.3d at 224.  Any attempt by East Haven to use its regulatory powers to stop, change, interfere with, and/or delay construction of the RSAs thwarts Congress' intent to centralize all such regulatory authority in the FAA, and should be enjoined.

---

[6] See FAA Airport Design – Advisory Circular, AC: 150/5300-13; Date: 9/29/89, Exhibit 14, p. 5, 251-74.

### d)  The FAA, with Assistance of the State of Connecticut, has Regulated and Vetted All Aspects of the Project the United States has Deemed Appropriate

As is evidenced by the extensive planning, review and analysis conducted by the federal and state authorities, the FAA has exhaustively considered all required aspects of the Project.  See Stipulated Facts P. 24, ¶ 44- P. 25, ¶ 49.  There is nothing further for East Haven to regulate.[7]

During the multi-year vetting process, the FAA, in cooperation with the DEP (see Testimony of John Silva, Exhibit 10, P. 45, L. 19 through P. 46, L. 12.), analyzed:

> [a]ll factors which may be relevant to the proposal . . ., including the cumulative effects thereof; among those are: conservation, economics, aesthetics, general environmental

---

[7] The extensive investigation, review and analysis that was brought to this Project by multiple agencies of the federal and state governments casts this Project in stark contrast to the facts surrounding the small, private field at issue in In re Commercial Airfield, 170 Vt. 595, 752 A.2d 13 (Vt.,2000).  There, the airfield was not subject to the extensive federal regulations which control the operations of commercial Part 139 airports like the Airport.

There are two ways in which the FAA's authority intersects with land-use issues. First, the Aviation Act provides that the Environmental Protection Agency will assist them on airport development projects to ensure there is no significant impact on natural resources, water and air quality, and other environmental concerns. See 49 U.S.C.A. § 47101(h). This policy applies to developments at airports falling within certain guidelines, for example, large size, number of flights and number of passengers. See id. § 47102 (definitions of "airport development," "public airport," etc.). The Peet Airport is small and privately-owned, thereby exempting it from these guidelines.

In re Commercial Airfield, 170 Vt. at 596. There, the town sought to regulate the location of the airfield, claiming that the field needed to apply for a town permit to operate at the location in question. Citing 14 C.F.R. § 157.7 the court stated that the FAA would "not consider environmental or land use compatibility impacts" at the airfield, because the field was exempt from FAA regulation. Id. Thus, the court concluded that because "environmental impact and land use compatibility are matters of local concern and will not be determined by the FAA," that the FAA had left that field of regulation and oversight to the municipality. Id.  Here, the FAA has left no such regulatory vacuum for East Haven to fill. The Airport is subject to the very regulations at issue.  The FAA, in cooperation with other federal and state agencies, has spent fifteen years planning, analyzing, vetting and approving every aspect of "environmental or land use compatibility impacts" required under federal law. Id.  There is nothing left for East Haven to regulate.

> concerns, wetlands, cultural value, fish and wildlife values, flood hazards, flood plain
> value, land use, navigation, shoreline erosion and accretion, recreation, water supply and
> conservation, water quality, energy needs, safety, food production, and in general, the
> needs and welfare of the people.

U.S. Army Corps. Of Engineers, Public Notice, Exhibit 27 at P. 3 (emphasis added).  The FAA has

approved the Project after extensively considering "19 areas of potential environmental impact." See

FAA Record of Decision, Exhibit 29, P. 5.[8]  These areas are:

> aircraft noise and compatible land use;  social impact;  induced socioeconomic impact;  air
> quality;  water quality;  parkland and wildlife refuge impacts;  historical, archeological,
> architectural, and cultural resources;  biotic communities;  endangered and threatened
> species;  wetlands;  floodplains;  Coastal Zone Management Program and coastal barriers;
> wild and scenic rivers;  farmland;  energy supply and natural resources;  light emissions;
> solid waste;  hazardous materials;  ground transportation;  construction;  and
> environmental justice.

FAA Record of Decision, Exhibit 29, P. 5.  Importantly, within this exhaustive list of considerations,

the FAA specifically considered Coastal Area Management ("CAM") issues, and erosion &

sedimentation control ("E&SC") issues, two issues over which East Haven still seeks to assert local

jurisdiction.  See FAA Record of Decision, Exhibit 29, P. 5 (CAM); DEP Notice of Tentative

Determinations, Exhibit 32, P. 2 (CAM and E&SC); DEP Wetlands Permit, Exhibit 40, P. 14, ¶¶ 20-

22 and 25-26 (E&SC); DEP Erosion & Sediment Control Approval, Exhibit 42 (same).

The FAA's comprehensive review also considered the interests of the community, and the

effects of the Project on residents living near the airport including "ground traffic associated with the

relocation of Dodge Avenue and potential increased flooding." FAA Record of Decision, Exhibit 29,

---

[8] While the FAA states that it analyzed 19 areas of potential environmental impact, the Record of Decision actually lists
21 such areas.  See FAA Record of Decision, Exhibit 29, P. 5.

P. 6, second bullet point; Testimony of John Silva, Exhibit 10, P. 44, L. 11 through P. 51, L. 20.   The

FAA, in cooperation with the DEP, gave the public and the local municipalities significant

opportunity to participate in the process, both with submitted comments and with open public

hearings.   See FAA Record of Decision, Exhibit 29, P.8-10; Stipulated Facts P. 24, ¶ 44.   The FAA

has now finally determined exactly how it wants the Authority to build the RSAs.   See Stipulated

Facts P. 25, ¶ 49; FAA Record of Decision, Exhibit 29, P. 10, Sec. VIII.

Even if East Haven's regulatory efforts were not designed to improperly regulate the

preempted field of aviation safety, East Haven's attempted oversight of the same environmental and

land use aspects of the Project which have already been exhaustively regulated, analyzed and vetted

by the FAA, does nothing but allow the local municipality to second guess and challenge the

expertise, judgment and competence of the United States and its surrogates.   Where Congress has

established a uniform system of comprehensive regulation designed to implement a national policy,

Congress clearly did not intend to allow municipalities to effect such a result.

> Because of the strong federal interest in establishing a uniform system of regulation
> designed to implement a national policy of ensuring an adequate supply of natural gas at
> reasonable prices; and, because the federal regulatory scheme comprehensively regulates
> the location, construction and modification of natural gas facilities, there is no room for
> local zoning or building code regulations on the same subjects. In short, Congress clearly
> has manifested an intent to occupy the field and has preempted local zoning ordinances
> and building codes to the extent that they purport to regulate matters addressed by federal
> law.

AES Sparrows Point LNG, LLC v. Smith,  470 F.Supp.2d 586, 594 (D.Md.,2007).  The Court should

enjoin East Haven from any further attempts to regulate any aspect of the Project.

### 2.   FEDERAL CONFLICT PREEMPTION

The Authority respectfully refers the Court to its Memorandum of Position on Contested

Issues of Fact and Law at pages 106-119 of the Joint Trial Memorandum ("JTM").

Conflict preemption arises when federal regulation does not fully occupy the field and

compliance with both federal and state regulation is a physical impossibility or state regulation stands

as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Hillsborough County v. Automated Med Labs., Inc., 471 U.S. 707, 713, 105 S. Ct. 2371, 85 L. Ed. 2d

714, (1985).  These principles apply to local regulation by ordinance, Blue Circle Cement Inc. v.

Board of County Comm., 27 F. 3rd 1499 (10th Cir. 1994), to local zoning authority, AES Sparrows

Point LNG, LLC v Smith, 470 F.Supp. 2d 586 (D.Md. 2007), and to the government's application of

regulation in a specific situation.  Grossbaum v. Indianapolis - Marion County Bldg. Authority 100

F.3rd 1287 (7th Cir. 1996); Arapahoe County Public Airport v. Federal Aviation Administration, 242

F. 3d 1213 (10th Cir. 2001).

As has been demonstrated in this case, without challenge, it is a physical impossibility to

construct the federally mandated, vetted and approved Runway Safety Area at the north end of

Runway 20, the main runway, without the relocation of Dodge Avenue and Tuttle Brook (See

Exhibits 4; 5, p. 3; 12; 19, and Downar Testimony, Trial Transcript P. 20, L. 19 through P. 21, L. 5).

East Haven's Planning & Zoning Commission and Town Council have unanimously denied such

relocation efforts, as will be addressed in more detail hereinafter.  Indeed, the current Mayor, April

Capone Almon, acknowledged (Capone Almon Testimony, Trial Transcript P. 85, L. 11-13) that she was responsible for her website, Exhibit 62, and stated therein that she voted against the "proposed safety zone because it represented a 'Trojan Horse' for expansion." She stated in that website, "[a]s an elected official, it's my obligation to support the interest of my constituents. **Therefore I do not support its expansion."** (Emphasis in original). The Mayor's website also states, "Connecticut is a geographically small state. Major investment has been made to upgrade Bradley International Airport in Windsor Locks. Let's use it." See Exhibit 62. Mayor Capone Almon acknowledged that expansion was the main reason she voted against the Project. See Capone Almon Testimony, Trial Transcript P. 87, L. 8-10. She further testified that she continues to oppose the Project based upon her current belief that the Project represents a Trojan Horse for expansion. See Capone Almon Testimony, Trial Transcript P. 88, L. 1-20. The unchallenged effect of the Town Council's unanimous vote denying the ordinances permitting the relocation of Dodge Avenue and Tuttle Brook is to prevent the construction of the federally mandated, vetted and approved Runway Safety Area immediately north of the main runway in conflict with federal policy.

At the south end of the main runway, Runway 2, it is a physical impossibility to construct the Runway Safety Area without the relocation of Morris Creek and the required environmental remediation within East Haven and within the Airport boundaries. See Exhibits 4; 5, p. 1; 13; 99; Downar Testimony, Trial Transcript P. 12, L. 21 through P. 13, L. 1; and Zawoy Testimony, Trial Transcript P. 147, L. 23 through P. 148, L. 8. When the Authority attempted to commence activity

within the airport as permitted by the DEP, and as acknowledged by the Assistant Town Engineer Booker to have been permitted by DEP, (see Booker Testimony, Trial Transcript P. 116, L. 23 through P. 117, L. 8; Booker Deposition Transcript P. 94, L. 6-13; and Downar Testimony, Trial Transcript P. 15, L. 11-15), East Haven issued a Cease and Desist Order (Exhibit 45) also to be addressed further in this memorandum.  Of significance, East Haven continues to assert jurisdiction over the Project and within the last 30 days has continued to threaten enforcement action should work commence on the Project within East Haven.  On August 11, 2008, Town Engineer James Staunton wrote to the DEP, in connection with the south end, that "[i]f the work should commence with this project, it is our intention to take enforcement action."  See Exhibit 515.

Thus, at both the north end and the south end of the main runway, East Haven has taken actions to prevent the Project and continues today in its opposition to the Project in conflict with federal policy.

In Sparrows Point, 470 F.Supp. 2d at 600, a United States District Court, in dealing with a zoning amendment affecting the citing of a liquefied natural gas facility, held that the zoning amendment "'actually conflicts with' the NGA because it serves as 'an anticipatory veto of FERC's authority to determine whether to allow the siting of an LNG Facility at Sparrow's Point.'"  Id. (internal quotations omitted).  Such is the case here.  The veto and delay by East Haven is a significant impediment to, and thwarts, the federal policy in a material way.  Conflict preemption requires that the "state or local action be a material impediment to the federal action, or thwarts the

federal policy in a material way."  <u>Mount Olivet Cemetery Ass'n v. Salt Lake City</u>,164 F. 3d 480, 489 (10th Cir. 1998), <u>citing</u> <u>Florida Avocado Growers v. Paul</u>, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217 (1963) and <u>Blue Circle Cement</u>, *supra*.  Indeed, East Haven's veto and delay efforts could doom the Project, contrary to federal policy, by, *inter alia*, jeopardizing the 95% FAA funding for the Project.  <u>See</u> Exhibit 96.  P. 2, ¶ 4 of the August 11, 2008 Grant Offer from the FAA,  Exhibit 96, states that "[t]he sponsor shall carry out and complete the Project without undue delays in accordance with the terms hereof, and such regulations and procedures as the Secretary shall prescribe, and agrees to comply with the assurances which were made part of the project application."  Significantly, these assurances, also known as the Certificate of Sponsor's Attorney, state, on page 4, in pertinent part, "[i]n addition, for grants involving projects to be carried out on property not owned by the Sponsor, <u>there</u> <u>are</u> <u>no</u> <u>legal</u> <u>impediments</u> <u>that</u> <u>will</u> <u>prevent</u> <u>the</u> <u>full</u> <u>performance</u> <u>by</u> <u>the</u> <u>Sponsor</u>."  (emphasis added).

### a)  Physical Impossibility

The case at bar is a classical example of physical impossibility.  Objectively, as demonstrated by the evidence in exhibits and testimony in this case (again, without challenge, and <u>see</u> Stipulated Facts P.19, Paragraphs 24-26), the Project cannot go forward if East Haven stands in the way and, under Article VI, Cl. 2 of the United States Constitution, the purpose and effect of East Haven's policy is in conflict with federal policy, and, therefore, is preempted.  As stated by the United States Supreme Court: "[t]he relative importance to the State of its own law is not material when there is a

conflict with a valid federal law, for the framers of our Constitution provided that the federal law must prevail." Free v. Bland, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092 (1962); see also Sparrows Point 470 F.Supp. 2d at 600.

### b)  Obstacle to the Accomplishment and Execution of the Full Purposes and Objectives of Congress

The test under this theory of conflict preemption is objective.  See Blue Circle Cement 27 F. 3rd at 1508.  That is, what is the effect of East Haven's regulation on federal policy and/or the intent of Congress.  East Haven's subjective intent is irrelevant.  The "subjective motivation of a state actor is irrelevant to preemption analysis, which is guided by the objective effects of state action in relation to the federal scheme." Legal Aid Society v. City of New York, 114 F. Supp 2d 204, 237 (S.D.N.Y. 2000).  However, the court may examine the purpose of a statute or regulation because the purpose of the regulation, as applied, may determine its effect upon the federal policy.  Courts have applied both a purpose and effect analysis, but the objective effect of the regulation on federal policy determines the outcome of the preemption analysis.

In Gade, supra, Justice O'Connor dealt with the purpose and effect analysis.  Gade involved whether a state OSHA standard was preempted.  In framing the question, the Court wrote, "[b]ut petitioner asserts that if the state legislature articulates a purpose other than (or in addition to) workplace health and safety, then the OSH Act loses its pre-emptive force.  We disagree.  Although 'part of the pre-emptive field is defined by reference to the purpose of the state law in question,…

another part of the field is defined by the state law's actual effect.'"  Gade, 505 U.S. at 105.  The

Court went on to state:

> [i]n assessing the impact of the state law on the federal scheme, we have refused to rely
> solely on the legislature's professed purpose and have looked as well to the effects of the
> law.  As we have explained over two decades ago: 'We can no longer adhere to the
> aberrational doctrine…. that the state law may frustrate the operation of the federal law as
> long as the state legislature in passing its law had some purpose in mind other than one of
> frustration.  Apart from the fact that it is at odds with the approach taken in nearly all of
> our supremacy clause cases, such a doctrine would enable state legislatures to nullify
> nearly all unwanted federal legislation by simply publishing a legislative committee report
> articulating some state interest or policy – other than frustration of the federal objective –
> that would be tangentially furthered by the proposed state law…[A]ny state legislation
> which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy
> Clause.' Perez v. Campbell, 402 U.S., at 651, 652, 91  S. Ct. at 1712-1713.

 Gade, 505 U.S. at 105-106.  The United States Supreme Court further stated: "[W]hen considering

the purpose of a challenged statute, this Court is not bound by '[t]he name, description or

characterization given it by the legislature or the courts of the State', but will determine for itself the

practical impact of the law." Gade, 505 U.S. at 106.  Finally, that Court stated that "(pre-emption

analysis turns not on whether federal and state laws 'are aimed at distinct and different evils' but

whether they 'operate upon the same object.)'" Gade, 505 U.S. at 106.  In this instance, the effect of

East Haven's regulation is to "operate upon the same object" being regulated by the federal

government.  They both are regulating, in conflict, the federally mandated, vetted and approved

Project within the existing boundaries of an FAA certified airport.

While stating that the standard of review for preemption analysis is objective, <u>Blue Circle</u>, *supra*, speaks in terms of whether the local regulatory actions are a reasonable response to a legitimate local concern for safety and welfare (here zoning and environmental considerations), or whether the regulation's purpose is to prevent the Project, which, in turn, affects the outcome because the regulation as applied is in conflict with federal policy.  In other words, motivation or subjective intent play no role, even if there may be some legitimate concerns.  If the objective purpose of East Haven's regulation, or one among the purposes, is to prevent the Project, federal law trumps East Haven's regulation.  <u>Blue Circle</u>, *supra*, citing <u>Gade</u>, *supra*, states, "we must consider 'whether the regulation is consistent with the structure and purpose of the federal statute as a whole.'" <u>Blue Circle</u> 27 F. 3d at 1505.  As the court stated in <u>Grossbaum</u>, 100 F. 3d at 1294 (7th Cir 1996), "[n]o matter how constitutionally sound a given rule may be, the repeated misapplication or selective application of the rule could create a entirely unconstitutional policy."  The <u>Grossbaum</u> court (100 F. 3d at 1292 n. 3) explains that the subjective motivation of government actors should not be confused with what the United States Supreme Court has referred to as the "object" of a law.

Other courts have found the purpose of the challenged statute or ordinance to be pertinent to their federal preemption analysis, as opposed to the subjective intent of the actors.  <u>See</u> <u>English v. Gen. Elect. Co</u>, 496 U.S. 72, 79, 110 S. Ct. 2270, 2278 (1990) (noting that the preempted field under the Energy Reorganization Act may be defined, in part, by reference to the purpose of the state law); <u>Skull Valley Band of Goshute Indians v. Neilson</u>, 376 F. 3d 1223, 1252 (10th Cir. 2004) (pre-

emption analysis under Atomic Energy Act requires "consideration of the purpose of the allegedly pre-empted statute, along with its effects."). As previously stated, the purpose of East Haven's regulation, as applied, in part, determines the effect of the regulation on the Project. If the effect of the regulation on the Project conflicts with federal policy and congressional intent, East Haven's regulation is preempted.

To the extent that statements have been made, both by Mayor Capone Almon[9] and Mayor Maturo, about expansion of the airport and, specifically, expansion of the runways within the existing boundaries of the airport, said statements do not reference a legitimate local concern because runway length within the existing boundaries of an FAA-certified airport is not a matter of legitimate local concern. That determination lies within the sole jurisdictional authority of the FAA. See United States v. City of New Haven, 447 F. 2d 972, 973 (2d Cir. 1971) (runway protection zones embrace navigable airspace which are within the sole jurisdiction of the federal government); Dallas/Fort Worth Int'l Airport v. City of Irving, 854 S.W. 2d 161, 168 (Tex. App.- Dallas), *vacated as moot*, 868 S.W. 2d 750 (Tex. 1993) (whereas the initial siting of an airport may be subject to the traditional power of state and local authorities, the expansion of an airport within its existing boundaries is a matter within FAA's jurisdiction and interest, "[n]o one disputes that federal laws preempt local regulation within the boundaries of an airport"); United States v. City of Berkley 735 F. Supp. 937, 940 (E.D. Mo. 1990) ("air navigation facility" includes a "landing area," which in turn, includes "an

---

[9] Mayor Capone Almon also testified that she had a concern about an expanded flight schedule, see Capone Almon Testimony, Trial Transcript, P. 99, L. 7-10, an area clearly pre-empted under the Federal Aviation Act of 1958, as amended and recodified, 49 U.S.C. 40101, et seq.)

airport," holding that a city building code was preempted by the Federal Aviation Act of 1958 and could not impede construction of an airport radar facility located on land within the city.); Burbank-Glendale-Pasadena Airport Authority v. City of Burbank 979 F. 2d 1339 (9th Cir. 1992) (non proprietor city's regulations of runways and taxiways is a direct interference with the movements and operations of aircraft, and is, therefore, preempted by federal law); Air Transport v. Cuomo, 520 F. 3d at 225 (Federal Aviation Act of 1958 implicitly preempts state law standards governing aviation safety, including runway safety areas).

In basing its opposition to the Project upon expansion of the Airport, and, specifically, the length of runways within the existing boundaries of the airport (which is not affected by, nor relevant to, the Project), East Haven is not responding to a legitimate local concern. Rather, the purpose and effect of its actions are to regulate an air navigation facility (Runway Safety Area), and this regulation is in conflict with, and preempted by, the expressed intent of Congress.

### c)  The Purpose and Effect of East Haven's Regulation is to Stop the Project

#### i.      Dodge Avenue

Exhibit 72, as noted in the Stipulated Facts at paragraphs 52-54, was the Authority's application to the Planning and Zoning Commission for a favorable referral of two ordinances to relocate Dodge Avenue and Tuttle Brook at the north end of the main runway. See Exhibits 4; 5, p. 3; 12; 19; and DeSorbo Testimony, Trial Transcript P. 68, L. 2-18.  The actions of the Planning &

Zoning Commission are set forth in Exhibit 43 and the Minutes of the Planning & Zoning Commission meeting of July 11, 2007 are set forth in Exhibit 66.  Item 3D of Exhibit 43 represents the action taken by the Planning & Zoning Commission in connection with the Authority's application, namely a unanimous unfavorable 8-24 referral.  Connecticut General Statutes § 8-24, having to do with, *inter alia*, road abandonment, requires that the reasons for any disapproval be recorded and transmitted to the legislative body.  In violation of the statute, there is no evidence that the reasons for disapproval ever were recorded or transmitted to the legislative body.

The application of the Authority, Exhibit 72, relates solely to zoning concerns, such as Dodge Avenue being located in a light industrial district, road relocation, construction issues, and so forth. There is nothing in Exhibit 72 relating to the expansion of the airport, or the expansion of runways within the existing boundaries of the airport.  Nonetheless, as set forth on page 3 of Exhibit 66, the minutes of the meeting, the zoning enforcement officer read a letter from then Mayor Maturo stating that the Mayor was adamantly opposed to any type of expansion at the airport.  The letter from Mayor Maturo, dated July 11, 2007, Exhibit 7, states, in pertinent part:

> As I am sure you are aware, I am opposed to the airport proposal to expand the runway on the north and south end.  In particular, the relocation of Dodge Avenue, the subject of tonight's 8-24 referral, must not be approved.  The extension proposed for the airport runway's north end is by their own admission a pre-cursor to the actual expansion of the runway in the near future.  While they represent the relocation as an extension of the runway safety area, once Dodge Avenue is relocated their long-term plan is to extend the runway.

> East Haven homeowners will be adversely affected by this action and there is overwhelming opposition to the project……Therefore, I respectfully and strenuously request that your commission issue a strongly worded, unfavorable 8-24 report to the East Haven Town Council.

Clearly, the Mayor's purpose, and the purpose and effect of the action by the Planning and Zoning Commission, was to prevent the Project based not on the substance of the Application, but rather based upon a belief that the Project represented a pre-cursor to expansion of the Airport.  This concern, as stated previously, is not a legitimate local concern, but rather one confined exclusively within the purview of the FAA.

On September 4, 2007, the unfavorable 8-24 referral came before the East Haven Town Council.  Exhibit 44 sets forth the Actions taken by the Town Council and Exhibit 67 sets forth the Minutes of the meeting of the Town Council.  As disclosed in Exhibit 67, on page 3, Arthur DeSorbo, the East Haven Director of Management and Administration, spoke on behalf of Mayor Maturo.  "He stated that the Mayor is absolutely opposed to both ordinances," and further, "[a]gain, the Mayor is clearly opposed to these ordinances."  The Minutes also reflect on page 4 that then Councilwoman, and now Mayor, Capone Almon made only one statement, and that related solely to the non-issue of paving the runway and expansion of the runway, which is not part of, nor relevant to, the Project or the Application, Exhibit 72.  Capone Almon's statement had nothing to do with the substance of the 8-24 Referral.  As disclosed by Exhibit 44, Actions of Town Council, items 7, 8, and 9 dealt with the ordinances related to the relocation of Dodge Avenue and Tuttle Brook.  While all of the other items on the Town Council's agenda were approved unanimously, both items 8 and 9, having to do with the

Project, were unanimously voted down without public comment or any comment from the Council. Item 7 discloses an executive session involving pending litigation involving DEP permits with regard to the Airport.  After the executive session, the Town Council immediately, and as noted without comment, voted down both ordinances.  All of these issues are dealt with in the Stipulated Facts at Paragraphs 55 through 65.

The Maturo administration's opposition to the relocation of Dodge Avenue and Tuttle Brook and its position that the Dodge Avenue relocation was a precursor to expansion were conveyed by the administration to its Planning and Zoning Commission and Town Council through Mr. DeSorbo. See DeSorbo Testimony, Trial Transcript P. 54, L. 6-11; and P. 60, L. 23 through P. 62, L. 13.  These concerns are related to larger planes coming into the Airport, more frequent flights, and noise of aircraft. Id.  Strategies ("We came up with a strategy", DeSorbo Testimony, Trial Transcript P. 63, L. 15) were developed and engaged in including possible action before the state legislature and initiation of litigation to prevent the Project from going forward. See DeSorbo Testimony, Trial Transcript P. 64, L. 6-12; and P. 64 L. 21-24).  There was discussion concerning the utilization of local boards to prevent the relocation of Dodge Avenue, with the understood result being that the Project would not go forward as designed. See DeSorbo Testimony, Trial Transcript P. 66, L. 10-24.  There was recognition that the Town Council and all of the boards and commissions were aware of the position of the administration, and that certain Council members "were opposed to the airport."  See DeSorbo Testimony, Trial Transcript P. 69, L. 16-21.  Mr. DeSorbo authored Exhibit 7, Mayor Maturo's letter

to the Planning and Zoning Commission concerning the Project being a precursor to expansion –the supposed lengthening of the runways.  See DeSorbo Testimony, Trial Transcript P. 70, L. 6 through P. 71 L. 3.

### ii.    East Haven's Alleged Environmental Concerns

After the Environmental Impact Statement ("EIS") process (Exhibits 18 and 58), the DEP engaged in a seven year permitting process properly serving all required notices and soliciting public participation.  As stated in the Stipulated Facts, Paragraph 13, referencing the final EIS, the RSAs are a "vital component of air safety.  They enhance the safety of travelers by providing an area for aircraft which undershoot, overrun, or veer off the runway, and they provide direct access for firefighting and rescue equipment and personnel during such incidents."  The final EIS, Exhibit 58, states at 1-7: "The proposed improvements address **safety margins** at the Tweed-New Haven Airport and **do not** affect the underlying demand for air traffic through Tweed or the ability of the airport to accommodate larger aircraft." (emphasis in original).  Both the EIS process and the DEP process involved significant public participation.  See Stipulated Facts Paragraphs 38; 39; 40; 42; 43; 44; and 45.  As a result of this process, required federal and state permits were applied for and received.  See Stipulated Facts Paragraphs 46; 47; 48; and 49.  The Army Corps of Engineers and DEP permits expire in 2012.  See Stipulated Facts Paragraph 50.

A seminal exhibit for this Court to review is Exhibit 59, the DEP Findings of Fact and Conclusions of Law with regard to the permits applied for and granted.  Exhibit 60 is the Proposed

Final Decision of the Hearing Officer with recommendation for approval, which includes Exhibit 59. Exhibit 61 is the Final Decision affirming the Proposed Final Decision of the Hearing Officer, which is signed by Gina McCarthy, Commissioner of the Department of Environmental Protection, dated April 17, 2007.  These proposed Findings of Fact and Conclusions of Law were addressed in testimony before the Court by Kevin Zawoy of DEP who, on behalf of DEP, essentially assumed the lead role for the DEP in the permitting process for the Project.  His testimony can be found in the Trial Transcript at pp. 130-153, and, specifically with regard to Exhibit 59, at P. 150.  Exhibit 59 contains 205 Findings of Fact and 29 Conclusions of Law.

Exhibit 59 deals with proposed regulated activities at the north end including the relocation of Dodge Avenue and Tuttle Brook (paragraphs 22-24), and at the south end (paragraphs 27 and 28). Paragraph 29 of Exhibit 59 deals with the wetland restoration/enhancement plan stating that approximately 56 acres of degraded tidal wetlands will be restored.  Exhibit 59 deals with flood plain and storm events in paragraphs 38 and 39, and further deals with flood plain issues in paragraphs 140, 141-145, 146-149 and 152.  Exhibit 59 deals with alternatives to the Project, as approved at both ends of the runway, in paragraphs 47-62.  Exhibit 59 also contains repeated references to compliance with the Coastal Management Act, Connecticut General Statutes §§22a-90 to 22a-112, in connection with the permits, by way of example in paragraphs 110, 155 and 188, and in Conclusions of Law paragraphs 8, 16 and 24.  Exhibit 59 deals with soil erosion and sediment control in paragraphs 178 and 185.

In the section of Exhibit 59 devoted to the Intervenor (Findings of Fact, paragraphs 194 through 198, and Conclusions of Law, paragraphs 25 through 29) Exhibit 59 states that the Criscuolo group, an East Haven activist organization, was granted intervenor status on June 25, 2001.  East Haven, which now seeks to assert new alleged environmental concerns, did not attempt to intervene until December 2006, five and a half years later, and its Intervention Petition was rejected by the DEP as untimely.  See Ricozzi Testimony, Trial Transcript P. 126, L. 18-24.  Even counsel for East Haven in this case, in its Objection to Motion to Compel, dated August 18, 2008, ("Objection") addresses the late intervention issue in paragraphs 20 and 22 of the Objection.  According to East Haven counsel, East Haven thought that the Authority ultimately must come to the town for local permits, "so that very little was actually done on behalf of the Town during the several years of processing by the State Department of Environmental Protection."  Paragraph 20 of the Objection.  Further, East Haven counsel states, "[t]hat limited Town involvement while the matter was pending before the State DEP is candidly a problem we confront in defending this lawsuit."  Paragraph 22 of the Objection.

On a number of occasions, there was discussion within the Maturo administration whether to intervene in the DEP process as an option to prevent the Project from going forward as designed, but, despite having the opportunity to do so, East Haven decided not to intervene. See DeSorbo Testimony, Trial Transcript P. 64, L. 13-20; P. 65 L. 12-15; and P. 66, L. 25 through P. 67, L. 17. Exhibit 81 references a letter from Mr. DeSorbo to the Town Attorney in October of 2006 raising the

issue of whether East Haven should intervene in the DEP proceeding.  Exhibit 78 references a letter from Mr. DeSorbo to the Town Attorney in May 2007 concerning whether East Haven should join the Criscuolo litigation in May of 2007.  Of note, neither of these letters references any general or specific concerns for the environment, but rather deal solely with legal strategy.

Exhibit 77, which was addressed by Mario Ricozzi in his testimony (Ricozzi Testimony, Trial Transcript P. 127, L. 20 through P. 128, L. 25), is the Exceptions to Proposed Decision by East Haven, dated April 12, 2007.  In this document, signed by the Assistant Town Attorney, and submitted to the DEP by Mario Ricozzi, Town Engineer, none of the six exceptions set forth relates to environmental concerns.  Rather, each relates to East Haven's jurisdictional claims that the Authority needs to come before local East Haven land use agencies.  Yet, while now claiming new alleged environmental concerns –which East Haven has failed to offer or raise—the record is clear that East Haven chose not to participate in the most significant aspect of the environmental review of the Project.

The issue of the February 5, 2008 Cease and Desist Order (Exhibit 45) previously has been briefed to this Court in connection with the Authority's Application for a Temporary Restraining Order.  The Court's attention is directed to Exhibit 8, the letter from Assistant Town Engineer Booker, dated January 7, 2008, to the Project Contractor stating that the Project Contractor cannot use East Haven for the staging of material; to Exhibit 9, the Project Contractor's phone log with Mr. Booker concerning activities in East Haven; to Exhibit 45, the Cease and Desist Order; and to

Paragraphs 63 and 64 of the Stipulated Facts.  The Cease and Desist Order precludes activities within the wetlands and watercourses, and precludes the removal of vegetation within 50 feet not merely of the wetlands, but also within 50 feet of the wetlands buffer zone, stating that present filling, construction and/or use must cease immediately.  There is no regulation to support a Cease and Desist Order involving activities within 50 feet of the buffer zone, as contrasted within the buffer zone itself. This was acknowledged by Assistant Town Engineer Booker in his testimony before the Court (see Booker Testimony, Trial Transcript P. 114, L. 25 through P. 115, L. 22) and is an example of East Haven's purpose to veto and delay the Project.

The designations of Mr. Booker's Deposition Testimony demonstrate significant involvement of the current mayoral administration in directing Mr. Booker to send the January 7, 2008 letter (Exhibit 8).  See Booker Deposition Transcript, Designations a & b.  Designations f & g demonstrate a significant and immediate mayoral involvement in the issuance of the Cease and Desist Order, and a complete lack of involvement of the Chairman of the Inland Wetlands and Watercourses Commission and the Commission itself in the issuance of the Cease and Desist Order.  Mr. Booker testified at his deposition that had Ralph Mauro, the then Assistant Director of Administration and Management and now Deputy Director of Town Affairs, part of Mayor Capone Almon's office staff and one of her direct assistants (Capone Almon Testimony, Trial Transcript P. 90, L 21 through P. 91, L. 4), not ordered him to issue the Cease and Desist Order, he would not have issued it.  See

Booker Deposition Transcript P. 87, L. 8-11.  At P. 90, L. 5-13 of Mr. Booker's Deposition

Transcript (within designation g), the colloquy reads as follows:

> Q. So he didn't initiate it [referring to Mr. Andrade, Chairman] and the Inland Wetlands
> Commission didn't authorize it, but it was directed by Mr. Mauro, you prepared it, and
> then you contacted Mr. Andrade to sign it; is that accurate?  Mr. Echter:  Objection; You
> can answer.
>
> A. Yes.  I informed him I was going to be issuing a Cease and Desist Order.  He had no
> objection to that and that I was going to have him sign it as the Chairman.

Clearly the decision to issue the Cease and Desist Order came not from the Inland Wetlands

and Watercourses Commission or the Chairman, but rather from the Mayor's Assistant Director of

Administration for the purpose of stopping the work.  No reasons were given, or why, but just to stop

the work.  In fact, none of this work was taking place in the wetlands, but rather on the site in the

Airport which had been permitted by DEP.  In designation i of Mr. Booker's Deposition Transcript,

p. 94, lines 7-13, the following colloquy took place:  "Q.  And if you know was this particular site

part of the – ultimately part of the DEP permit.  A.  The Temporary Storage Area  Q.  Yes.  A.  I

believe it is, yes, sir.  Q.  So it was approved to your knowledge by DEP?  A.  Yes, sir, absolutely."

East Haven's purpose of asserting control over environmental issues and stopping the Project

continues today.  Referring to page 2 of Exhibit 515, which is the current Town Engineer's letter to

Kevin Zawoy of DEP dated August 11, 2008, the letter states that "[i]t is the intention of the Town of

East Haven to participate in the review, regulation, approval and enforcement as required of this

project for engineering, safety and compliance with applicable local regulations.  If the work should

<u>commence with this project, it is our intention to take enforcement action.</u>" (emphasis added). Despite fifteen years of vetting, including seven years before the DEP in which it chose largely not to participate, East Haven now seeks to regulate the project and continues to threaten enforcement actions in East Haven: "[i]f the work should commence with this project, it is our intention to take enforcement action." All of the foregoing demonstrates a purpose to stop, and the effect of stopping the Project.

Indeed, the Town's consultant, Stearns and Wheeler, was retained by the current administration on January 4, 2008 to stop the Project—<u>not</u> to undertake a neutral review. Exhibit 95 represents Stearns and Wheeler's engagement proposal to the Town of East Haven. While Exhibit 95 is not signed by the Town of East Haven, Attorney Echter acknowledged at trial that it had been executed by the Town of East Haven (Trial Transcript P. 163, L. 8-16), pursuant to which the Authority withdrew its proposed Exhibit 98, which would have been the executed document had said document been turned over to the Authority by the Town. Exhibit 95, a document conceded to be have been executed by the Town, states in paragraph 2, as directed to Ralph Mauro, Assistant Director, "We have recently been contacted by Patricia Cofranseco, and attended a meeting at her office on December 20, 2007, to review options and work needed **as part of the Town's pursuit of legal remedies to stop work."** (emphasis added). The letter goes on to state that Stearns and Wheeler will provide technical information "to aid in the Town's preparation of the case" and to "[p]rovide Court testimony in support of legal proceedings" and to "attend meetings with the Town

and legal counsel in preparation of legal action." There is nothing in Exhibit 95 which relates to a single issue of environmental concern, but rather the entire proposal is in relation to "the Town's pursuit of legal remedies to stop work."

The retention of Stearns & Wheeler as "environmental consultants" is one more example of the overwhelming evidence that the purpose of East Haven's regulation, both at the north end and the south end of the main runway, is to stop the Project, and the effect of this regulation is in conflict with federal policy and a congressional safety mandate. East Haven's regulation of the Project, with the purpose and effect of preventing the Project, is preempted under Article VI, Cl.2 of the United States Constitution.

## II.      FEDERAL COMMERCE CLAUSE

The Authority respectfully refers the Court to its Memorandum of Position on Contested Issues of Fact and Law at pages 119-128 of the JTM.

East Haven's actions and attempted regulation of the federally mandated, vetted and approved Project unreasonably discriminate against and burden interstate commerce. The Supreme Court has interpreted the language of the U.S. Const. Art. I, § 8, Cl. 3 as having a negative or dormant aspect that limits the ability of states to discriminate against or burden interstate commerce. See Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Or., 511 U.S. 93, 98, 114 S.Ct. 1345, 1349 (1994) (the Commerce Clause "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate

flow of articles of commerce.") (citing, Wyoming v. Oklahoma, 502 U.S. 437, 454, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992); Welton v. Missouri, 91 U.S. 275, 23 L.Ed. 347 (1876). The regulation attempted by East Haven, a political subdivision of the State of Connecticut, must yield to federal law under the dormant commerce clause. See Blue Circle, 27 F.3d at 1511 n.13 (10th Cir. 1994) ("The Supreme Court has affirmed that the dormant Commerce Clause applies…to measures adopted by political subdivisions of the States that burden interstate commerce") (citing Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources, 504 U.S. 353, 361, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992)).

### A. DISCRIMINATION AGAINST INTERSTATE COMMERCIAL AIRCRAFT SERVICE

East Haven's attempted regulation over the Project has the effect of discriminating against interstate commercial air service. East Haven's attempts to regulate and thereby prevent the construction of the Runway Safety Areas will ultimately result in the cessation of scheduled commercial aircraft service which flies exclusively in interstate commerce. The Airport services commercial airlines with regular flights to and from Philadelphia, Pennsylvania. See Billowitz Testimony, Transcript of Hearing on May 5, 2008, Exhibit 63, P. 54; and FAA Record of Decision, Exhibit 29. The Airport is also the home of a fixed base operator at the Airport which provides intrastate and interstate corporate airline services (see Robinson Aviation website, Exhibit 65) and various private business aircraft that are dependant on the existing length of the runway.

Should East Haven prevail in its attempt to prohibit construction of the RSAs, the Airport's ability to remain a viable commercial aviation facility will be severely compromised. Operative FAA regulations would likely require that the Airport shorten the effective length of the runways, which would prohibit larger aircraft, commercial aircraft that fly exclusively in interstate commerce, from operating from the Airport. See Billowitz Testimony, Transcript of Hearing on May 5, 2008, Exhibit 63, P. 54-55. A lack of RSAs at the Airport will likely result in the end of all commercial interstate air service at the Airport because, as stated by Mr. Billowitz, "[t]hey couldn't operate." Id. at P. 69, L. 11.

**B.  EAST HAVEN'S ACTIONS AND CONDUCT DISCRIMINATE IN PURPOSE AND EFFECT AGAINST INTERSTATE COMMERCE**

As previously discussed more thoroughly in the Preemption analysis of this Brief, East Haven's actions are discriminatory in purpose and effect and, as applied under the Dormant Commerce Clause theory, they discriminate against interstate commerce. The evidence of East Haven's alleged environmental concerns and actions concerning Dodge Avenue (see Section I(B)(2)(c)(i) and (ii) of this Brief) are applicable in this analysis as their purpose and effect has been to such discriminate against interstate commerce. Generally, a law or ordinance may be adjudged discriminatory against interstate commerce in three ways: (1) by discriminating against interstate commerce on its face, (2) by harboring a discriminatory purpose, or (3) by discriminating in its effect. See Town of Southold v. Town of East Hampton, 477 F.3d 38, 48 (2d Cir. 2007). While there is no

facial discrimination present in this case, East Haven does oppose the Project, which it views as a precursor to expansion. See Capone Testimony, Trial Transcript, p. 88, lines 13-16; and DeSorbo Testimony, Trial Transcript, P. 61, L. 2-8.  Further, East Haven's actions to frustrate and prevent the Project harbor a discriminatory purpose against interstate commerce.  In addition to harboring a discriminatory purpose, East Haven's actions are also discriminatory in their effect. See Section I(B)(2)(c)(i) and (ii) of this Brief.  Allowing East Haven's enforcement of its local regulations to prevent construction of the Project would have a deleterious effect on the ability of the Airport to provide continued interstate commercial air service.

East Haven's attempts to frustrate implementation of the federally mandated, vetted and approved Project has both a discriminatory purpose and effect upon interstate commerce.  Thus, East Haven should be enjoined from further delaying, interfering with, or stopping construction of the RSAs.

### C.  BURDEN ON COMMERCE OUTWEIGHS LOCAL BENEFIT

Any putative benefit which East Haven's residents may receive from its attempts to regulate and frustrate the Project are outweighed by the excessive burden placed on interstate commerce. Under Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847  (1970), a challenged regulation will be stricken by the courts when it "places a burden on interstate commerce that is clearly excessive in relation to the putative local benefits." United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Management Authority, 438 F.3d 150, 156; Nat'l Elec. Mfrs. Ass'n v. Sorrell,

272 F.3d 104, 109 (2d Cir. 2001).  Any possible negative impact the Project may have on East

Haven, its residents or the wetlands, has already been exhaustively scrutinized by the applicable state

and federal agencies.[10]  Through this exhaustive vetting and approval process, the United States and

the State of Connecticut have determined that the benefit to the flying public of building the RSAs as

designed and approved, greatly outweighs any putative inconvenience to the local residents. Under

Pike, East Haven's regulatory efforts must be enjoined.

      East Haven's newfound environmental concerns have already been extensively vetted and

addressed by the federal and state governments over the past fifteen years, and despite several

attempts to include East Haven in the planning process, East Haven instead chose to abstain from

participating with the intention of defeating the Project via application of its municipal regulations.

See DeSorbo Testimony, Trial Transcript, p. 66, lines 10-24.  East Haven has had multiple

opportunities to raise potential alternatives, express concerns, make comments and to extensively

participate in the alternatives assessment process.  See February 22, 2007 State of Connecticut

Department of Environmental Protection and Applicant Tweed-New Haven Airport Authority's Joint

Proposed Findings of Fact and Conclusions of Law, Exhibit 59, Section VII; and FAA Record of

---

[10] This analysis was subject to review and approval the United States Army Corps of Engineers ("Corps of Engineers"), the United States Environmental Protection Agency ("EPA"), the Federal Emergency Management Agency ("FEMA"), the Connecticut Office of Policy and Management ("COPM"), the Connecticut Department of Transportation (" CTDOT"), and the Connecticut Department of Environmental Protection ("DEP").  After this exhaustive review spanning many years, each approved the Project.  See Corps of Engineers Permit, Exhibit 34; Federal Register USEPA Notice, Exhibit 35; FEMA Conditional Letter Of Map Revision approval for New Haven, Exhibit 36; FEMA Conditional Letter Of Map Revision approval for East Haven, Exhibit 37; Letter of Support from Commissioner of CTDOT, Exhibit 38; COPM Memorandum, Exhibit 39; DEP Permit No.200003049-KZ, Exhibit 40; DEP Permit Nos. IW-2000-116, DIV-200003052 & WQC-200003051, Exhibit 41; and DEP Approval of NPDES Application No. 200600317, Exhibit 42.

Decision, Exhibit 29.  However, East Haven deliberately chose not to participate based on the misconception that, regardless of the outcome in the EIS/DEP process, East Haven would be able to stop the Project using its local regulations.  If East Haven's local concerns were legitimate, it would have presumably raised those concerns before the DEP when it had the opportunity to do so.

Moreover, with regard to the Airport and East Haven's residents, this Court has already held that "the right of the public to travel by air by means of modern airplanes far outweighs the disadvantage to the relatively few persons, such as these plaintiffs, who are adversely affected to some extent."  Town of East Haven v. Eastern Airlines, Inc., 331 F. Supp. 16, 30 (D. Conn., 1971). Allowing East Haven to further delay or interfere with the construction of the RSAs will cause significant injury to the flying public, and to the federal government's ability to enforce a uniform national system of airport safety standards.  See U.S. v. City of Berkeley, 735 F.Supp. 937, 940 (E.D.Mo.,1990) ("Such a delay could deprive the flying public of enhanced air safety for several years and disrupt a national program to improve air traffic control safety."); see also, U.S. v. City of New Haven, 447 F.2d 972, 974 (2d Cir. 1971) ("In balancing the equities it is clear that the interference created by the state court's order closing a part of the runway and thus halting jet service constitutes an irreparable public injury and interference with the commercial use of navigable air space.").

Thus, under the Pike test, East Haven's attempts to regulate construction of the RSAs "places a burden on interstate commerce that is clearly excessive in relation to the putative local benefits."

United Haulers, 438 F.3d at 156.  As such, all future attempts by East Haven to do so must be enjoined.

**III.   STATE PREEMPTION**

      Any regulatory authority which may be found to be neither expressly nor implicitly preempted by federal law, is vested exclusively in the State of Connecticut, leaving no authority for East Haven to regulate aviation safety and air navigation facilities being constructed entirely within the boundaries of an airport operated by an instrumentality of the state.  Like federal preemption, state preemption can be either express or implied.  See City of Shelton v. Commissioner of Dept. of Environmental Protection, 193 Conn. 506, 517, 479 A.2d 208, 214 (1984) (finding that local zoning regulations which operated to exclude facilities which the Connecticut Resources Recovery Authority found necessary and which the DEP found environmentally acceptable were preempted because they frustrated the purposes of state statutes).  As in the federal context, local regulations can be impliedly preempted by state law when the state has occupied the field, or when the local regulation conflicts with the state law.  Shelton v. DEP, 193 Conn. at 517.  ("A local ordinance is preempted by a state statute whenever the legislature has demonstrated an intent to occupy the entire field of regulation on the matter; East Haven v. New Haven, 159 Conn. 453, 469, 271 A.2d 110 (1970); or, as here, whenever the local ordinance irreconcilably conflicts with the statute.") (citations omitted).

      Here, East Haven's power to regulate construction of aviation safety and air navigation facilities at the Airport are both expressly and impliedly preempted.

## A.  THE AUTHORITY IS AN "INSTRUMENTALITY OF THE STATE"

As an "instrumentality of the state," the Authority is specifically exempt from East Haven's Inland Wetland and Watercourse Regulations.  Any entity created by the State is a "political subdivision" in the broadest sense of the term.  Included in this broad category are cities, towns and boroughs, all of which are general purpose local governments with taxing authority, eminent domain, elected officials and a host of delegated powers.  Conn. Constitution Article Tenth, Sec. 1; Conn. Gen. Stat.  § 7-148(c).  An "instrumentality" has different powers and is designed to carry out a specific function that the General Assembly believes cannot be handled by either general purpose local governments or a state agency.   For example, the Connecticut Resources Recovery Authority ("CRRA") is the prototypical "instrumentality of the state" designed to "address the statewide problems of solid waste disposal."   Shelton vs. Commissioner, 193 Conn. at 517; Town of Preston v. Connecticut Siting Council,  20 Conn.App. 474, 476, 568 A.2d 799, 801 (Conn.App.,1990) ("[T]he SCRRRA and the CRRA, are state instrumentalities authorized to implement a long term, regional solid waste management program through the development of resource recovery facilities.") (emphasis added).  The enabling statute for CRRA reads as follows:

> There is hereby established and created a body politic and corporate, constituting a public instrumentality and political subdivision of the state of Connecticut established and created for the performance of an essential public and governmental function, to be known as the Connecticut Resources Recovery Authority.  The authority shall not be construed to be a department, institution or agency of the state.

Conn. Gen. Stat. § 22a-261(a).  This language is virtually identical to that found in the enabling

statute creating the Authority, Conn. Gen. Stat. § 15-120i.  When the Connecticut legislature creates

"instrumentalities of the state," this is the language that it uses.  See e.g., Harper v. King,  2001 WL

76989, 4 (Conn.Super., No. CV960392107S, January 10, 2001, Devlin, J.)(Finding that under almost

identical enabling language, the Connecticut Housing Finance Authority "is not, strictly speaking, a

corporation but rather a public instrumentality of the State of Connecticut.") (emphasis added)

(attached hereto as Exhibit A).

      The Connecticut Supreme Court in Shelton stated that the statutes creating the CRRA

"evidence a legislative intent to commit the difficult regional problems of solid waste disposal to

regional and statewide solutions."  Shelton vs. Commissioner, 193 Conn. at 518.  The Court

explained that: "The legislature could reasonably have determined that only a decision-making body

with a mandate to consider the needs of more than one community could adequately balance the

competing concerns of various localities within the state."  Id.  The legislature created the Authority

to deal with the difficult regional issue of a downstate commercial airport, and chose an

"instrumentality of the state" form of public entity to address the issue.  The legislative history of the

Authority's enabling legislation (Exhibits 504 and 505) supports the choice of a state instrumentality

to carry out the regional airport function.  The challenge for CRRA and the Authority is to implement

federal and state-mandated policies that may conflict with any single local concern.  See, Id., at 525.

For CRRA, one issue was the siting of a waste disposal area in the City of Shelton.  For the

Authority, it is currently the construction of federally-mandated runway safety areas and wetland mitigation measures within the boundaries of the existing Airport in East Haven.

The Connecticut Supreme Court in <u>Shelton</u> concluded that for CRRA to carry out its legislative mandate, it needed to have the power to preempt local authority.  "Local zoning regulations, such as Shelton's, which operate to exclude the facilities that the CRRA has found necessary, and the DEP has found environmentally acceptable, frustrate the explicit purposes of the state statutes and are therefore preempted."  <u>Id.</u> At 518.  This is precisely the Authority's position with regard to East Haven.

### B.  CONNECTICUT STATUTES EXPRESSLY PREEMPT ALL REGULATION OF AIR NAVIGATION FACILITIES

The state, through the Commissioner of Transportation, has jurisdiction generally over all aspects of aviation in Connecticut.

> (a) The commissioner shall have jurisdiction over aeronautics in the state with all the powers and duties prescribed in this title, in title 15, and as otherwise provided by law.

> (b) The commissioner shall have general responsibility for aeronautics in the state with all the powers and duties established under chapter 266 [C.G.S.A. § 15-34 et seq.], this chapter and as otherwise provided by law.

C.G.S.A. § 13b-39 .  The term "aeronautics" is then defined in C.G.S.A. § 15-34 to include construction and improvement of airports and air navigation facilities.

> "Aeronautics" means transportation by aircraft; the operation, repair or maintenance of aircraft or aircraft engines except by a manufacturer, including the repair, packing and maintenance of parachutes; <u>the design, establishment, construction, extension, operation,</u>

<u>improvement, repair or maintenance of airports, heliports, restricted landing areas or other air navigation facilities</u>, and air instruction.

C.G.S.A. § 15-34(1)(emphasis added).  Pursuant to C.G.S.A. § 13b-50 (a) the state is entitled to

coordinate with the FAA – as was done on the approval of the Project:

> The commissioner is authorized to cooperate with the government of the United States or any agency or department thereof in the acquisition, construction, improvement, maintenance and operation of airports, heliports, landing fields and other aeronautical facilities in this state where federal financial aid is received and to comply with the provisions of the laws of the United States and any regulations made thereunder for the expenditure of federal moneys upon such airports, heliports and facilities.

C.G.S.A. § 13b-50 (a).  Together, these statutes clearly and expressly vest exclusive state jurisdiction

over the construction and improvement of the RSAs at the Airport, and provide for coordination with

the federal government as needed.  Thus, notwithstanding any general authority East Haven may

have been delegated to regulate land use issues within its boundaries, the Airport is an island of

immunity, regulated exclusively by federal and state authorities.  East Haven has no jurisdiction to

regulate any aspect of the Project.

### C.  <u>STATE REGULATION OCCUPIES THE ENTIRE FIELD REGARDING AIRPORTS OPERATED BY STATE INSTRUMENTALITIES</u>

As an instrumentality of the state, the Authority itself has been legislatively delegated broad

power over the Airport's land use – power the Authority may exercise without first seeking

permission from East Haven.  Specifically, pursuant to C.G.S.A. § 15-120j (b), "The authority shall

have <u>full control of the operation and management of the airport, including land</u>, buildings and

easements by means of a lease to the authority by the city of New Haven and the town of East Haven."[11] Id. (emphasis added).

Among the powers delegated by the state legislature to the Authority are: "to contract for the construction, reconstruction, enlargement or alteration of airport projects with private persons and firms in accordance with such terms and conditions as the authority shall determine."  C.G.S.A. § 15-120j(a)(5).  The statute provides that it is the Authority, not East Haven, that has been delegated the power to determine the terms and conditions applicable to airport construction projects.  Id.  The Authority is also given the power to coordinate with the FAA on such projects, as was extensively done on the Project.  See C.G.S.A. § 15-120j(a)(6)  (giving the Authority the power "to make plans and studies in conjunction with the Federal Aviation Administration or other state or federal

---

[11] The lease by East Haven, referred to in C.G.S.A. § 15-120j (b), is no longer applicable, nor does it in any way affect the Authority's delegated powers.  See City of New Haven v. Town of East Haven, 47 Conn.Supp. 594, 597-598, 822 A.2d 376, 379 (Conn.Super.,2001).

> Subsequent to the passage of the aforementioned act, the Authority entered into negotiations with the city [of New Haven] and the town [of East Haven]. Initially, the Authority sought a single agreement among the three parties; then the Authority sought separate agreements, between itself and the city and between itself and the town.  In its review of the draft lease agreement, the FAA advised that 'Participation in the Lease and Operating Agreement should be limited to the existing owner, the City of New Haven and the Airport Authority. The Town of East Haven's interest can be protected under a separate agreement.' Ultimately, the Authority concluded it need not enter into a lease with East Haven because the town 'had nothing to lease.' On July 1, 1998, the city and the Authority entered into a lease and operating agreement entitled the 'Lease and Operating Agreement By and Between the City of New Haven and Tweed-New Haven Airport Authority,' (the lease identified in the statute). East Haven was not a party to this agreement and it is undisputed that the authority has not entered into a lease with the town of East Haven.

Id.; see also, Lease and Operating Agreement, attached as Exhibit 1.

agencies.").  The statute makes no provision for East Haven to veto, or even to participate in, any such plans or studies.  Id.

Similarly, the state legislature has delegated to the Authority the power "to acquire property by purchase or lease for airport purposes, subject to applicable requirements of federal law and regulation" C.G.S.A. § 15-120j(a)(12).  Again, the Authority's powers are subject here to "federal law and regulation," not to local regulation.  Id.

These statutes, delegating powers to the Commissioner of Transportation and to the Authority, evidence an intent by the Connecticut legislature to preempt any land use regulatory power East Haven may wish to assert in order to stop or delay the Project.  State law (vis-à-vis municipal regulation) occupies the field of aviation safety at the Airport.  East Haven simply has not been delegated any power by the State of Connecticut over aviation safety issues, which would allow East Haven to prevent a state instrumentality from constructing RSAs within the borders of an established "air navigation facility."  East Haven should be enjoined from asserting powers it has not been delegated.

The state regulatory scheme is so complete and thorough that even land use issues otherwise handled by municipal authorities, such as stormwater, erosion and sediment control are reviewed, vetted, approved and permitted by the appropriate state agencies delegated with such authority.  See DEP Approval regarding Erosion and Sediment Controls, Exhibit 42.  East Haven's own inland wetland regulations restrict the Town's authority to regulate the Authority, as an instrumentality of

the state.  See Section 5 of the Regulations of the East Haven Inland Wetland And Watercourse

Agency, Exhibit 509, P.10.  There is nothing left on the Project for East Haven to regulate, which has

not already been regulated and approved by the state and federal governments.

**D.   EAST HAVEN'S OWN REGULATIONS PROHIBIT IT FROM REGULATING THIS PROJECT**

Pursuant to East Haven's own Inland Wetland and Watercourse Regulations, Exhibit 509

("Wetland Regs."), P. 10, the State of Connecticut has exclusive jurisdiction over any work the

Authority, as an instrumentality of the state, undertakes in a wetland or watercourse.   Therefore, the

Cease & Desist Order is jurisdictionally invalid, and East Haven should be enjoined from asserting

any regulatory authority over the project.

**1.   SECTION 5.1 – THE STATE HAS EXCLUSIVE JURISDICTION OVER INLAND WETLAND ACTIVITY OF A STATE INSTRUMENTALITY**

Section 5 of the Wetland Regs. sets forth four regulatory areas over which the state has

exclusive jurisdiction.  See Wetland Regs., Exhibit 509, p. 10, Section 5.   Pursuant to Section 5.1,

East Haven's Wetland Regs give it <u>no authority</u> to regulate any aspect of the Project because the

Authority is an instrumentality of the state.[12]   Under East Haven's Wetland Regs, the Connecticut

---

[12] There is created a body politic and corporate to be known as the "Tweed-New Haven Airport Authority". <u>Said authority shall be a public instrumentality and political subdivision of this state</u> and the exercise by the authority of the powers conferred by sections 15-120g to 15-120o, inclusive, shall be deemed and held to be the performance of an essential public and governmental function. C.G.S.A. § 15-120i(a) (emphasis added).

Department of Environmental Protection, and not East Haven, has exclusive jurisdiction to regulate

and approve inland wetlands activities of state instrumentalities.

> The Commissioner of Environmental Protection shall have <u>exclusive jurisdiction</u> over regulated activities in or affecting Wetlands or Watercourses, undertaken by any department, Agency, <u>or instrumentality of the State of Connecticut</u>, except any local or regional board of education, pursuant to sections 22a-39 or 22a-45a of the C.G.S.. [13]

Wetland Regs, § 5.1 (emphasis added).  This provision of East Haven's Wetland Regs closely tracks

the state statute which specifically provides that it is the Commissioner of Environmental Protection,

not East Haven, that has the power to regulate and approve inland wetlands activities of state

instrumentalities.

> The Commissioner [of Environmental Protection] shall:
>
> (h) Grant, deny, limit or modify in accordance with the provisions of section 22a-42a, an application for a license or permit for any proposed regulated activity conducted by any department, agency or <u>instrumentality of the state</u>, except any local or regional board of education, (1) after an advisory decision on such license or permit has been rendered to the commissioner by the wetland agency of the municipality within which such wetland is located or (2) thirty-five days after receipt by the commissioner of such application, whichever occurs first.

---

[13] The Wetland Regs. were amended in March 2008.  The prior version is Exhibit 508, p. 11.  In the prior version section 5.1 (Exhibit 508, p. 11, section 5.2) purported to condition the state's exclusive jurisdiction on the Wetland Agency issuing an advisory decision or the passage of time.  Exclusive jurisdiction under the prior Wetland Regs. purportedly occurred:

> (1) after an advisory decision on such License or Permit has been rendered to the Commissioner by the Wetland Agency of the municipality within which such wetland is located or
> (2) thirty five (35) days after receipt by the Commissioner of such application, which ever occurs first.

These conditions were the subject of discussion at the May 5, 2008 injunction Hearing in this case.  <u>See</u> May 5, 2008 hearing transcript, Exhibit 63 at P. 84, L. 9 through P. 88, L. 15.  However, it appears the parties were all working off of the old version of the Wetland Regs.  These caveats were specifically removed in the March 2008 revision, and replaced with a reference to C.G.S.A. § 22a-39 and C.G.S.A. § 22a-45a.  <u>See</u> Wetland Regs., Exhibit 509, p. 10, section 501.

C.G.S.A. § 22a-39.  Under C.G.S.A. § 22a-39, the state was vested with exclusive jurisdiction over the Authority's wetland activities "thirty-five days after receipt by the commissioner of such application."  Id.

The commissioner of the DEP was in receipt of the Authority's wetlands application on or about November 7, 2000.  See DEP Permit, Exhibit 41, p. 1 (permit granted "in accordance with the applications referenced above and filed with this Department on November 7, 2000 and described herein."); Joint Proposed Findings of Fact and Conclusions of Law, Exhibit 59, p. 18, ¶ 65-66 (stating that the DEP received the Authority's applications on November 6, 2000, and that notice of the applications was published and mailed to East Haven on November 14, 2000).  On November 10, 2000, the DEP sent notice to East Haven that the DEP was in receipt of the Authority's application.  See Certificate of Notice Form – Notice of Application, Exhibit 28, p.2.  Exhibit 28 establishes that the application was not only received by the DEP, but also by East Haven.   Thirty-five days after November 7, 2000, on December 12, 2000, exclusive jurisdiction over the Authority's wetland activities on the Project vested exclusively in the DEP.[14]  See also, Proposed Final Decision – March 30, 2007, Exhibit 60, Attachment A, p. 18, ¶ 64:

> In determining jurisdiction over the proposed regulated activities, DEP concluded that all wetlands up to elevation 3.5 NGVD were tidal wetlands and under the jurisdiction of DEP's Office of Long Island Sound Programs ("OLISP") and all wetlands above 3.5 NGVD were inland wetlands and under the jurisdiction of DEP's Inland Water Resources Division ("IWRD").

---

[14] This analysis would be the same under East Haven's old or revised Wetland Regs.

Id.  East Haven quite simply has no jurisdiction under federal, state or local law, to regulate the Authority's wetland activities at the Airport, and it should be restrained from further attempts to do so.  See Phoenix Horizon Corp. v. Town of North Canaan Inland Wetlands-Conservation Com'n, 1996 WL 88270, 1 (Conn.Super., 1996) (in dicta) ("The [DEP] Commissioner must issue or deny permits for regulated activities in wetlands or watercourses to be performed by state agencies or other instrumentalities of the State of Connecticut . . .")(attached hereto as Exhibit B).

### 2.   SECTION 5.2 – THE STATE HAS EXCLUSIVE JURISDICTION OVER TIDAL WETLANDS

Because much of the Project's wetland activities involve tidal wetlands, Section 5.2 of the revised Wetland Regs also prohibits East Haven from regulating the Project.  Section 5.2 provides that: "The Commissioner of Environmental Protection shall have exclusive jurisdiction over tidal wetlands designated and regulated pursuant to Sections 22a-28 through 22a-35 of the General Statutes."  Wetland Regs, § 5.2 (emphasis added).  The majority of the wetland work on the Project involved tidal wetlands.  See Proposed Final Decision – March 30, 2007, Exhibit 60, Attachment A, p. 18, ¶ 64 ("As the majority of the impacts associated with the proposed activites impacted tidal wetlands, OLISP took the lead in permit application review and undertook the majority of review coordination.").  To the extent the Project affects tidal wetlands, not inland wetlands, East Haven is specifically prohibited from regulating under Wetland Regs, § 5.2.

### 3.   SECTION 5.3 – THE STATE HAS EXCLUSIVE JURISDICTION OVER THE TIDE GATES

East Haven's Wetland Regs. expressly provide that East Haven has no jurisdiction over the dam repair work permitted by the DEP.   Wetland Regs, § 5.3.  The tide gates are a dam in that they restrict the flow of water in a channel, tidal or otherwise.   See Downar Testimony, Trial Transcript P. 33, L. 25 through P. 34, L. 34.  Under § 5.3, the DEP has exclusive jurisdiction over the permitting of dam repair work.  Id.   Section 5.3 specifically provides that "[a]ny person receiving such a dam repair or removal order or permit shall not be required to obtain a permit from municipal Wetlands Agency for any action necessary to comply with said dam order or to carry out any activities authorized by said permit."  Wetland Regs, § 5.3.  Pursuant to C.G.S.A. § 22a- 401 "all dams, dikes, reservoirs and other similar structures, with their appurtenances, without exception and without further definition or enumeration"  are under the exclusive jurisdiction of the DEP.  See also, Conn. Agencies Regs. § 22a-39-4.3.

> Activities to be regulated solely by the commissioner:
>
> The Commissioner shall regulate the following activities to the exclusion of the local inland wetlands agencies:
>
> (1) Construction or modification of any dam, pursuant to Sections 25-110 and 25-112 of the General Statutes, as amended;
>
> (2) Construction or placement of any obstruction within channel encroachment lines, pursuant to Sections 25-4a to g of the General Statutes, as amended;
>
> (3) Construction or placement of any structure or obstruction within tidal, coastal and navigable waters, pursuant to Sections 25-7b to e of the General Statutes, as amended;
>
> (4) Diversion of water for public and domestic use, pursuant to Sections 25- 8a to e of the General Statutes, as amended;

(5) Discharges into waters of the state, pursuant to Section 25-54i of the General Statutes, as amended.

Conn. Agencies Regs. § 22a-39-4.3.  These are precisely the activities permitted on the Project by the DEP.  See DEP Permit, Exhibit 40, p. 8, ¶13 and p. 13, ¶17-18.  Because the tide gate work was permitted by the DEP, East Haven has no jurisdiction to regulate this activity.  See C.G.S.A. § 22a-403(b) ("An applicant for a permit issued under this section to alter, rebuild, repair or remove an existing dam shall not be required to obtain a permit under sections 22a-36 to 22a-45a, inclusive, or section 22a-342 or 22a-368."); see also, C.G.S.A. § 22a-35a ("The Commissioner of Environmental Protection, within available appropriations and bond authorizations, shall conduct wetlands restoration and enhancement projects, including but not limited to, open water marsh management and coastal culvert and tide gate management.")(emphasis added).  East Haven has no jurisdiction to regulate any aspect of the tide gate work, which has been reviewed and permitted by the DEP, and East Haven should be enjoined from stopping, changing, interfering with, and/or delaying, construction of the Project under the mantle of local regulation.

### 4.  SECTION 5.4 – THE STATE HAS EXCLUSIVE JURISDICTION OVER FILLING AND DREDGING

Finally, Section 5.4 of the Wetland Regs. provides that the DEP shall have exclusive jurisdiction "over the discharge of fill or dredged materials into the Wetlands and Watercources of the state pursuant to Section 401 of the Federal Clean Water Act, as amended, for activities regulated by the U.S. Army Corps of Engineers under Section 404 of the federal Clean Water Act.").  All of the

dredging and filling of wetlands on the Project is being carried out pursuant to Section 401 of the Federal Clean Water Act, as amended, (see DEP Notice of Tentative Determinations, Exhibit 32, p. 1), and is regulated, vetted, and approved by the U.S. Army Corps of Engineers under Section 404 of the federal Clean Water Act.  See U.S. Army Corps of Engineers Public Notice, Exhibit 27, p. 1. East Haven's own regulations prohibit it from attempting to regulate any aspect of the Project and it should be enjoined from any further attempts to do so.

### E.  **EAST HAVEN'S ACTIONS ARE *ULTRA VIRES***

East Haven's current Cease and Desist Order is illegal because East Haven lacks jurisdiction over the Authority, an instrumentality of the state, and East Haven's regulatory authority over the Project has been preempted under federal and state law.  The challenged regulation is *ultra vires* because East Haven has acted beyond the powers conferred upon it by law.

> In order for the challenged regulation to be found "ultra vires," the commission, in enacting the regulation, must have acted beyond the powers conferred upon it by law. . . . As a creature of the state, the town, whether acting itself or through its planning commission, can exercise only such powers as are expressly granted to it, or such powers as are necessary to enable it to discharge the duties and carry into effect the objects and purposes of its creation. If the legislation is a zoning ordinance, it must comply with, and serve the purpose of the statute under which the sanction is claimed for it. A local zoning commission is subject to the limitations prescribed by law and the power to zone is not absolute but is conditioned upon an adherence to the statutory purposes to be served.

Builders Service Corp., Inc. v. Planning & Zoning Com'n of Town of East Hampton,  208 Conn. 267, 274-275, 545 A.2d 530, 535 (Conn., 1988) (internal brackets and citations omitted).

Quite simply, the State of Connecticut has not delegated to East Haven the power to regulate the construction of an aviation safety project being carried out by an instrumentality of the state entirely within the boundaries of an airport operated by that instrumentality.  More importantly, East Haven is prohibited by the Supremacy Clause of the United States Constitution from exercising any regulatory power it may possess, to interfere with construction of a federally-mandated and federally-funded aviation safety project.  Any attempt by East Haven to assert jurisdiction over the Project is *ultra vires* to the powers delegated to East Haven by the State of Connecticut.

Furthermore, East Haven is not simply exceeding its delegated powers, but it is doing so in furtherance of the expressed improper purpose of preventing the alleged future expansion of the Airport's runways, an issue which is neither part of the Project, nor is it an issue before East Haven. Preventing runway expansion at a commercial airport operated by a state instrumentality is not something East Haven is jurisdictionally entitled or empowered to do.  Thus, East Haven's opposition to the Project is not a reasonable response to a legitimate local concern.

### F.  EAST HAVEN'S CEASE & DESIST ORDER IS FATALLY DEFECTIVE

Even ignoring the fact that East Haven lacked jurisdiction to issue the Cease & Desist Order, the Order is defective in a myriad of ways which, aside from the jurisdictional issues, prevent enforcement.   The Cease & Desist Order claims the Authority is violating the Wetland Regs in two distinct ways.  It claims the Authority must stop "the placement of material, removal of materials, and alteration of wetlands and watercourses . . ."  C&D Order, Exhibit 45.  On this point the Order is

factually defective because, at the time the Cease & Desist Order was issued, no such work was being performed. See Booker Testimony, Trial Transcript P. 113, L. 12-13. (admitting that the work being done was in the "buffer zone, not in the wetlands). Rather, all activity was being conducted exclusively in upland areas, not within the wetlands or watercourses as defined in the Wetland Regs.[15] Id. There is no provision in law for East Haven to preemptively issue a Cease & Desist Order in anticipation that a person may conduct activities in a wetland at some future time. A "[b]oard is not required to anticipate that the applicant would later violate the zoning regulations by a use not authorized ... and should such a violation occur, the ready remedy is by proper legal action at that time." Miklus v. Zoning Board of Appeals, 154 Conn. 399, 402, 225 A.2d 637 (1967) (emphasis added).

---

[15] Under the Wetland Regs, Exhibit 509, p. 5-6., Wetlands and Watercourses are defined as follows:

WATERCOURSES means rivers, streams, brooks, waterways, lakes, ponds, marshes, swamps, bogs and all other bodies of water, natural or artificial, vernal or intermittent, public or private, which are contained within, flow through or border upon the Town or any portion thereof not regulated pursuant to Sections 22a-28 through 22a-35 of the General Statutes, inclusive. Intermittent watercourses shall be delineated by a defined permanent channel and bank and the occurrence of one or more of the following characteristics:

(A)      evidence of scour or deposits of recent alluvium or detritus,

(B)      the presence of standing or flowing water for a duration longer than a particular storm incident, and

(C)      the presence of hydrophytic vegetation.

WETLANDS means land, including submerged land, not regulated pursuant to Sections 22a-28 through 22a-35, inclusive, of the Connecticut General Statutes, which consists of any of the soil types designated as poorly drained, very poorly drained, alluvial and flood plain by the National Cooperative Soils Survey, as it may be amended from time to time, of the Natural Resources Conservation Service of the United States Department of Agriculture (USDA). Such area may include filled, graded, or excavated sites, which possess an aquatic (saturated) soil moisture regime as defined by the USDA Cooperative Soil Survey.

Further, rather than limit the Cease & Desist Order to the wetlands and watercourses as defined in the Wetland Regs, the Cease & Desist Order also claims that, "[p]ursuant to section 6.2 and corresponding definition 2.1 of conditions," that East Haven also has the authority to stop "the removal of vegetation within fifty feet of the wetlands buffer zone."  C&D Order, Exhibit 45 (emphasis added).  However, there is nothing in the Wetland Regs that empowers East Haven to regulate in this upland area.  In fact, Section 6.2 of the Wetland Regs provides only for a fifty foot (50') buffer zone around the actual wetland and/or watercourse.  There is no provision for regulating an additional fifty feet beyond that fifty foot buffer zone.[16]

Unless the regulations specifically provide for regulation in upland areas, such upland areas are not subject to a wetland commission's regulatory powers.  See Prestige Builders, LLC v. Inland Wetlands Com'n of City of Ansonia,  79 Conn.App. 710, 831 A.2d 290 (2003).

> The commission had the authority to regulate activities in upland review areas, but elected not to enact any regulations governing such areas. Rather, its regulations governed only activities that occurred within or that made use of wetlands or watercourses. The definitions of "wetlands," "watercourses" and "regulated activity" in the commission's regulations did not encompass upland review areas. The commission, therefore, improperly denied the plaintiff's application because of proposed activities in upland review areas.

Id., at 723.

---

[16] Furthermore, this fifty foot "buffer zone" applies only to "Regulated Activities."  ("All regulated activities must maintain a fifty foot (50') non-disturb buffer area from such wetlands and watercourses . . . .").  Wetland Regs, Sec. 6.2 (emphasis added).  Non-regulated activities therefore, by exclusion, need not adhere to any specific "buffer zone," so long as the activities don't extend into the actual wetland or watercourse themselves, and thus, become "Regulated Activities."

The upland areas East Haven seeks to regulate are neither "wetlands" nor "watercourses." Rather, "wetlands" and "watercourses" are specifically defined in the Wetland Regs as being only the "wetlands" and "watercourses" themselves, <u>not upland area</u>.  <u>See</u> fn. 15, *supra*.  Both terms also expressly exclude from their definitions any references to <u>tidal</u> wetlands, which are regulated exclusively by the DEP under C.G.S.A. §§ 22a-28 through 22a-35.

Although East Haven further claims authority over "Regulated Activities" and activities taking place in "Regulated Areas," neither of these terms encompasses the one hundred foot exclusion zone claimed in the Cease & Desist Order.[17]  Therefore, even if East Haven had jurisdiction to regulate the construction of the RSAs – which it clearly does not have – East Haven has no authority to prohibit removal of vegetation out to one hundred (100) feet from the wetlands themselves.  Therefore, East Haven's own Wetland Regs do not support the issuance of the Cease & Desist Order, and enforcement of that Order, and any subsequent Order, should be enjoined.

While East Haven may have been able to promulgate regulations affecting upland areas, it never did so, and cannot do so in an ad hoc manner in the absence of prior-enacted regulations.

---

[17] Under the Wetland Regs, "Regulated Activity" and "Regulated Area" are defined as follows:

REGULATED ACTIVITY means any operation within or use of a wetland or watercourse involving removal or deposition of material or any obstruction, construction, alteration or pollution of such wetlands or watercourses, but shall not include the specified activities in Section 4 of the regulations.

REGULATED AREA means any wetlands or watercourses as defined in these regulations.

> We therefore conclude that neither § 22a-42a (f) nor our case law allows a commission to exercise its authority over activities in upland review areas without having first enacted a regulation governing such areas.

Prestige Builders, 79 Conn.App. at 723.[18]  If the Commission wishes to change its regulations to extend its regulated area to one hundred feet upland of the wetlands, it may well have the power to do so.  However, in the absence of a pre-existing regulation to that effect, East Haven cannot enforce such a 100-foot regulated zone. Id.  Nor can any such regulation, even if properly enacted, be used to regulate, delay or stop the construction of an airport safety project which has been reviewed, vetted, approved and permitted by the state and federal authorities with jurisdiction to do so, and which is being built entirely within the boundaries of an airport operated by an instrumentality of the State of Connecticut.  Thus, the Court should enjoin East Haven from seeking to enforce this, or any such Cease & Desist Order.

## IV.   **FLOOD & EROSION CONTROL BOARD**

### A.  **THE FLOOD & EROSION CONTROL BOARD HAS NO AUTHORITY TO REGULATE THE PROJECT.**

The Connecticut legislature has not granted the East Haven Flood & Erosion Control Board the authority it seeks to exercise over the Project.  Article II, Section 9-16 of the Town of East Haven Flood Damage Prevention and Control Ordinance adopts the "provisions of sections 25-84 through 25-94 of the Connecticut General Statutes."  See Flood Damage Prevention and Control Ordinance,

---

[18] This is in contrast to the Connecticut Supreme Court's seminal case of Queach Corp. v. Inland Wetlands Com'n of Town of Branford, 258 Conn. 178 (2001) in which the Court found the town's new regulations, specifically empowering the wetlands commission to regulate within a 100 foot buffer zone of wetlands and watercourses, was not inconsistent with the state's Inland Wetlands and Watercourses Act, C.G.S. § 22a-42a(f).

Exhibit 68, p. 559, Sec. 6-16.  Under these state statutes, the jurisdiction of municipal flood and erosion control boards is limited to the oversight of <u>municipal</u> flood or erosion control systems.  The Authority is an instrumentality of the state, not a municipality, therefore, the Project is not a municipal flood and erosion control system.

> § 25-85. Establishment of flood or erosion control system
>
> Such board shall have authority, <u>within the limits of appropriations from time to time made by the municipality</u>, to plan, lay out, acquire, construct, reconstruct, repair, maintain, supervise and manage a flood or erosion control system. As used in sections 25-84 to 25-94, inclusive, "flood or erosion control system" means any dike, berm, dam, piping, groin, jetty, sea wall, embankment, revetment, tide-gate, water storage area, ditch, drain or other structure or facility useful in preventing or ameliorating damage from floods or erosion, whether caused by fresh or salt water, or any dam forming a lake or pond that benefits abutting properties, and shall include any easements, rights-of-way and riparian rights which may be required in furtherance of any such system.

C.G.S.A. § 25-85 (emphasis added).  These statutes merely give East Haven's flood and erosion control board the authority to "acquire, construct, or reconstruct any flood or erosion control system or portion thereof" (C.G.S.A. § 25-87) and the ability to issue bonds and assessments to fund its municipal projects. <u>See</u> C.G.S.A. § 25-88 et seq.  These statutes do <u>not</u> give the East Haven Flood and Erosion Control Board any regulatory or licensing authority over non-municipal projects, like the Project.

Therefore, the Connecticut legislature has limited the jurisdiction of East Haven's Flood and Erosion Control Board to municipal flood or erosion control systems, as statutorily defined in

C.G.S.A. § 25-85.  As the Project is not a municipal project, it does not fall within the jurisdiction of East Haven's Flood and Erosion Control Board.

**B.  THERE IS NO STATUTORY AUTHORIZATION FOR THE FLOOD AND EROSION CONTROL BOARD TO REGULATE THE PROJECT.**

Connecticut General Statutes sections 25-84 through 25-94 provides the East Haven Flood and Erosion Control Board's regulatory authority.  However, those statutes specifically limit the powers of the Flood and Erosion Control Board to municipal flood control projects.  See Conn. Gen. Stat. § 25-84 ("Any municipality may, by vote of its legislative body, adopt the provisions of this section and sections 25-85 to 25-94, inclusive, and exercise through a flood and erosion control board the powers granted thereunder.").  This enabling statute does not give the Flood and Erosion Control Board unlimited power to adopt "regulations designed to promote the public health, safety, and general welfare of its citizenry,"  (Article III, Section 9-31 of the Town of East Haven Flood Damage Prevention and Control Ordinance) citing to C.G.S.A. § 7-148(c)(7) under the header of "Statutory authorization."  The power to regulate generally for health and safety and welfare of the citizenry under C.G.S.A. § 7-148(c)(7) is not one of the limited powers granted to the East Haven Flood and Erosion Control Board by its enabling statute.  The Connecticut legislature never gave East Haven's Flood and Erosion Control Board the broad police powers set forth in C.G.S.A. § 7-148(c)(7), and notwithstanding the Flood and Erosion Control Board's attempt to broaden its regulatory powers, it has no statutory power to invoke C.G.S.A. § 7-148(c)(7)'s virtually unlimited police powers.   Its powers are specifically limited to those granted in C.G.S.A. §§ 25-84 through 25-94, to wit, "to plan,

lay out, acquire, construct, reconstruct, repair, maintain, supervise and manage a flood or erosion

control system" period.  Therefore, any attempt by the East Haven Flood and Erosion Control Board

to exercise jurisdiction over anything other than a municipal project is beyond its delegated powers,

and, therefore, illegal.  The Project is not a municipal project, and is therefore not subject to the

jurisdiction of the East Haven Flood and Erosion Control Board.

## C.  THE DEP HAS EXCLUSIVE JURISDICTION OVER THE PROJECT.

The Connecticut General Assembly has delegated exclusive floodplain jurisdiction to the

Commissioner of the DEP under section 25-68c of the Connecticut General Statutes:

> § 25-68c. Powers and duties of commissioner
>
> The commissioner shall have the following powers and duties under sections 25-68b to 25-68h, inclusive:
>
>> (1) To coordinate, monitor and analyze the floodplain management activities of state and local agencies;
>>
>> (2) To coordinate flood control projects within the state and be the sole initiator of a flood control project with a federal agency;
>>
>> (3) To act as the primary contact for federal funds for floodplain management activities sponsored by the state;
>>
>> (4) To regulate actions by state agencies affecting floodplains except conversion by The University of Connecticut of commercial or office structures to an educational structure;  . . .

C.G.S.A. § 25-68c.  Pursuant to C.G.S.A. § 25-68c(2) and (3), the Commissioner of the DEP has

exclusive jurisdiction over the floodplain aspects of the Project.  As federal funds have been applied

to the Project through FAA grants, which the Authority has sponsored as an instrumentality of the

state, the Commissioner of the DEP shall be the sole initiator and shall act as the primary contact for any flood control aspect of the Project.  East Haven has been left no room to regulate the Project.

## V.      ADMISSIBILITY OF EXHIBIT 97, FAA OPINION LETTER

The Authority seeks admission of Exhibit 97, the FAA opinion letter dated August 22, 2008 from Daphne A. Fuller, Assistant Chief Counsel of the Federal Aviation Administration, on the Runway Safety Area Project at Tweed – New Haven Airport ("Letter").

### A.  JUDICIAL NOTICE OF FAA'S DECISION OR OPINION

The Authority requests that the Court take judicial notice of the Letter and review it as the official statement, opinion, and decision of the FAA on the issues before this Court.  Pursuant to Federal Rule of Evidence 201,[19] courts may take judicial notice of the decisions of an administrative agency.  See Golden Hill Paugusset Tribe of Indians v. Rell, 463 F. Supp. 2d 192, 197 (D. Conn. 2006) ("Among the matters of which courts may take judicial notice are decisions of an administrative agency.") (internal quotations and citations omitted).  As the FAA's authority over the Airport and jurisdiction over the Project have been challenged by East Haven, judicial notice of the Letter should be taken as it represents the FAA's official position and decision as to the jurisdictional and preemption issues which East Haven has challenged.

---

[19] Under the Federal Rules of Evidence, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). "A court shall take judicial notice if requested by a party and supplied with the necessary information." Fed.R.Evid. 201(d).

In addition to decisions of administrative agencies, courts may also take judicial notice of the records and reports of such agencies, including opinion letters. See In re Intelligroup Securities Litigation, 527 F. Supp. 2d 262, 274 (D.N.J. 2007) ("the Court may take judicial notice of records and reports of administrative bodies, such as notices and opinion letters") (internal quotations and citations omitted); Lundquist v. Continental Casualty Co., 394 F. Supp. 2d 1230, 1243-1244 (C.D.Cal. 2005) (Court took judicial notice of a letter opinion issued by the California Department of Insurance).  Upon such a basis, the Court may take judicial notice of the Letter as an opinion letter issued by the FAA.

### B.  JUDICIAL NOTICE ACKNOWLEDGING FAA'S POSITION

As an alternative to full admissibility, the Court may admit the Letter for the limited purpose of acknowledging the position of the FAA. See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie, Nos. 2:05-CV-302, 2:05-CV-304, 2007 WL 1601518, at *1 (D.Vt. June 4, 2007) (The court took judicial notice of documents that reflected the federal government's position as to climate change, and not for the truth of the factual matter asserted.)(attached hereto as Exhibit C).  The crux of the Letter is not necessarily dependent upon the truth of the factual matters asserted therein, but rather, the Court could still determine the FAA's position, interpretation and conclusions on the issues before the Court even if the Court chose to disregard the factual matters asserted therein. Likewise, the Court may take judicial notice of the concerns of the FAA and the "general nature and substance of its conclusions."  See Korematsu v. United States, 584 F. Supp. 1406, 1415 (N.D.Cal.

1984) ("the Court finds it proper to take judicial notice of a Commission's Report to determine the purpose of the Commission, the manner in which it was established and, subject to a finding of trustworthiness, <u>the general nature and substance of its conclusions.</u>")(emphasis added).  If not fully admitted, the Court should review the Letter for the limited purpose of acknowledging the nature and substance of the FAA's position on the issues in this case.

### C. <u>FAA LETTTER SHOULD BE GIVEN JUDICIAL DEFERENCE</u>

As the FAA is the executive agency entrusted with ensuring the safety of the flying public, the Court, at the very least, should admit the Letter for the purpose of understanding and considering the FAA's interpretation of its own statutory and regulatory scheme.  The principle that an Agency's superior expertise and knowledge of its regulatory scheme should be given an appropriate weight by a reviewing Court is applicable to the admissibility of the Letter in this case.  The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."  <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,</u> 467 U.S. 837, 104 S.Ct. 2778 (1984).  Likewise, the Supreme Court has recognized that a certain degree of deference should be afforded agency decisions, opinions and interpretations as the agencies which operate with regularity in a certain field or arena possess specialized experience and information regarding their own regulations.  Judicial deference and consideration of an agency's interpretations "has been consistently followed by this Court whenever a decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the

force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." Id.; see also U.S. v. Mead Corp., 533 U.S. 218, 234-235, 121 S.Ct. 2164I, 2175 (2001) ("an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires.").  While the Authority does not go so far as to suggest that this Court should defer in whole to the FAA's determinations, it does request that the Court review the Letter and assign the interpretations and conclusions therein an appropriate weight. See Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121, 136, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (reasonable agency interpretations carry "at least some added persuasive force" where Chevron is inapplicable); Reno v. Koray, 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (according "some deference" to an interpretive rule that "do[es] not require notice and comment"); Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) ("some weight" is due to informal interpretations though not "the same deference as norms that derive from the exercise of ... delegated lawmaking powers").

### D.  **TIMING OF INTRODUCTION**

The Authority immediately disclosed the Letter to East Haven's counsel and to the Court as Exhibit 97.  The Authority formally requested an FAA opinion letter on May 20, 2008, although the Authority's initial requests of the FAA had been made prior to the May 5, 2008 hearing— approximately four months ago.  See Trial Transcript, P. 19, L. 1-7.  Despite requesting that the FAA

produce the Letter on an expedited basis, the FAA produced the Letter on the eve of trial much to the dismay of the Authority.  Despite the FAA's tardy submission of its Letter, the Authority requests that the Court admit the Letter, Exhibit 97, into evidence and that the Court assign the interpretations and conclusions of the FAA the appropriate weight in its review of such.

<u>**CONCLUSION**</u>

Allowing East Haven to continue its unauthorized attempts to stop, change, interfere with, and/or delay, construction of the Project through enforcement of its regulation would be to allow East Haven to usurp the power jurisdictionally reserved for the federal and state governments.  The Court should issue a Declaratory Judgment that East Haven is without jurisdiction to do so, and issue a permanent injunction enjoining East Haven from any further regulation of the Project.

Dated in New Haven, Connecticut, this 5th day of September 2008. Corrected for non-substantive technical errors  September 10, 2008

PLAINTIFF,
TWEED-NEW HAVEN AIRPORT AUTHORITY

By:  /s/ Doug Dubitsky_____
JOHN C. KING (ct09570)
DOUG DUBITSKY (ct21558)
HUGH I. MANKE (ct05250)
RICHARD W. PINGEL (ct27611)
UPDIKE, KELLY & SPELLACY, P.C.
One State Street, P.O. Box 231277
Hartford, CT 06123-1277
Tel. No. (860) 548-2600
jking@uks.com

ddubitsky@uks.com
hmanke@uks.com
rpingel@uks.com

## CERTIFICATION OF SERVICE

I hereby certify that, on this 10th day of August 2008, a copy of the PLAINTIFF's

CORRRECTED POST TRIAL BRIEF, was filed electronically and served by mail on anyone unable

to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the

Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on

the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

A copy has been mailed to the Chambers of Judge Janet C. Hall.

<div style="margin-left: 40%;">

By: /s/ Richard W. Pingel
RICHARD W. PINGEL
UPDIKE, KELLY & SPELLACY, P.C.
One State Street, P.O. Box 231277
Hartford, CT 06123-1277
Tel. No. (860) 548-2600
rpingel@uks.com

</div>