UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TWEED-NEW HAVEN AIRPORT AUTHORITY | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| v. | : | 3:08-cv-597 (JCH) |
| | : | |
| TOWN OF EAST HAVEN, CONNECTICUT et al., | : | |
| Defendants. | : | OCTOBER 24, 2008 |

**BENCH TRIAL RULING**

**I.  INTRODUCTION**

The plaintiff, Tweed-New Haven Airport Authority ("Authority"), brings this action under the Supremacy Clause, Art. VI, cl. 2, of the United States Constitution. Named as defendants are the Town of East Haven ("East Haven"), the Town's Inland Wetlands and Watercourse Commission, the Town's Planning and Zoning Commission, and the Town's Flood and Erosion Control Board (collectively "East Haven defendants"). The Authority seeks to prevent the East Haven defendants from continuing to use their local municipal powers to obstruct construction of a federally-mandated, federally-funded, and state- and federally-approved, aviation safety and air navigation project ("Runway Project"). The Authority claims that the East Haven defendants' municipal powers, as applied to the Runway Project, are preempted by federal and state law.

The Authority seeks an order from the court enjoining the East Haven defendants from taking any action, including seeking injunctive relief in Connecticut state court, that would have the effect of interfering with the Runway Project. The Authority also seeks a judgment that declares, inter alia, that the East Haven defendants' regulations are preempted by federal and state law and that the Authority

may continue construction of its Runway Project.

## II. FINDINGS OF FACT

### A. The Airport

Tweed-New Haven Airport (the "Airport") is situated on land located in both East Haven and the City of New Haven ("New Haven"). The Authority, which was established by Connecticut General Statutes §§ 15-120i et seq., manages the Airport. The Airport property, consisting of land situated in both East Haven and New Haven, is owned by New Haven, which leases it to the Authority. The Airport consists of numerous structures, including an airport terminal building and an air rescue and fire safety facility. It also has a main runway that essentially runs north/south (hereinafter "Runway").[1] The Airport is classified by the Federal Aviation Administration ("FAA") as a primary commercial service airport because it provides regularly scheduled, passenger air service.

### B. Runway Safety Areas

Because the Airport provides regularly scheduled passenger service, it is required to hold an operating certificate under FAA Regulation Part 139, which includes a requirement for Runway Safety Areas ("RSAs") acceptable to the FAA. RSAs are "a vital component of airport safety," because "[t]hey enhance the safety of air travelers by providing an area for aircraft which undershoot, overrun, or veer off the runway . . . ." Stipulation of Uncontroverted Facts at ¶ 13 ("Stip."). They also "provide direct access for firefighting and rescue equipment and personnel during such incidents." Id. At the

---

[1] The records indicate that the Runway, called Runway 2/20, is the main runway. "Runway 2" is the south end and "Runway 20" is the north end. See Stipulation of Uncontroverted Facts at ¶ 11.

time the Complaint was filed, the Airport did not have standard RSAs at either end of the Runway and therefore did not comply with FAA Part 139 requirements. Stip. at ¶ 18.

    1.    <u>Construction of the RSAs</u>

With the help of the FAA, between 2000 and 2002, the Authority substantially updated the Airport's "Master Plan." Phase One of the updated Master Plan involved preparation of an Environmental Impact Statement regarding the RSAs. Phase Two of the Master Plan involves construction of the RSAs. Phase Two has two stages. Stage One will take place at the southern portion of the Runway, and Stage Two will take place at the northern end of the Runway.

Stage One calls for the construction of a 500 by 1,000 foot RSA at the southern end of the Runway. All of the construction work related to the southern portion of the runway will take place within the existing boundaries of the Airport and located entirely within New Haven. <u>See</u> Pl.'s Exh 13; Transcript of Bench Trial Proceedings (August 25, 2008)(hereinafter "Trial Tr.") at 11/3-24.[2] Stage One also includes wetlands and tidal wetlands mitigation. This mitigation includes the relocation of Morris Creek farther to the south, and certain cutting, dredging, filling, and other work related to activities in the wetlands. Stip. at ¶ 25. The purpose of the mitigation is to reclaim former tidal wetlands that are currently less than tidal wetlands due to lack of salinity. Trial Tr. at 16/3-9. The mitigation seeks to restore them to tidal wetlands. <u>Id.</u> While the mitigation will take place in East Haven, it will all take place within the existing boundaries of the

---

[2] Cites to trial transcript are to page/line.

Airport. Id. at 16/13-19.

Stage Two calls for the construction of a 500 by 1,000 foot long RSA at the north end of the Runway. The construction of the RSA on the north end of the Runway requires moving the part of Dodge Avenue that is within the Airport, 500 feet north of its current location. See Pl.'s Exh. 5, Figure 2-3.[3] The construction of the north RSA is to take place entirely within the boundaries of the Airport. Trial Tr. at 22/17-20. In reaching this conclusion, the court credits the testimony of James Downar.[4] Trial Tr. at 22/17-20. In addition, a review of Plaintiff's Exhibit 5, at figure 2-3, further evidences the Airport property boundary (green dashed line) and visually demonstrates that the relocation of Dodge Avenue occurs within the Airport property.[5]

Stage Two also requires channeling an existing brook, Tuttle Brook. To properly construct the RSA, so that it can support an aircraft in the emergency event that it continues past the end of the Runway, Tuttle Brook/Morris Creek must be relocated.[6] Id. at 12/21-25; at 13/1-12. The marshy terrain cannot currently sustain an aircraft in case of an emergency. Id. at 12/21-23; at 21/1-5. Tuttle Brook/Morris Creek at the

---

[3] On Airport property, Dodge Avenue currently runs east/west, approximately 340 feet north of the end of the Runway. Trial Tr. at 8/16-18.

[4] Mr. Downar is the Chief Airport Engineer for the consulting firm of Hoyle Tanner and Associates which is the consulting engineering firm to Tweed New Haven Airport. Trial Tr. at 3/17-25. Mr. Downar has worked at Hoyle for 30 years and has been the Chief Airport Engineer for 20 years. Id. at 4/1-7.

[5] The new Dodge Avenue within the Airport will have to be reconnected to streets on either end off the Airport, which streets are located in New Haven and East Haven. Trial Tr. at 22/17-25. This will not require realignment of any road in East Haven outside Airport property lines. Id. at 23/22-25. All that takes place in East Haven is that the new east end of Dodge Avenue, as it runs through the Airport property, will join up with an existing road in East Haven. Id. at 25/6-16; see also Pl.'s Exhs. 19 and 5; Pl.'s Exh. 58 (EIS) at 1-9 ("into the boundaries of the airport").

[6] On the north side of Dodge Avenue it is known as Tuttle Brook; on the south side of Dodge Avenue it is called Morris Creek. Id. at 20/11-13.

north end of the Runway runs north/south and diagonally bisects Dodge Avenue and continues down to the south portion of the Runway.  See, e.g. Pl.'s Exh. 13.  To the north of the Runway, Tuttle Brook is located in East Haven.  See Pl.'s Exh. 19.  All work relocating Tuttle Brook/Morris Creek will occur on Airport property.  Trial Tr. at 11/21-24; at 16/13-19.

2.	Approval Process

Ninety-five percent of the RSA construction costs are to be funded by a federal grant under the Airport and Airway Improvement Act.  At the time of the filing of the Complaint, the FAA had already awarded the Authority $10,050,000 for construction of Stage One.  The Authority requested $10,762,968 for fiscal year 2009 for the costs of completing Stage Two.  On August 11, 2008, the Authority received funding for Stage Two of the Runway Project.  See Pl.'s Exh. 96; Trial Tr. at 42/21-24.

The proposed RSAs have been thoroughly vetted by regulatory bodies over many years.  The FAA published a draft Environmental Impact Statement (EIS) in October 1999 and a final version in 2000.  The project has been approved by the FAA, the Army Corps of Engineers, the Environmental Protection Agency, the Federal Emergency Management Agency, the Connecticut Office of Policy and Management, the Connecticut Department of Transportation, and the Connecticut Department of Environmental Protection.[7]

The Authority made a presentation before the East Haven Planning and Zoning Commission in an attempt to include the East Haven defendants in the planning and

---

[7] The East Haven defendants could have participated in the Connecticut Department of Environmental Protection proceeding, but chose not to do so.  Trial. Tr. at 66/25-68/1.

implementation of the Runway Project. The Commission unanimously voted to send to the Town Council an unfavorable referral on the Authority's application. The Authority subsequently requested review of the Commission's decision by the Town Council, which also unanimously rejected the Authority's application. Nevertheless, pursuant to the state and federal approvals, the Authority began constructing Stage One of the Runway Project.

C.   The Instant Action

Asserting jurisdiction based on its regulatory authority over wetlands, on February 5, 2008, the East Haven Inland Wetland and Watercourse Commission issued a Cease and Desist Order, which ordered all work on the East Haven portion of the Runway Project to stop. On February 13, 2008, the Authority and the East Haven defendants agreed to a sixty-day moratorium on construction to provide time for the parties to attempt to resolve their differences. Those attempts were unsuccessful, and the Authority filed the instant lawsuit.

The Authority filed a Motion for Temporary Restraining Order as well as a Motion for Preliminary Injunction on April 21, 2008. The court denied the Motion for Temporary Restraining Order (Doc. No. 9) and for Preliminary Injunction (Doc. No. 8) on May 21, 2008, but ordered the matter set down for an early trial. The court subsequently denied the East Haven defendants' Motion to Dismiss based on the Authority's failure to join the State of Connecticut as a party (Doc. No. 65). On August 25, 2008, the court held a bench trial where both parties presented evidence.[8] Post-trial briefs were filed by the

---

[8] In its post trial brief, the Authority made a request that the court take Judicial Notice of an opinion letter regarding the Runway Project dated August 22, 2008. The letter is from Daphne A. Fuller,

plaintiff on September 10, 2008 (Doc. No. 101), and by the defendants on September 24, 2008 (Doc. No. 106).

## III. CONCLUSIONS OF LAW

  A. Federal Preemption

The Supremacy Clause of the United States Constitution, article VI, clause 2, "invalidates state laws that 'interfere with, or are contrary to, federal law.'" Air Transportation Assoc. of America, Inc. v. Cuomo, 520 F.3d 218, 220 (2d Cir. 2008)(citing Hillsborough County v. Automated Med. Labs. Inc., 471 U.S. 707, 712 (1985)("ATA"). Federal preemption may be express or implied. See, e.g., ATA, 520 F.3d at 220-221; Gade v. Nat'l Solid Waste Managment Assoc., 505 U.S. 88, 94-95 (1992). Express preemption arises when "'a federal statute expressly directs that state law be ousted.'" ATA, 520 F.3d at 220 (quoting Ass'n of Int'l Auto. Mfrs. v. Abrams, 84 F.3d 603, 607 (2d Cir. 1996)). There are two types of implied preemption: field and conflict preemption. See, e.g., Montalvo v. American Airlines, Inc., 508 F.3d 464, 470 (9th Cir. 2007). Implied preemption arises when, "'in the absence of explicit statutory language, . . . Congress intended the Federal Government to occupy [a field]

---

who is the Assistant Chief Counsel of the FAA. Pursuant to Rule 201(b) of the Federal Rules of Evidence, a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. Furthermore, "a court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). The Authority quotes Golden Hill Paugussett Tribe of Indians v. Rell for the proposition that "courts may take judicial notice of decisions of an administrative agency." 463 F.Supp.2d 192, 197 (D. Conn. 2006).
  The court finds that the FAA letter is not the proper subject of judicial notice. First, there is nothing on the face of the letter reflecting that the letter is an opinion of the FAA. The court views this letter as an opinion letter written by an agency counsel which amounts to argument and hearsay. The arguments from this letter can be made (and were made) by the Authority in its Brief. Thus, the court denies the Authority's request to take "judicial notice" of the FAA letter which was marked Plaintiff's Exhibit 97 for identification.

exclusively,' or when state law 'actually conflicts with federal law.'" ATA, 520 F.3d at 220 (quoting English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990)). As stated by the Second Circuit, field

> "preemption is implied when the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal the same purpose."

Id. at 221 (quoting Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300 (1988)(internal quotations omitted). Conflict preemption arises when compliance with both federal and state law is "a physical impossibility" and "when state law stands as an obstacle to the accomplishment . . . of the . . . objectives of Congress." Hillsborough County, 471 U.S. at 713 (internal citations and quotations omitted).

The Authority argues that the Airline Deregulation Act ("ADA"), 29 U.S.C. § 41713, and the Federal Aviation Act of 1958 ("FAAct"), 49 U.S.C. § 40101, et seq. preempt the East Haven defendants' attempts to regulate the Runway Project at Tweed New Haven Airport. The East Haven defendants attack the legal authority relied on by the Authority and argue that their local regulations are not preempted by federal law. The court disagrees and holds that the FAAct impliedly preempts the East Haven defendants' regulations because Congress intended to regulate, i.e., to fully occupy, the field of airline safety within which field the Runway Project lies. Therefore, any regulation of the East Haven defendants which acts to prevent the work provided for in the Runway Project, including the relocation of Dodge Avenue and Tuttle Brook, and any cease and desist order stopping that Project is preempted by federal law.

1.  Express Preemption

The Authority argues that the ADA and the FAAct expressly preempt the East Haven defendants' regulations because the ADA has an express preemption provision that states:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. §41713(b)(1).[9]  Thus, according to the Authority, interference by the East Haven defendants is prohibited because the local regulation is "related to a price, route, or service of an air carrier." See ATA, 520 F.3d at 221(finding that New York State's Passenger Bill of Rights requiring airlines to provide food, water, electricity, and restrooms to passengers during ground delays was expressly preempted because it attempted to regulate the "service" of an air carrier).

The Authority argues that the East Haven defendants' regulatory enforcement actions are "specifically designed to have a direct and significant effect on the routes and services of air carriers operating pursuant to federal law at the airport." Pl.'s Corrected Trial Brief ("Pl.'s Brief") at 4. It argues that the actions of the East Haven defendants prevent construction of the RSAs, which in turn affects commercial aircraft travel (routes) and schedule of flights (service) because, without the RSAs, the FAA can withdraw the Airport's Operating Certificate.

---

[9] The Authority argues that the FAAct also expressly preempts local regulations because the FAA contains the same language regarding laws relating to "price, routes, or services." Pl.'s Brief at 4 n.1 (citing Rowe v. New Hampshire Motor Transport Ass'n, __ U.S. __ ,128 S.Ct. 989, 995(2008)).

It is true that preemption can exist under the ADA even if a state law's effect on rates, routes and services is only indirect. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992); see also Rowe v. New Hampshire Motor Transport Ass'n., __ U.S. __,128 S.Ct. 989, 995-6 (2008)(finding that federal law preempts a Maine regulation even though the effect of the regulation is "less direct"); ATA, 530 F.3d at 222. The breadth of express preemption in this context is driven by the inclusion in the statute of the phrase "related to" in reference to price, route, or service. Morales, 504 U.S. at 383-4.

However, the court finds that the Authority has failed to show that the regulatory actions of the East Haven defendants affect "price, routes, and services" at the Airport. While it is true that impact on routes and service is a possibility, it is not clear from the record that the East Haven defendants' actions would definitely result in the FAA withdrawing the operating certificate. See, e.g., Testimony of John Silva, Pl.'s Exh. 10 at 75 (stating that the withdrawal of the operating certificate is the "worst case" scenario). The final EIS also states that, "the proposed improvements address safety margins at the Tweed-New Haven Airport and do not affect the underlying demand for air traffic through Tweed or the ability of the airport to accommodate a larger aircraft." Pl.'s Exh. 58 at 1-7; see also Stip. at ¶ 28-30 (discussing the possibility of alternatives to the Runway Project). Therefore, with regard to the facts at issue in this case, the court concludes that federal legislation did not expressly preempt the regulations and actions of the East Haven defendants.

2. Implied Preemption

    a. The FAA regulates the field of air safety.

Congress intended to occupy and regulate the field of airline safety. The FAAct was enacted "to create a uniform and exclusive system of federal regulation in the field of airline safety." ATA, 520 F.3d at 224 (quoting City of Burbank v. Lockheed Air Terminal, Inc., 41 U.S. 624, 639 (1973)(internal quotations omitted)). Moreover, Congress intended its control of airspace to be "concentrated at the national level." Id. (quoting British Airways Bd. v. Port Auth. Of N.Y. & N.J., 558 F.2d 75, 83 (2d Cir. 1977). "Congress and the Federal Aviation Administration have used this authority to enact rules addressing virtually all areas of air safety." ATA, 520 F.3d at 224. Under the FAAct, "the United States has asserted that it possesses and exercises 'complete and exclusive national sovereignty in the airspace of the United States.'" United States v. City of New Haven, 447 F.2d 972, 973 (2d Cir. 1971)(quoting the FAAct, 49 U.S.C. §1508(a), as amended 49 U.S.C. § 40103(a)). The FAAct defines navigable airspace as "including airspace needed to ensure safety in the takeoff and landing of aircraft." 49 U.S.C. 40102(32); see also City of New Haven, 447 F.2d at 973. "This power extends to grounded planes and airport runways." Id. (citing 14 C.F.R. §§ 91.123 and 139.329). Thus, by the passage of the FAAct, Congress intended to occupy the entire field of airline safety, including runways.[10]

---

[10] While stating it need not address the scope of any FAAct preemption, the Second Circuit in ATA indicated that the passenger bill of rights at issue in that case "may also be impliedly preempted by the FAA[ct] and regulations promulgated thereunder." 520 F.2d at 224. It further agreed that Montalvo v. Spirit Airlines was instructive on this point, id. at 225, and cited Montalvo for the point that "Congress intended to occupy the entire field and thereby preempt state regulation of air safety." Id. (citing Montalvo, 508 F.3d 464, 468 (9th Cir. 2007)).

Not only does the language of the FAAct indicate Congress' intention to regulate the field of airline safety, but the legislative history does so as well. Recently, the Ninth Circuit, in Montavo v. Spirit Airlines, analyzed the legislative history of the FAAct when determining a similar question regarding its preemptive reach. 508 F.3d 464 (9th Cir. 2007). In Montalvo, the Ninth Circuit held that federal law occupies the entire field of airline safety and thus preempts any state-imposed duty to warn about the risks of deep vein thrombosis during long-distance flights. Id. at 474. In arriving at this conclusion, the Montalvo court outlined the FAAct's legislative history. It stated in pertinent part:

> The House Report for the FAA[ct] explained in a section entitled "Purpose of legislation," that "the administrator of the new Federal Aviation Agency (1) would be given full responsibility and authority for the . . . promulgation and enforcement of safety regulations . . . .

Id. at 472 (citing H.R. Rep. NO. 2360, 85th Cong., 2d Sess, 22). The Montalvo court continued, "[t]he FAA[ct] not only authorizes but affirmatively directs the Administrator of the Federal Aviation Administration to promulgate regulations for the 'safe flight of civil aircraft in air commerce.'" Id. (citing 49 U.S.C. § 44701); see also Airline Pilots Association, Int'l v. Quesada, 276 F.2d 892, 897 (2d Cir. 1960)(noting that "the legislative history of the Federal Aviation Act and the practice under prior law show that Congress intended the Administrator to have broad power to establish safety rules for the nation's airways . . . .").

While Montalvo dealt with pre-flight warnings, other courts, in addressing cases with fact patterns similar to the case before this court, have found that the FAAct preemptively occupies the field of airline safety. In Burbank-Glendale-Pasadena v. City of Los Angeles, the City of Los Angeles enacted an ordinance requiring a local airport

to submit for approval any plans that involved development--specifically runway and taxiway construction--on airport-owned land. 979 F.2d. 1338, 1339 (9th Cir. 1992). The ordinance interfered with the airport's plan to lengthen the runway for safety reasons. Id. The court held that, "[i]t is settled law that non-proprietor municipalities are preempted from regulating airports in any manner that directly interferes with aircraft operations." Id. at 1340 (citing City of Burbank, 411 U.S. 624 (1973); and San Diego Unified Port District v. Gianturco, 651 F.2d 1306 (9th Cir. 1981)). In so holding, the Burbank court stated that, "[t]he proper placement of taxiways and runways is critical to the safety of takeoffs and landings," and thus regulation of taxiways and runways is preempted by federal law. Id.

In United States v. City of Berkeley, 735 F. Supp. 937, 940 (E.D. Mo. 1990), a case relied on by the Authority, the court addressed the City's attempt to regulate construction of an airport surveillance radar. According to the FAA, the construction was necessary to ensure air safety. The Berkeley court held that the City's attempted regulation was impliedly preempted by the FAAct because federal regulation of the area is so pervasive.[11]

According to the FAA's final EIS, Tweed-New Haven Airport has "[i]nsufficient runway safety areas on its [Runway], which do not meet current [FAA] safety standards." Pl.'s Exh. 58 at 1-6. The Runway Project seeks to improve the Airport's safety margin by expanding the size of the airport consistent with 49 U.S.C. § 44706

---

[11]The Berkeley court found that it would find preemption on those grounds alone. However, in assessing whether the city's stop work order was preempted, it further stated that, "where local control over federal activity obstructs the achievement of a congressional objective, local regulation is [conflict] preempted." Id. at 940 (citing Don't Tear It Down v. Pennsylvania Ave. Dev. Corp., 642 F.2d 527, 534-5 (D.C. Cir. 1980)). This court agrees.

and 14 C.F.R. Part 139. Section 44706 of title 49 of the United States Code requires airports that serve air carriers operating aircraft designed for at least 31 passenger seats, such as Tweed-New Haven, to have an "airport operating certificate." 49 U.S.C. § 44706(a). This section's implementing regulations, 14 C.F.R. Part 139, require each certificated airport, "in a manner authorized by the Administrator, . . . [to] provide and maintain, for each runway and taxiway that is available for air carrier use, a safety area" of certain dimensions. 14 C.F.R. 139.309(a), (a)(1), and (a)(2). The Runway Project will put Tweed-New Haven Airport in compliance with the FAA's current RSA requirements. The Runway Project will be undertaken within the bounds of Authority property. Because the RSAs are being created for the purpose of meeting the FAA safety standards and the Runway Project is being done within Authority property, the court finds that the East Haven defendants' regulations, as applied to the Runway Project, are preempted by the FAAct.

    b. <u>The Runway Project is within the boundaries of the already existing airport</u>

  The East Haven defendants argue that federal law does not preempt its local regulations because the Runway Project will take place outside the existing boundaries of the Airport. In their argument, they appear to concede that "federal law preempts local regulation <u>within</u> the boundaries of an airport." Def's Brief at 24 (quoting <u>Dallas/Forth Worth Int'l Airport Bd. v. City of Irving</u>, 854 S.W.2d 161, 167 (Tex. Ct. App. 1993)(emphasis added). Because they believe that the construction will take place outside of airport property, the East Haven defendants view the issue as one of land use regulation, not airport safety. Accordingly, they cite to many cases involving local,

-14-

land use regulations defeating challenges based on federal preemption. See, e.g., Hoagland v. Town of Clear Lake, 344 F.Supp.2d 1150 (N.D. Ind. 2004) (where the town enacted zoning regulations to prevent an individual from creating a heliport in his yard); Dallas/Forth Worth, 854 S.W.2d 161(concerning expansion of an already existing airport which included the acquisition of homes and streets outside the boundaries of the airport). However, while the court is not convinced that construction on land outside of airport property would necessarily fail a preemption challenge if it related to airport safety, it finds that, in this case, it need not answer that question because the record supports the conclusion that the Runway Project will take place within pre-existing Airport boundaries. See Findings, supra, at 3-5. Thus, the East Haven defendants' case law is inapposite.

The East Haven defendants rely on Dallas/Forth Worth, in which the court held that the local zoning ordinances at issue were not preempted by the FAAct. 854 S.W.2d at 163. That case involved airport expansion onto land not owned by the airport. Id. at 167. In fact, the Dallas/Fort Worth court explicitly stated, "No one disputes that federal laws preempt local regulation within the boundaries of an airport." Id. at 168. Because the airport in Dallas/Fort Worth was seeking to expand its activities outside of its current boundaries, the Dallas/Forth Worth court viewed it as a question regarding land use, rather than airport safety. However, the Dallas/Forth Worth court did not disagree with the principle that the FAAct preempts local laws in the specific areas of safety, airspace, and noise control. Id. at 169.

The East Haven defendants also rely on Hoagland v. Town of Clear Lake, Indiana for the proposition that the FAAct does not preempt its local regulations. In

Hoagland, a resident sought to fly his helicopter on and off his private property. In order to prevent this, the municipality enacted a local land use ordinance that required a resident to obtain a special use permit in order to create an aircraft landing strip. 344 F.Supp.2d at 1154. The court found that this land use regulation was neither expressly nor impliedly preempted by federal law because the FAAct leaves state and local governments free to regulate land use. Id. At 1158. The court views the Hoagland case as distinguishable from the one at bar. In the instant case, the Authority is engaged in activity on an already existing, federally-regulated airport. It is not creating an airport or expanding the Runway. Instead, it is creating a safer airport within its pre-existing boundaries. In contrast, in Hoagland, the local regulations sought to prevent the creation of an airport, which is a quintessential land use issue.

While there was a brief reference in testimony that may have suggested that a very small portion of the Runway Project would take place outside Airport property ("tie-ins" to Dodge Avenue and Tuttle Brook), the court finds that this is not enough to shift the preemption analysis from that of airline safety to land use. First, construction of the tie-ins will not require anything on the part of East Haven. The new Dodge Avenue will flow onto a pre-existing street located within East Haven and will not impact the existing right of way. Trial Tr. at 23/14-25; Pl.'s Exh. 5 at Fig. 2-3. In other words, the road located outside the airport boundaries in East Haven will not require realignment.[12] Id. Second, the Authority has explicitly stated that the Runway Project is being undertaken to comply with the FAA safety standards. Pl.'s Reply Brief at 4 (stating "[i]n the face of

---

[12] "Tie-ins" are the point of connection between the existing Dodge Avenue in, e.g., East Haven outside the Airport, and the relocated Dodge Avenue within the Airport. Trial Tr. at 40/11-12; at 38/10-11.

the undisputed evidence in the record and presented at trial . . . the runways at the Airport are not being extended . . ."); see also Stip. at ¶ 13. In other words, this is not an effort to expand the Airport.

The RSAs are located completely within Airport boundaries. While the court understands the concerns of the East Haven defendants,[13] it finds that, because the Runway Project's purpose is airline safety and will take place within the Airport boundaries, the East Haven defendants' regulations as applied to the Runway Project are preempted by federal law.

B.  State Law Preemption

The Authority also argues that state law preempts the East Haven defendants' regulations. However, because the court has determined that any action by the East Haven defendants to prevent the Runway Project is preempted by federal law, it need not address the merits of this argument.[14]

---

[13] Both Mayor Almon and Arthur DeSorbo expressed the fears and concerns of the East Haven community in their testimony to the court. With respect to the relocation of Dodge Avenue, there is concern that it would disrupt traffic flow. Trial Tr. at 59/1-3. There is also concern that it would affect the quality of life of the residents who live next to the Airport property line where Dodge Avenue is to be relocated. Id. at 59/4-15. There was also concern about the safety of the residents due to the proximity of the airplanes, as well as concern for noise and disruption. Id. at 62/5-12.
It also bears noting that it is quite clear to the court that the East Haven defendants are fearful of more than just the potential disruption of Dodge Avenue and increase in noise levels. The testimony reveals that the East Haven defendants are resistant to anything that may lead to the expansion of the Airport. See, e.g., Trial Tr. at 75/2-25 (Mayor Almon discussing her fear that the RSAs would eventually be paved over to become runways); id. at 86/14-18 (Mayor Almon stating that she voted against the project because it represented "a Trojan horse for expansion."); id. at 61/4-8 (DeSorbo stating that the Maturo Administration believed that the RSA project was a precursor to expansion). There was also concern that the Runway Project would lead to more frequent flights. Id. at 62/1-4. However, as stated in the final EIS, "[t]he proposed improvements . . . do not affect the underlying demand for air traffic through Tweed or the ability of the airport to accommodate larger aircrafts." Pl.'s Exh. 58 at 1-7; see also Stip. at ¶ 13.

[14] It bears noting that the Authority argues, on alternative grounds, that the Cease and Desist Order issued by the East Haven Inland Wetland and Watercourse Commission was fatally flawed. So much so, it argues, that the Commission lacked jurisdiction to issue the Order. The Authority argues that

## IV. CONCLUSION:

Based on the foregoing, the court concludes that the Runway Project involves air safety and is occurring within the boundaries of the existing airport. As such, any attempt to regulate the Runway Project by the East Haven defendants is preempted by federal law.

Accordingly, the court ORDERS that the East Haven defendants are permanently enjoined from taking any action which would have the effect of stopping, changing, interfering with, or delaying the Runway Project. Further, the court DECLARES that:

1. the Cease and Desist Order issued by the East Haven Inland Wetland & Watercourse Commission on February 5, 2008, against construction of the Project is invalid and of no legal effect;

2. the regulations, ordinances, rules, codes, and municipal powers of the East Haven defendants are preempted by the laws of the United States to the extent such land use regulations, or any of them, purport to bestow any jurisdiction, power, or authority on any one or more the East Haven

---

the Order was flawed both factually and fatally. First, it argues that the Order stated that the Authority must cease "the placement of material, removal of materials, and alteration of wetlands and watercourses." Pl.'s Brief at 63 (citing Exh. 45). The Authority states that this was factually incorrect because it was not conducting work on the wetlands. In his testimony, Charles Booker confirmed that the work was being done in the buffer zone, not in the wetlands. Trial Tr. at 113/12-13. While the court agrees that this suggests there was a "preemptive" issuance of a Cease and Desist Order, it is not persuaded that these facts would void the Order.

The court is, however, persuaded by the Authority's argument related to the Commission's regulation of upland (i.e. bordering wetland) areas. The Order reads that, "[p]ursuant to section 6.2 and corresponding definition 2.1 of conditions," the East Haven defendants have the authority to stop "the removal of vegetation within fifty feet of the wetlands buffer zone." Pl.'s Exh. 45. The buffer zone is around the inland wetlands, meaning no type of activity can take place in the buffer zone. Trial Tr. at 112/9-23. In East Haven, the buffer zone is 50 feet. Id. at 113/14-22. However, the Authority points out that the Cease and Desist Order states that the work must stop within fifty feet of the buffer zone. In order to be in compliance with the local provision, it should have said, according to Booker, that work was to stop within fifty feet of the wetlands. Id. at 115/1-22. Thus, according to the Authority, the East Haven defendants did not have the authority to prohibit the removal of vegetation 100 feet from the wetlands. The court, while it does not have to decide this issue because it has already found the local regulations are preempted by federal law, notes that it is persuaded by the Authority's argument and would find in its favor alternatively on this ground.

      defendants to regulate, review, approve, deny, or condition construction of the Runway project;

3.     that East Haven and its subdivisions, officers, elected officials, employees, agents, boards, and commissions, and those acting in concert therewith, have no jurisdiction, power, or authority to enforce any regulation, ordinance, rule, code, or law promulgated by East Haven or any subdivision, board, commission, or agent thereof, to regulate, review, approve, deny, or condition construction of the Runway Project; and

4.     the Authority may begin and/or continue construction of the Runway Project notwithstanding the Cease & Desist Order issued by East Haven's Inland Wetland & Watercourse Commission on February 5, 2008, or any subsequent orders issued by any of the East Haven defendants or their officers, elected officials, employees, agents, boards, and commissions, and those acting in concert therewith.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 24th day of October, 2008.

                                              /s/ Janet C. Hall
                                              Janet C. Hall
                                              United States District Judge